E-FILED
Friday, 30 April, 2021  01:19:06 AM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION**

| | | |
|---|---|---|
| MICHAEL SHREFFLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:19-cv-02170-CSB-EIL |
| v. | ) | |
| | ) | Judge Colin S. Bruce |
| CITY OF KANKAKEE and PRICE | ) | |
| DUMAS, Individually and in his Official | ) | Magistrate Judge Eric I. Long |
| Capacity, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' LOCAL RULE
7.1(D)(1) MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S LOCAL RULE
7.1(D)(2) RESPONSE AND STATEMENT OF ADDITIONAL FACTS**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 7.1(D)(2), Plaintiff submits the following

Response to Defendants' Local Rule 7.1(D)(1) Motion for Summary Judgment and Response to

Defendants' Local Rule 7.1(D)(1)(b) Undisputed Material Facts requiring the denial of Defendants'

Motion for Summary Judgment:

**PLAINTIFF'S RESPONSE PURSUANT TO LOCAL RULE 7.1(D)(2)(a)
Introduction**

Plaintiff, Michael Shreffler, a former Patrolman First Class for the City of Kankakee Police

Department seeks redress for discrimination and retaliation in violation of his equal protection

rights, due process and free speech under the First and Fourteenth Amendments to the Constitution

of the United States pursuant to the Civil Rights Act of 1866, 42 U.S.C. § 1983, pursuant to Title VII

of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq., in violation of the Illinois Constitution,

Article I, §§ 4 and 5, and the Illinois tort of retaliatory discharge.

**PLAINTIFF'S RESPONSE PURSUANT TO LOCAL RULE 7.1(D)(2)(b)(1)
Undisputed Material Facts**

I.      **The Parties.**

1.      Michael Shreffler ("Plaintiff") is a Caucasian male.  Def. Ans. ¶ 8, attached as Ex. B.

**Response:**     **Undisputed.**

2.     Plaintiff was hired as a Patrolman for the KPD on or about June 16, 2009 and promoted to the position of Patrolman First Class on or about May 11, 2011.  Def. Ans. ¶¶ 15, 16.

**Response:**     **Undisputed.**

3.     Defendant, City, is a municipality incorporated under the laws of the State of Illinois. Def. Ans. ¶ 12.

**Response:**     **Undisputed.**

4.     The KPD is an executive department of the municipality.  Def. Ans. ¶ 13.

**Response:**     **Undisputed.**

5.     Defendant Dumas is an African-American male who served as Interim Chief of Police of the KPD from June of 2017 until August of 2018.  Def. Ans. ¶ 9.

**Response:**     **Undisputed.**

6.   Plaintiff found Hunt's Facebook posts egregious and racially charged.  Pltf. Dep. p. 115.

**Response:**     **Undisputed.**

7.     Plaintiff's employment with the City was subject to a Collective Bargaining Agreement ("CBA") between the City and the Illinois FOP Labor Council ("Union").  Dumas Affidavit, attached as Ex. C.

**Response:**     **Undisputed.**

8.     The CBA included a grievance procedure for contesting disciplinary decisions from command staff.  Pltf. Dep. pp. 64-65, attached as Ex. D.

**Response:**     **Undisputed.**

9.     The grievance procedure contains three (3) steps for resolves disputes internally. Dumas Aff. Ex. 1, CBA, pp. 8-9.

**Response:**     **Undisputed.**

2

10.     Chastity Wells-Armstrong ("Mayor Wells-Armstrong") was elected Mayor of the City of Kankakee in April 2017.  Wells-Armstrong Dep. p. 30, attached as Ex. P.

**Response:     Undisputed.**

11.     Mayor Wells-Armstrong is the first African-American elected to the office of Mayor of the City of Kankakee.  Def. Ans. ¶ 18.

**Response:     Undisputed.**

12.     Upon taking office in May 2017, Mayor Wells-Armstrong appointed Deputy Chief Robin Passwater ("Passwater") as Acting Chief of Police.  Wells-Armstrong Dep. p. 31.

**Response:     Undisputed.**

13.     Chief Regnier issued Hunt a written reprimand for his Facebook posts.  Dep. of Willie Hunt, pp. 226, attached as Ex. L; Hunt Discipline, attached at Ex. M.

**Response:     Undisputed.**

14.     In or around July of 2017, Mayor Wells-Armstrong appointed Hunt, an African-American male, to the position of Deputy Chief. Def. Ans. ¶ 21.

**Response:     Undisputed.**

15.     On or around September 7, 2017, Plaintiff's field trainee found a handgun underneath the front passenger seat of Plaintiff's squad car during a routine beginning of shift inside-the-squad check.  Pltf. Dep. pp. 132-133; Def. Ans. ¶ 31.

**Response:     Undisputed.**

16.     The handgun did not belong to either Plaintiff or his trainee.  Pltf. Dep. p. 133.

**Response:     Undisputed.**

17.     Plaintiff or his trainee reported that they had found this gun up the chain-of-command.  Pltf. Dep. p. 133.

**Response:     Undisputed.**

4814-4316-2599, v. 1

18.     Officer Troy Jacobson initially said that he thought it was his firearm because he was missing a firearm, and then he ultimately found his firearm.  Kidwell Dep. p. 32.

**Response:     Undisputed.**

19.     In late November or early December 2017, as part of his duties on the gang unit, Plaintiff, along with Officer Villagomez ("Villagomez") went to the residence of a female with an outstanding arrest warrant in order to attempt to serve the warrant.  Pltf. Dep. pp. 145-154.

**Response:     Undisputed.**

20.     When they arrived at the residence, they walked up the back stairs and knocked on the door twice and no one answered.  Pltf. Dep. p. 154.

**Response:     Undisputed.**

21.     After they received no answer, Villagomez opened the door and walked in the residence where they located the suspect and arrested her on the warrant and took her to jail.  Pltf. Dep. p. 154.

**Response:     Undisputed.**

22.     On December 21, 2017, Dumas issued Plaintiff a written reprimand for violation of department policies, citing his failure to properly search a passenger that entered his squad car.  Pltf. Dep. p. 129, Dep. Ex. P, attached as Ex. Q.

**Response:     Undisputed.**

23.     Plaintiff believes that Dumas issued him this reprimand because Hunt had issues with him since he brought Hunt's Facebook posts to Chief Regnier in February 2016.  Pltf. Dep. pp. 142-143.

**Response:     Undisputed.**

24.     Plaintiff filed a grievance concerning the written reprimand because he did not feel that he violated department rules that the reprimand alleged.  Pltf. Dep. p. 137.

4

**Response:**    Undisputed.

25.    Plaintiff had legal and union representation through a step three grievance hearing with Mayor Wells-Armstrong during which he was given an opportunity to present evidence on his side that he did not violate the rule.  Pltf. Dep. p. 139.

**Response:**    Undisputed.

26.    Ultimately, on February 18, 2018, Mayor Wells-Armstrong denied the grievance. Pltf. Dep. p. 138, Grievance Denial Letter, attached as Ex. R.

**Response:**    Undisputed.

27.    In late January 2018, Plaintiff was assigned a trainee to work with on the midnight shift. Pltf. Dep. pp. 160-162.

**Response:**    Undisputed.

28.    Plaintiff's understanding, which was based on "regular talk with everyone," was that Hunter was advised of his promotion to sergeant weeks in advance.  Pltf. Dep. pp. 177-178.

**Response:**    Undisputed.

29.    Plaintiff worked with the trainee one day before he was informed by Kidwell that the trainee was being moved to another shift.  Pltf. Dep. p. 163.

**Response:**    Undisputed.

30.    When Plaintiff posted the comments, he knew they were going out to members of the group, but he did not have any idea how many people they were going out to.  Pltf. Dep. 185-186.

**Response:**    Undisputed.

31.    Plaintiff knew that both Kankakee police officers and residents of the City were members of the group who would have the ability to view his comments.  Pltf. Dep. p. 186.

**Response:**    Undisputed.

4814-4316-2599, v. 1

32.     On February 23, 2018, Lieutenant Austin ("Austin") handed Plaintiff a document advising him to appear for an interrogation with respect to an investigation relating to the Facebook posts.  Pltf. Dep. 187-188.

**Response:     Undisputed.**

33.     Plaintiff gave an interview to Inspector Bartlett ("Bartlett") on February 23, 2018. Pltf. Dep. p. 189-190.  Austin, Plaintiff's FOP attorney, and another FOP representative were present during the interview.  Pltf. Dep. pp. 189-190, Pltf. Dep. Ex. 12, attached as Ex. U.

**Response:     Undisputed.**

34.     During the interview, Plaintiff advised that he fully understood the KPD's social media policy, and remarked that his comments were personal opinions and that he did not believe they violated policy.  Pltf. Dep. Ex. 12.  Plaintiff acknowledged that he understood that his opinions could affect what others believed about the operations of the KPD.  Pltf. Dep. Ex. 12.

**Response:     Undisputed.**

35.     On March 5, 2018, Dumas issued Plaintiff a written notice of a five (5) day suspension for several rule violations implicated by Plaintiff's Facebook posts.  Pltf. Dep. pp. 190-191, Pltf. Dep. Ex. 13, attached as Ex. V.

**Response:     Undisputed.**

36.     At some point, a Step 3 grievance hearing was held at City Hall.  Pltf. Dep. pp. 209-212.  Those in attendance at the meeting were Plaintiff, Mayor Wells-Armstrong, Hunt, Dumas, Carolyn Croswell from Human Resources, the Union president, and Plaintiff's FOP lawyer.  Pltf. Dep. p. 212.

**Response:     Undisputed.**

37.     Plaintiff never received any resolution to the Step 3 grievance.  Pltf. Dep. pp. 213-214.

4814-4316-2599, v. 1

**Response:**    **Undisputed.**

38.    The union filed for arbitration on the suspension.  Pltf. Dep. pp. 213-214.

**Response:**    **Undisputed.**

39.    On March 29, 2018, Plaintiff participated in an active shooter training at Kankakee Junior High School.  Def. Ans. ¶ 44.

**Response:**    **Undisputed.**

40.    Plaintiff stated that he recalled that while in the van during the training, he stated in a conversation with Officer Herscher ("Herscher"), "What kind of dumbass would involve an employee's wife at her place of employment with regard to my work-related situation?"  Pltf. Dep. pp. 198, 200-201; Pltf. Dep. Ex. 14.

**Response:**    **Undisputed.**

41.    Plaintiff denied using any racial slurs or threatening words about Dumas.  Pltf. Dep. pp. 198, 200-201; Pltf. Dep. Ex. 14.

**Response:**    **Undisputed.**

42.    Hunt walked Villagomez over to Dumas's office and Villagomez repeated to Dumas what he witnesses in the van during the training.  Hunt Dep. p. 163.

**Response:**    **Undisputed.**

43.    Hunt called Tison and told him to come back to the station, write a statement about what happened in the back of the van, make a list of everyone that was in back of the van, and have everyone on the list write a statement about what happened in the back of the van.  Hunt Dep. p. 167.

**Response:**    **Undisputed.**

4814-4316-2599, v. 1

44.    Bartlett advised Plaintiff that Herscher denied that he was engaged in a direct conversation with him when Plaintiff called Dumas a dumbass.  Pltf. Dep. pp. 198, 200-201; Pltf. Dep. Ex. 14.

**Response:    Undisputed.**

45.    During the interview, Bartlett asked Plaintiff to relate in his own words, the incident in the SWAT van at the active shooter training on March 29, 2018.  Pltf. Dep. pp. 198, 200-20; Pltf. Dep. Ex. 14.

**Response:    Undisputed.**

46.    Bartlett's investigation consisted of reviewing written statements by each of the officers present at the alleged incident and conduction video recorded interviews of each of them. Bartlett Affidavit, ¶ 7, attached as Ex. Y.

**Response:    Undisputed.**

47.    After Bartlett conducted interviews of all officers present, including Plaintiff, he prepared an Investigation Summary that included a brief synopsis and a copy of each interview summary including attachments.  Bartlett Affd., ¶ 10.

**Response:    Undisputed.**

48.    Bartlett provided Dumas with a complete copy of the Investigation Summary sometime between April 18, 2018 and May 23, 2018.  Bartlett Affd., ¶ 10, Bartlett Affd., Ex. 1.

**Response:    Undisputed.**

49.    Kidwell notified Plaintiff that he had to come in for an interrogation and pick up paperwork; the paperwork advised Plaintiff he would be interviewed by Bartlett.  Pltf. Dep. pp. 198-199.

**Response:    Undisputed.**

4814-4316-2599, v. 1

50.    The Notice of Formal Inquiry stated that "[d]uring training at Kankakee Junior High School on March 29, 2018 Ptlm Shreffler made several disparaging/threatening remarks in reference to the Acting Chief Dumas.  In the remarks Ptlm Shreffler used racial epithets to describe the chief and threatened violence against him." The Notice of Formal Inquiry further advised that Plaintiff's actions violated several policies of the KPD.  Pltf. Dep. Ex. 15.

**Response:    Undisputed.**

51.    On May 23, 2018, Austin ordered Plaintiff to be at the Department at 4:00 p.m. with his union representative to turn in his police badge, police identification and key card.  When Plaintiff arrived at the Department, Dumas served him with a notice of formal inquiry and ordered him to appear for a meeting with administrators on May 29, 2018.  Def. Ans. to Compl. ¶ 50; Pltf. Dep. Ex. 15, attached at Ex. BB.

**Response:    Undisputed.**

52.    On May 29, 2018, [Plaintiff] appeared for the meeting with Hunt, Dumas, the union president, and his union attorney.  Pltf. Dep. pp. 217-218.

**Response:    Undisputed.**

53.    At the meeting, Dumas handed Plaintiff two documents, one titled "Notice of Termination" and the second titled "Last Chance Discipline Agreement."  Pltf. Dep. p. 219, Pltf. Dep. Ex. 16, attached as Ex. CC, Pltf. Dep. Ex. 17, attached as Ex. DD.

**Response:    Undisputed.**

54.    Dumas told Plaintiff he would be terminated if he did not respond to the Last Chance Agreement.  Pltf. Dep. pp. 224-225.

**Response:    Undisputed.**

55.    Dumas read Plaintiff the "Notice of Termination."  Pltf. Dep. pp. 219-220.  The Notice of Termination advised Plaintiff that Dumas was "recommending to the Board of Fire and

Police Commissions that [his] employment with the KPD be immediately terminated." The Notice of Termination further advised that Plaintiff "has also allegedly used racially-charged language toward the Chief of Police, as well as, threatening to kill him" and that it had been determined "based on the outcome of the investigation and [Plaintiff's] progressive disciplinary actions. . . " that Plaintiff's actions on March 29, 2018 are considered gross misconduct and are cause for additional discipline." Pltf. Dep. Ex. 16.

> **Response:      Undisputed.**

56.      Plaintiff decided not to take the Last Chance Agreement. Pltf. Dep. p. 227.

> **Response:      Undisputed.**

## PLAINTIFF'S RESPONSE PURSUANT TO LOCAL RULE 7.1(D)(2)(b)(2)
### Disputed Material Facts

57.      On February 10 or 11, 2016, Officer Michael Suprenant ("Suprenant") showed Plaintiff some posts that Lieutenant Willie Hunt ("Hunt") had made on Facebook. Pltf. Dep. pp. 114-115.

> **Response:      Disputed in part. Shreffler testified that Suprenant showed him Willie Hunt's Facebook posts when Suprenant heard that Shreffler had been written up. Dkt. 22, Ex. 7, pp. 114. Suprenant testified that Shreffler complained to Suprenant about being disciplined for his Facebook posts and did not believe it was fair because his posts were not improper. Suprenant then advised Shreffler that Willie Hunt posted racially motivated and offensive statements and pictures to Facebook several times daily. Suprenant sent Shreffler screenshots of Willie Hunt's racially motivated Facebook posts. See Suprenant Dep. pp. 14-17, attached hereto as Exhibit "A".**

58.      Hunt's posts consisted of eight (8) memes that were originally posted by other Facebook users that he reposted. The posts each contained either text superimposed over photographs or text included as captions of photographs. The text of posts included the following:

(1) White Supremacy is convincing millions of black people that their savior is a white man (2) Guess who still wants their 40 acres and a mule (3) The White man committed the worst and most violent crimes in history, but somehow managed to convince the World negros is a threat (4) when someone calls your ancestors slaves correct them and say they were prisoners of war, and (5) "Just some interesting fyi: Did u know that around 25% of white ppl are born with tails. They cut them off at birth. Whites share DNA with the RHESUS MONKEY. They enjoy calling others monkeys because 80% of them don't know the truth about themselves. Whites also share 4% Neanderthal DNA." Hunt Facebook Posts, attached as Ex. K.

**Response:     Disputed. Defendants failed to include all of Hunt's Facebook posts and does not accurately depict Hunt's Facebook posts. (1) Hunt posted, "anyone else?" Hunt's Facebook posts included a photo of a black man with the caption above the photo saying "IN AMERICA WHERE THEY MAKE BS SEEM LIKE NORMAL" and in the photo of the post includes a caption "when they announce Bill Cosby was being charged" and at the bottom of the photo "but none of the cops that committed murder in the last year or two". (2) A post shared by Hunt on April 17th which is a photo of a white man holding an American flag with a quote above the photo saying, "boycott all things Trump" and the top of the photo "stop illegal immigrants" and the bottom of the photo "they're taking the land we stole". (3) The white man committed the worst and most violent crimes in history, but somehow managed to convince the World negros is a threat, depicting black men in chains. (4) when someone calls your ancestors slaves correct them and say they were prisoners of war, a description of the photo shows classroom setting with what appears to be a black classroom and a black teacher where all the young, black students appear to be raising their right arm with a clenched first. (5) Not included in Defendants' statement of material facts was a post by Hunt with the caption "they never talk about white on white crime." The**

11

photo contains this quote "85% of white people that are killed in America each year are murdered by other white people, yet we never hear the term white on white crime, it's only being done to black people to create feelings of self-hatred". (6) Defendants failed to include the quote "this isn't prejudice, this is genetics and knowledge, get you some!" These photos depict what appears to be a white male naked with a tail. See Hunt Facebook posts, attached hereto as Exhibit "D".

59.    Within a week of learning of Hunt's Facebook posts, Plaintiff showed them to Chief Regnier (1)  because he felt that if his Facebook posts violated department policy, then Hunt's posts did too, and (2) as a tit-for-tat because he was under the impression that Hunt showed Chief Regnier the posts that led to his own discipline.  Pltf. Dep. 116-117.

**Response:    Disputed in part.  Shreffler testified that he brought Hunt's Facebook posts to Chief Regnier because Shreffler believed them to be racist.  Dkt. 22, Ex. 7, pp. 118.**

60.    Plaintiff did not bring Hunt's Facebook posts to Chief Regnier because he believed they were unlawful.  Pltf. Dep. p. 118.

**Response:    Disputed in part.  Shreffler testified that he brought Hunt's Facebook posts to Chief Regnier because Shreffler believed them to be racist.  Dkt. 22, Ex. 7, pp. 118. Mayor Wells-Armstrong testified that Hunt believed he was improperly disciplined for his Facebook posts which the Mayor concluded, "could be interpreted as insensitive toward white people."  Dkt. 22, Ex. 25, pp. 40-43.**

61.    Around Memorial Day 2017, Passwater quit with very little notice.  Wells-Armstrong Dep., pp. 33-34.

**Response:    Disputed.  Passwater, a Caucasian, resigned his position after being confronted by Mayor Wells-Armstrong regarding a white police officer's use of force.  Dkt. 22, Ex. 25, pp. 34.  Passwater alleged that Mayor Wells-Armstong called him a racist and he**

4814-4316-2599, v. 1

threatened to file an EEOC complaint.  Dkt. 22, Ex. 25, pp. 34. Mayor Wells-Armstrong told
Passwater that minority officers, including Willie Hunt, were complaining about racial
remarks made toward them in the workplace.  Dkt. 22, Ex. 25, pp. 35, 37-39. Dumas
promoted Hunt to Deputy Chief to replace Passwater, who is white, because Dumas had
concerns over his ability to trust Passwater and discussed this point with the Mayor.  Dkt.
22, Ex. 33, pp. 75, 79.

62.    In and around June of 2017, Mayor Wells-Armstrong appointed Dumas as Interim
Chief of Police.  Def. Ans. ¶ 21.

**Response:    Disputed.  Mayor Wells-Armstrong testified that she appointed Dumas
as Chief of Police.  Dkt. 22, Ex. 25, 32-35.**

63.    A month or two later, based on information they had received from the State's
Attorney's Office, the administration formed the belief that the firearm was left in Plaintiff's patrol
car by an individual Plaintiff had arrested.  Kidwell Dep. pp. 32-33.

**Response:    Objection this calls for speculation, foundation and relies on hearsay.
Disputed.**

64.    Plaintiff disagreed with the outcome because he does not believe that Dumas
showed any proof that he violated policy.  Pltf. Dep. p. 138.

**Response:    Disputed in part.  Shreffler testified that other patrolmen failed to
secure a firearm and received no discipline.  Shreffler testified that he believed this
discipline to be retaliation for his reporting of Hunt's Facebook posts because this write-up
did not occur for two or three months after the alleged violation wherein the gun was found
in Shreffler's and two other officer's squad car.  Dkt. 22, Ex. 7, pp. 141-143.  Dumas never
disciplined anyone other than Shreffler for missing a gun, which Dumas testified is a Level
One offense.  Dkt. 22, Ex. 33, pp. 104.**

13

65.     After the arrest, Plaintiff went to Hunt's office to discuss it with him.  He told Hunt that he and Villagomez went to serve a warrant and that Villagomez entered the residence after knocking a few different times.  He told Hunt that Villagomez admitted to him that he should not have entered the residence.  He told Hunt that Villagomez either did not know how to do his job, or did not mind breaking the rules.  Pltf. Dep. pp. 155-157.

**Response:     Disputed in part.  Shreffler testified that he told Deputy Chief Hunt about the manner in which Villagomez entered the residence; and he told Hunt some other concerns he had about the way Patrolman Villagomez did things because Shreffler and Villagomez were then working as partners, so he wanted Hunt to hear his concerns. Shreffler testified that he told Hunt that he does not feel comfortable working with Villagomez if this is the way he is going to do things; and, that Shreffler had concerns on how Villagomez conducted himself while in contact with other individuals through gangs or people that they pulled over or just made contact with; Shreffler had concerns with the way Villagomez conducted himself as a police officer.  Shreffler further testified that he told Hunt that he was concerned that Villagomez did not know that he cannot just let people go that have drugs on them them; and, Shreffler's concern was either that it was an ethics issue or it was an incompetence issue and he believed that a supervisor needed to address it. Shreffler further testified that he is required to report any misconduct of a fellow officer. Dkt. 22, Ex. 7, pp. 155-157, 242.**

66.     The next day, Plaintiff spoke with Dumas and raised the same concerns about Villagomez's conduct during the arrest.  Pltf. Dep. pp. 158-159.

**Response:     Disputed in part.  Shreffler testified that he told Dumas the same thing he told Hunt regarding Villagomez.  Shreffler asked Dumas if Hunt informed him of what Shreffler told him and Dumas admitted that Hunt did not tell Dumas anything about it.**

14

Shreffler believed that it was his duty to report to his superiors about a fellow patrolman's potential illegal entry and questionable exercise of discretion in making arrests. Dkt. 22, Ex. 7, pp. 158-159.

67.    Hunt decided to move the trainee to another shift because he did not think the trainee needed to spend two tours on the midnight shift. Hunt Dep. p. 156-157.

**Response:    Disputed. Hunt testified that he could have allowed Shreffler to train this officer on a different shift, but he didn't offer that. Hunt also testified that during his time as Deputy Chief this was the only incident where he removed a recruit from a field training officer; Shreffler was the only one he ever did this to and this removal caused Shreffler to lose additional wages. Dkt. 22, Ex. L, pp. 155-157. Shreffler testified that he asked Kidwell if the decision to move Sam was personal and Kidwell responded that he did not know, but it was the first time he had even heard of it happening. Kidwell told Shreffler that Hunt made the decision to move Sam. Dkt. 22, Ex. 7, pp. 163-164. Kidwell testified that he had never been told by a supervisor other than Hunt in this situation to take somebody off field training duties while they were a field training officer; and, Kidwell was not aware that Shreffler had any performance issues training recruits. Dkt. 22, Ex. 17, pp. 43-44.**

68.    Plaintiff believes that Hunt moved the trainee to another shift because he and Hunt had a history since the Facebook incident. Pltf. Dep. p. 164.

**Response:    Disputed in part. Shreffler testified that he believed Hunt's decision to remove the trainee was racially motivated and retaliatory because he would not receive the extra pay associated with being an FTO. Dkt. 22, Ex. 7, pp. 164-167.**

69.     In February 2018, Plaintiff, identifying himself as "Michael Patrick," posted three comments in a Facebook group dedicated to discussing government and political issues involving Kankakee County.  Pltf. Dep. pp. 170, 184.

**Response:      Disputed in part.  Austin testified that Shreffler's Facebook posts were critical of Mayor Wells-Armstrong's administration; the alleged corruption with the Mayor's administration and Auto Lab; and, Austin admitted that complaints about public officials and police officials are protected by the First Amendment.  Ex. B, pp. 118, 165-166.**

70.     The first two comments were part of an ongoing conversation with a local business owner named Patrick Wilder ("Wilder").  Pltf. Dep. pp. 171-172.  Wilder's original post had showed his displeasures with how the City of Kankakee handled the auction of a building and its eventual gifting of the building to an alleged relative of Mayor Wells-Armstrong.  Pltf. Dep. p. 172.  Plaintiff commented in response, "Corruption from this Mayor….weird!"  Pltf. Dep. p. 171; Pltf. Dep. Ex. 10, attached as Ex. S.

**Response:      Disputed.  Shreffler testified that Wilder's original post was showing his displeasure with how the City handled the building auction, because the way it was supposed to be handled, it was not handled the proper way.  Wilder believed it to be a shady deal.  Shreffler further testified that this was big talk at the police department and the city in general about the gifting of the building; everyone had been hearing the same stuff.  Dkt. 22, Ex. 7, pp. 172-173.**

71.     In response to Plaintiff's comment, Wilder commented, "I would love to know how many people from Sheridan [Illinois] know our mayor in Kankakee [sic] so well that she gave them property and the city vehicle contract."  Pltf. Dep. Ex. 10.  Plaintiff then responded, "Good question, but with this Administration anything is possible!!! Shit show…."  Pltf. Dep. p. 173; Pltf. Dep. Ex. 10.

16

**Response:     Disputed.  Shreffler testified that he used the term "shit show" because of the way the administration was handling situations with the police department, things happening at the city council meetings, and just his overall experience with how the administration was running things.  Dkt. 22, Ex. 7, pp. 173-175.**

72.    Plaintiff's understanding of the issue raised by Wilder was based only on what he had heard from Wilder and "big talk at the police department and the City in general."  Pltf. Dep. pp. 172-173.

**Response:     Disputed.  Shreffler further testified that this was big talk at the police department and the city in general about the gifting of the building; everyone had been hearing the same stuff.  Dkt. 22, Ex. 7, pp. 172-173.**

73.    In calling the administration a "shit show," Plaintiff was referring to the way it was handling situations inside and outside of the police department, including Mayor Wells-Armstrong choice for Chief of Police and Deputy Chief.  Pltf. Dep. p. 174-175.

**Response:     Disputed.  Shreffler testified that he used the term "shit show" because of the way the administration was handling situations with the police department, things happening at the city council meetings, and just his overall experience with how the administration was running things.  Shreffler testified that there were a lot of times the Mayor made comments that eluded that she had a belief that the police department members were not doing their job.  Dkt. 22, Ex. 7, pp. 173-175.  Mayor Wells-Armstrong believed white officers were mistreating minority members of the community.  Dkt. 22, Ex. 25, pp. 36.**

74.    Plaintiff's third comment ("shit show") was part of a discussion about the promotion of Steven Hunter ("Hunter") to the position of sergeant within KPD.  Pltf. Dep. p. 177.  Regarding the promotion, Plaintiff wrote, "Regardless of who was promoted or who was more qualified, the

point remains the same.  This was racially motivated and a complete hypocrisy."  Pltf. Dep. p. 177.

Plaintiff intended to imply with this comment that Dumas, Hunt, and Mayor Wells-Armstrong

engaged in racial bias in promotional decisions within the KPD.  Pltf. Dep. p. 177.

> **Response:** **Disputed in part.  Shreffler further testified that the hypocrisy was that the two that are leading the administration, Chief Dumas and Deputy Chief Hunt, sued Kankakee for not getting promoted 10 or 15 years earlier because of race and now what they previously claimed, they were doing the same thing.  Dkt. 22, Ex. 7, pp. 178.  Dumas filed a lawsuit alleging he and other African-American officers were discriminated against by the KPD.  Dkt. 22, Ex. 33, pp. 21, 23, 27.**

75.    Plaintiff felt that two other officers were unfairly passed over for the promotion to

sergeant.  Pltf. Dep. p. 179.

> **Response:** **Disputed in part.  Shreffler testified that Hunter who had been promoted to Sergeant was African-American and the two officers who ranked numbers one and two on the promotion list, who were both Caucasian, were passed up to promote Hunter; Shreffler thought that was unfair.  Dkt. 22, Ex. 7, pp. 179.**

76.    The document advised Plaintiff that the Chief of Police was conducting an

investigation into alleged unprofessional conduct and policy violations relating to several disparaging

remarks Plaintiff made on Facebook during February 2018 regarding the KPD, its administration,

and the mayor.  The document noted that the remarks, "tend to compromise and or damage the

mission, function, reputation, and professionalism of the Kankakee Police Department and its

employees."  Pltf. Dep. Ex. 11, attached as Ex. T.

> **Response:** **Disputed.  Mayor Wells-Armstrong told Dumas to investigate who posted the Facebook posts that criticized her administration; Dumas utilized Department computers and accessed LEADS to conduct that investigation.  Dkt. 22, Ex. 33, pp. 126-127.**

4814-4316-2599, v. 1

Dumas was aware that he was not supposed to access Department computers for anything unrelated to official police duties.  Dkt. 22, Ex. 33, pp. 128.  Dumas agreed that officers had a right to post anything as long as it was not detrimental to the Department.  Dkt. 22, Ex. 33, pp. 141.

77.    Plaintiff filed a grievance to challenge the five-day suspension, which was denied at Steps 1 and 2.  During the grievance process, Dumas agreed to reduce the suspension to two days, but Plaintiff rejected that offer.  Pltf. Dep. pp. 191-192.

**Response:    Disputed in part.  Shreffler testified that at some point during the grievance process Chief agreed to reduce the suspension from five days to four days, but Shreffler rejected that offer.  Dkt. 22, Ex. 7, pp. 191-192.  Burke testified that the Union filed a grievance on Shreffler's behalf because it believed Shreffler's discipline to be improper and violated the Collective Bargaining Agreement.  Dkt. 22, Ex. 32, pp. 60.**

78.    During the hearing, Plaintiff explained to the Mayor his opinion that Hunt was going out of his way to mess with him.  They discussed some type of resolution.  At the end of the hearing, Plaintiff's attorney advised the Mayor that they would accept no resolution that included any suspension.  Pltf. Dep. p. 213.

**Response:    Disputed in part.  Shreffler testified that during the meeting he told the Mayor that he would not accept a suspension and in order to resolve this he would only accept a written reprimand.  Dkt. 22, Ex. 7, pp. 213.**

79.    The grievance and request for binding arbitration remain pending.  Burke Dep. p. 25, attached as Ex. W.

**Response:    Disputed.  Article 7(C) of the Collective Bargaining Agreement between the Illinois FOP Labor Council and the City of Kankakee Patrol Officers provides that if a grievance is not settled in Step-Three and the Union wishes to appeal the grievance**

4814-4316-2599, v. 1

from Step-Three of the grievance procedure, the Union may refer the grievance to arbitration within ten (10) business days of receipt of the City's written answer.  Article 7(C)(1) of the CBA provides that the parties shall attempt to agree upon an arbitrator within five (5) business days after receipt of referral. None of this was done in this case.  Dkt. 22, Ex. 5, pp. 8-10.

80.     Following the training session, Villagomez reported to Hunt that while the officers at the training were in a van, Sgt. Tison ("Tison") and Plaintiff were having a conversation and Tison asked something about the chief meeting with his wife.  Plaintiff blew up and stated "I ought to kill that nigger," or something to that effect.  Officer Villagomez further reported that after Plaintiff's remark, he looked at Tison, and said, "hey man, what are you going to do?  I can't believe he said that."  Hunt Dep. pp. 163-166.

**Response:**      **Plaintiff objects to this paragraph as it relies upon inadmissible hearsay.  *See Cortezano v. Salin Bank & Trust Co.*, 680 F.3d 916 (7th Cir. 2012)(inadmissible hearsay is properly disregarded when considering summary judgment); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009)("A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment.")  Subject to and without waiving the foregoing objections, Plaintiff disputes that the above paragraph is consistent with Shreffler's comments at the active shooter training.  Kidwell testified that he was the Commander on duty at the training and that he never heard Shreffler use a racial slur; and, in fact, Kidwell was surprised that someone accused Shreffler of using a racial slur and that he never knew Shreffler to use racial slurs.  Dkt. 22, Ex. 17, pp. 52-53.  Hunt testified that he never heard Shreffler use racially charged language in the workplace.  Dkt. 22, Ex. L, pp. 197.  Hunt testified that during his time at the active shooter training he did not see or hear Shreffler commit misconduct.  Dkt. 22, Ex. L, pp. 162.**

81.     Dumas told Kidwell to get statements from people in the van.  Dumas Dep. p. 151, attached as Ex. X.

**Response:      Disputed.  Austin testified that Dumas assigned Austin to investigate the alleged threats made by Shreffler even though Austin was working in a different unit. Ex. B, pp. 94.**

82.     Either later in the day after the training or the next day, Plaintiff received a call and was ordered to come in and write a statement about what happened at the training because "somebody said that [he] said something."  Pltf. Dep. pp. 194-195.

**Response:      Disputed in part.  Shreffler testified that Lieutenant Edsell called him to say he had to write a statement because somebody said I said something; Edsell was pretty vague about it.  But Shreffler had an idea of what Edsell was referencing because Patrolman Herscher and he had a conversation about Dumas going into Shreffler's wife's work and brought up his discipline to her.  Shreffler told Herscher about that during the training.  Shreffler said that during his conversation with Herscher he called Dumas a "dumb ass" and said "what kind of dumb ass. . . comes into his wife's work and says something about him being disciplined."  Dkt. 22, Ex. 7, pp. 194-195.**

83.     Bartlett and Austin, at Dumas's request, conducted an investigation about what happened inside the van during the training.  Dumas Dep. p. 152-153.

**Response:      Disputed.  Dumas testified that Lt. Austin initiated the investigation into Shreffler which led to his termination.  Dkt. 22, Ex. 33, pp. 150-151.  Austin testified that Dumas assigned Austin to investigate the alleged threats made by Shreffler even though Austin was working in a different unit.  Ex. B, pp. 94.**

84.     On April 18, 2018, Plaintiff gave an interview to Bartlett about what occurred during the training.  Pltf. Dep. pp. 198, 200-201; Pltf. Dep. Ex. 14, attached as Ex. Z.  Plaintiff was

represented by his FOP attorney during the interview, and another FOP representative was present. Pltf. Dep. Ex. 14.

**Response:    Disputed in part.  Shreffler testified that exhibit 14 shown to him at his deposition appeared to identify everyone present at his interview.  Dkt. 22, Ex. 7, pp. 201.**

85.    At the start of the interview, Bartlett read aloud the Notice of Allegations, specifically advising Plaintiff that (1) the Chief was conducting an investigation into the allegations that Plaintiff made disparaging and threatening remarks about the Chief during the active shooter training session, (2) the remarks tend to compromise and/or damage the mission, function, reputation, and professionalism of the KPD, (3) that disparaging remarks subverts the good order, efficiency, and discipline of the Department, and (4) the alleged remarks constituted violations of several specific KPD rules.  Pltf. Dep. pp. 198, 200-201; Pltf. Dep. Ex. 14; Notice of Allegations, attached as Ex. AA.

**Response:    Disputed. Bartlett never read aloud the allegations. See Bartlett investigative report bates stamped #00209, Ex. F.   Shreffler's testimony that Defendants cited to never identified that Bartlett read aloud the Notice of Allegations.  Dkt. 22, Ex. 7, pp. 198, 200-201.**

86.    Bartlett prepared summaries of each interview that he conducted which truly and accurately summarized the interviews.  Bartlett Affd. ¶ 8.

**Response:    Disputed in part.  Defendants never provided recordings of interviews which Bartlett confirms were recorded. (Id.) Bartlett's investigation summary states that "based upon all information that was gathered, I believe that such a disparaging statement that included the word, "nigger" was made and directed against the Chief of Police, however the exact context of the statement cannot be confirmed because of perceived deliberate inconsistencies by the witnesses.  Dkt. 22, Ex. 34, pp. 3.**

87.    Bartlett advised Plaintiff that other officers who were present reported that Plaintiff used the racial slur "nigger" during the course of the conversation that they heard.  Pltf. Dep. pp. 198, 200-201; Pltf. Dep. Ex. 14.

**Response:    Disputed in part.  Several Officers present did not hear any threats. Bartlett's investigation summary states that "based upon all information that was gathered, I believe that such a disparaging statement that included the word, "nigger" was made and directed against the Chief of Police, however the exact context of the statement cannot be confirmed because of perceived deliberate inconsistencies by the witnesses.  Dkt. 22, Ex. 34, pp. 3.**

88.    Dumas went over the Last Chance Agreement and explained what the stipulations would be if Plaintiff decided to accept it.  Pltf. Dep. p. 220.

**Response:    Disputed.  Dumas testified that he advised Shreffler to take the Last Chance Agreement in lieu of termination and indicated that the alleged threats did not rise to the level of termination.  Dkt. 22, Ex. 33, pp. 154-155.  Carlson testified that after signing a last chance agreement, it's much easier for an employer to terminate a police officer for subsequent offenses; employees give up rights when they sign a last chance agreement. Dkt. 22, Ex. 16, pp. 32.**

89.    On at least three instances during the meeting, Dumas told Plaintiff that he would be recommending Plaintiff's termination to the Commission.  Pltf. Dep. p. 226.

**Response:    Disputed.  Dumas testified that he never presented any evidence to the Commission to support Shreffler's termination.  Dkt. 22, Ex. 33, pp. 159**

90. After Dumas read the "Notice of Termination," Plaintiff could have said that he disagreed with it or that he did not do what was alleged, but he did not because he already had at other meetings.  Pltf. Dep. pp. 220-221.

4814-4316-2599, v. 1

**Response:** Disputed in part. Shreffler testified that he was never told that he could dispute the contents of the Notice of Termination at that point. Dkt. 22, Ex. 7, pp. 220-221. Burke testified that Kankakee's new city attorney communicated to him that he was not comfortable with the process of how the City's administration was handling Shreffler's termination; and, Burke further testified that his understanding was the new city attorney was not comfortable with Shreffler's termination being done without a hearing, the full on charges being filed, evidentiary hearing before the Board of Fire and Police Commission. Dkt. 22, Ex. 32, pp. 67, 70-72.

91. Plaintiff did not ask to meet again to present his side of the story to Dumas. Pltf. Dep. p. 222.

**Response:** Object to relevance. Disputed in part. Shreffler testified that he was never told that he could dispute the contents of the Notice of Termination at that point. Dkt. 22, Ex. 7, pp. 220-221.

92. Plaintiff understood that he had about a week to consider the Last Chance Agreement before Dumas recommended the termination. Pltf. Dep. p. 227.

**Response:** Disputed in part. Shreffler testified that he was told that if he did not accept the Last Chance Agreement that Dumas was taking it to the Fire and Police Commission meeting and that Shreffler would be fired. Dkt. 22, Ex. 7, pp. 227. Carlson testified that after signing a last chance agreement, it's much easier for an employer to terminate a police officer for subsequent offenses; employees give up rights when they sign a last chance agreement. Dkt. 22, Ex. 16, pp. 32. Mayor Wells-Armstrong said it was Dumas' decision to seek Shreffler's termination and consulted with her about it. Dkt. 22, Ex. 25, pp. 86.

4814-4316-2599, v. 1

## PLAINTIFF'S RESPONSE PURSUANT TO LOCAL RULE 7.1(D)(2)(b)(3)
### Disputed Immaterial Facts

93.    On January 7, 2013, Plaintiff received a one-day suspension from the Chief of Police Larry Regnier ("Chief Regnier") for several rule violations that Plaintiff committed while responding to a bank alarm call.  Pltf. Dep. pp. 71-72; Pl. Dep. Ex. 1 attached as Ex. E.

**Response:    Immaterial as discipline more than two years prior cannot be considered or used in aggravation.  Ex. B, pp. 123.  Disputed in part.  Shreffler testified that he committed the infractions and did not use the grievance procedure because he did, in fact, commit the infractions.  Dkt. 22, Ex. 7, pp. 71-72.**

94.    On June 20, 2013, Plaintiff received a written reprimand from Chief Regnier for violating a general order by missing a court date.  Pltf. Dep. pp. 72-73, Ptlf. Dep. Ex. 2, attached as Ex. F.

**Response:    Immaterial as discipline more than two years prior cannot be considered or used in aggravation.  Ex. B, pp. 123.  Disputed in part.  Shreffler testified that he missed a court date and did not use the grievance procedure because he did, in fact, miss the court date.  Dkt. 22, Ex. 7, pp. 72-73.**

95.    On March 11, 2015, Plaintiff received a one-day suspension from Chief Regnier for several admitted rule violations that he committed during a motor vehicle pursuit.  Pltf. Dep. pp. 74-75, Pltf. Dep. Ex. 3, attached as Ex. G.

**Response:    Immaterial as discipline more than two years prior cannot be considered or used in aggravation.  Ex. B, pp. 123.  Disputed in part.  Shreffler testified that he violated the pursuit policy but not to the extent that the department said he did.  Shreffler testified that he disengaged after the Sergeant called off the pursuit; but, he later ran into the vehicle probably five minutes later as the suspect pulled up to his house and Shreffler**

4814-4316-2599, v. 1

arrested him. Shreffler did not use the grievance procedure for this one-day suspension. Dkt. 22, Ex. 7, pp. 74-76.

96.    On August 16, 2016, Plaintiff received a written reprimand from Chief Regnier for violating department policies regarding use of sick time and sick time abuse. Pltf. Dep. pp. 120-121, Pltf. Dep. Ex. 7, attached as Ex. N.

**Response:    Immaterial as discipline more than two years prior cannot be considered or used in aggravation. Ex. B, pp. 123. Disputed in part. Shreffler testified that he did receive a written reprimand for violating policies relating to sick day use; and, Shreffler did not use the grievance process because the written reprimand was justified. Dkt. 22, Ex. 7, pp. 121.**

97.    On November 15, 2016, Plaintiff received a written reprimand from Chief Regnier for violations department policy regarding use of sick time. Pltf. Dep. pp. 121-122, Ex. 8, attached as Ex. O.

**Response:    Immaterial as discipline more than two years prior cannot be considered or used in aggravation. Ex. B, pp. 123. Disputed in part. Shreffler testified that he did not believe he violated the department policy regarding use of sick time because he was having back issues at the time and had documentation from his chiroprator; and, Shreffler filed a grievance regarding this written reprimand. Shreffler believed the then Mayor Epstein upheld the written reprimand. Dkt. 22, ex. 7, pp. 121-124.**

98.    The only investigation Plaintiff personally did into the issue was look up the people Wilder mentioned to see where they were from. Pltf. Dep. p. 173.

**Response:    Disputed in part. Shreffler testified that he looked up the people Wilder mentioned whom the auto lab was gifted to and where they were from. Dkt. 22, Ex. 7, pp. 173.**

4814-4316-2599, v. 1

99.     Plaintiff disagreed with the Mayor's choice for Chief and Deputy Chief.  Pltf. Dep. pp. 174-175.

**Response:     Disputed.  Shreffler testified that he disagreed with Dumas being appointed Chief based on his experiences with and observations of how Dumas interacted with people and how he talked to people.  Dkt. 22, Ex. 7, pp. 175-176.  City Council did not approve the Mayor's appointment of Dumas to the position of Chief.  Dkt. 22, Ex. 25, pp. 46, 49.  Mayor appointed Dumas because she trusted him and because he was black.  Dkt. 22, Ex. 25, pp. 51-53.  City Council concerns of Dumas were that he was not from Kankakee and that he had no supervisory experience.  Dkt. 22, Ex. 25, pp. 50-51.  Dumas was never promoted and left KPD when he was a patrolman.  Dkt. 22, Ex. 33, pp. 19, 30.  Dumas was not a resident of Kankakee when he was appointed Chief by Mayor Wells-Armstrong; Dumas expressed concern about there being a conflict when he was named Chief by Wells-Armstrong; and Dumas admits that being African-American was a factor in him being selected by the Mayor to be Chief.  Dkt. 22, Ex. 33, pp. 46, 48, 71.**

100.    Plaintiff understood that if he wanted to initiate an investigation into public corruption in the mayor's office, he could have made his statements at a board meeting, contacted the United States Attorney's Office of the FBI, reached out to the Illinois Attorney General's Office or contacted a journalist, but he did not do any of those things.  Pltf. Dep. pp. 180-182.

**Response:     Disputed.  Austin testified that he reported allegations of corruption involving the City's relationship with Auto Lab and that Mayor Wells-Armstrong, Hunt and Dumas were involved with the Auto Lab deal; Austin reported this to the FBI.  Ex. B, pp. 184-198.  Shreffler testified that he believed that the United State's Attorney's office had been contacted about this situation along with the FBI and that he filed a complaint with the EEOC and Illinois Department of Human Rights. Dkt. 22, Ex. 7, pp. 180-184.**

101.    Plaintiff understood that if he wanted to initiate an investigation into racial bias and promotions within the police department or bring such allegations to public light, he could have made his comments at a Kankakee board meeting, reached out to someone at the Justice Department, the EEOC, or the Illinois Department of Human Rights, but he did not do those things.  Pltf. Dep. pp. 182-184.

**Response:    Object Relevance. Disputed.  Hunt testified that since he started at KPD and even since 2006 when he was promoted to Sergeant, he believed that minorities experience discrimination by white officers at KPD and still do to this day.  Dkt. 22, Ex. L, pp. 68.  Shreffler testified that he believed that the United State's Attorney's office had been contacted about this situation along with the FBI and that he filed a complaint with the EEOC and Illinois Department of Human Rights. Dkt. 22, Ex. 7, pp. 180-184.**

### PLAINTIFF'S RESPONSE PURSUANT TO LOCAL RULE 7.1(D)(2)(b)(4)
#### Undisputed Immaterial Facts

1.    Following the third step, the Union may refer the dispute to a binding arbitration at which it has the rights (1) to legal counsel and (2) to request that the arbitrator require the presence of witnesses and documents.  CBA, pp. 8-9.

**Response:    Object Relevance. Immaterial as Shreffler was denied his due process rights through the termination process and entitled to a hearing on the merits before the Board of Fire and Police.  Dkt. 22, Ex. 33, pp. 157-158, Ex. B, pp. 98-102, 107, 110-111, 157. Undisputed.**

102.    On February 10, 2016, Plaintiff received a written reprimand from Chief Regnier for rule violations relating to the posts.  Pltf. Dep. p. 105 Dep Ex. 5, attached as Ex. J.

**Response:    Immaterial as discipline more than two years prior cannot be considered or used in aggravation.  Ex. B, pp. 123.  Undisputed.**

4814-4316-2599, v. 1

103.    On February 9, 2016, Plaintiff, identifying himself by his first name and surname, made several posts on Facebook concerning the performance of Beyoncé during the Super Bowl broadcast.  Pltf. Dep. pp. 76-78; Pltf. Dep. Ex. 4, attached as Ex. H.

**Response:    Immaterial as discipline more than two years prior cannot be considered or used in aggravation.  Ex. B, pp. 123.  Undisputed.**

104.    One of Plaintiff's posts read: "fucking pathetic, NFL is going to let these turds use national spotlight for liberal propaganda!!!"  Pltf. Dep. p. 83, Ex. 4.

**Response:    Immaterial as discipline more than two years prior cannot be considered or used in aggravation.  Ex. B, pp. 123.  Undisputed.**

105.    The larger Facebook conversation led to a back-and-forth between Plaintiff and a poster named Angie Churchill during which Plaintiff called her "a bitch," "a liberal nutcase," a "dumb motherfucker," and told her to "fuck off."  Pltf. Dep. pp. 95-96; Pltf. Dep. Ex. 4.

**Response:    Immaterial as discipline more than two years prior cannot be considered or used in aggravation.  Ex. B, pp. 123.  Undisputed.**

106.    A patrol officer who was offended by Plaintiff posts forwarded them to Commander Christopher Kidwell ("Kidwell") by telephone or e-mail, and Kidwell in turned forwarded them to Chief Regnier for him to review and decide what to do.  Dep. of Christopher Kidwell, pp. 23-27, attached as Ex. I.

**Response:    Immaterial as discipline more than two years prior cannot be considered or used in aggravation.  Ex. B, pp. 123.  Undisputed.**

107.    Plaintiff disagreed with Chief Regnier that his February 9, 2016 Facebook posts violated department rules.  Pltf. Dep pp. 105-106.

**Response:    Immaterial as discipline more than two years prior cannot be considered or used in aggravation.  Ex. B, pp. 123.  Undisputed.**

108.    The next day Chief Regnier announced his planned resignation from his position as Chief of Police.  Wells-Armstrong Dep. p. 30.

**Response:    Undisputed.**

109.    In order to post comments in the group, one had to be a member of the group.  Pltf. Dep. p. 185.

**Response:    Undisputed.**

110.    Plaintiff's motivation for making all three comments in the manner he did was "frustration."  Pltf. Dep. p. 180.

**Response:    Undisputed.**

### PLAINTIFF'S RESPONSE PURSUANT TO LOCAL RULE 7.1(D)(2)(b)(5)
### Additional Material Facts

111.    Dumas and Austin admit that Shreffler was entitled to a full due process hearing including service of specific allegations, right to notice of specific charges filed against him, and the right to present evidence on his behalf to challenge the charges at a hearing especially because Shreffler has a property interest in his employment with Kankakee.  Dkt. 22, Ex. 33, pp. 157-158, 161-162; Ex. B, pp. 98-102, 107, 110-11, 157.

112.    Dumas admits that Shreffler was never provided written notice of charges, a hearing, the Department improperly added allegations that were beyond the scope, and the Department violated its procedures when it terminated Shreffler.  Dkt. 22, Ex. 33, pp. 163-164, 169-170.

113.    Prior to Shreffler's alleged threats against Dumas which led to Shreffler's termination, Dumas approached Shreffler's wife at her place of work and made a comment to her that she said made her uncomfortable; Shreffler's wife reported it to the Department.  Dkt. 22, Ex. 33, pp. 172-175, 177; Dumas admitted his conduct was improper.  Dkt. 22, Ex. 33, pp. 178.

4814-4316-2599, v. 1

114.    Someone leaked internal department documents, relating to the investigation into Shreffler to people outside the department during the investigation process but before Shreffler was terminated.  Ex. B, pp. 180-183.

115.    Hunt admitted that his Facebook posts were offensive.  Dkt. 22, Ex. L, pp. 205. Hunt testified that he was upset that his Facebook posts were brought to the Chief and he asked individuals on his Facebook account if they had issues with anything he posted.  Dkt. 22, Ex. L, pp. 149-51.   Austin testified that Hunt's Facebook posts were in bad taste and characterized Hunt's posts as "white supremacy."  Ex. B, pp. 72.

116.    Mayor Wells-Armstrong demoted Commander Kidwell, who is Caucasian and does not deny that Austin being African-American factored into his promotion and Kidwell's demotion. Dkt. 22, Ex. 25, pp. 93-94, 152-153.

117.    Dumas was aware of Hunt's Facebook posts for which he was disciplined, but Dumas was not concerned with the posts' racial overtones in relation to promoting Hunt to the second in command.  Dkt. 22, Ex. 33, pp. 80-81, 83-89, 91, 93-98.

118.    Dumas promoted Hunt to Deputy Chief even though he believed Hunt's Facebook posts were detrimental to the Department.  Dkt. 22, Ex. 33, pp. 100.

119.    Dumas demoted Commander Kidwell, who is white, to Lieutenant and replaced him with Austin, who is African-American; Dumas said Kidwell did not have any performance issues related to his demotion.  Dkt. 22, Ex. 33, pp. 198-200.

120.    Austin testified that Kidwell was upset with his demotion but he offered to help Austin who stated that, "it would be difficult for me to do the job without drawing on his [Kidwell's] expertise."  Ex. B, pp. 47.

121.    Chief Regnier's May 2, 2016 memorandum provided to Hunt explicitly states the following: "Lt. Hunt said that he posted nothing on there that was not a fact, which I told him I did

31

not agree with him and that I knew of no people that had to have a tail removed. He told me that it is a well-known fact that white people have the Rh factor, which comes from the Rhesus Monkey. I told him I was aware of the RH factor but I thought all humans evolved from primates so his facts should include all Humans. He said those posts and shares were for his circle of friends and were not intended spread all over, and that police officers from this department were responsible for their being published. I advised him that I had no doubt that it was cops that provided those posts for all to see, and that I had disciplined an officer for what I felt <u>was a much less severe case than this</u>. I then handed him a Letter of Reprimand and told him that he left me know choice but to issue him the reprimand due to the anti-police and anti-white literature he was sharing. He told me he understood and the he was accepting the letter, but it ends here. I told him that is exactly what I want is for it to end here. He said that if Shreffler, Lombardi and the other officers involved keep pushing it then he will have to do what he has to do. I told him it was my job to counteract any type of policy violation, and that if he was being singled out for continued harassment, then he is to put it in writing and give it to me to be investigated. He agreed and I advised him not to give anyone any fuel to start the fire. He said he would not and reiterated that he felt this was done. I agreed. I pointed out several other pictures and posts that were anti-police, and he said, well I guess I am anti-police when it comes to the wrongs committed by officers. I agreed with him and told him it was our jobs to make sure our officers conformed to the law." Dkt. 22, Ex. M.

122. Mayor Wells-Armstrong testified that Hunt believed he was improperly disciplined for his Facebook posts which the Mayor concluded, "could be interpreted as insensitive toward white people." Dkt. 22, Ex. 25, pp. 40-43.

123. Approximately two days after and as a result of Shreffler's reports to Chief Dumas and Deputy Chief Hunt regarding Villagomez's improper execution of the arrest warrant in and

around November or December 2017, Villagomez was taken out of the gang unit.  Dkt. 22, Ex. 7, pp. 159.

124.    Suprenaut testified that he found Willie Hunt's Facebook posts offensive, including racial undertones and unfavorable comments about white people.  Suprenant never commented on Willie Hunt's offensive Facebook posts because he feared retaliation from Hunt as he was Suprenant's direct supervisor.  Ex. A, pp. 18-19.

125.    Mayor Wells-Armstrong testified that Hunt believed he was improperly disciplined for his Facebook posts which the Mayor concluded, "could be interpreted as insensitive toward white people."  Dkt. 22, Ex. 25, pp. 40-43.

126.    Shreffler testified that officers share squad cars with two other people, one person on the other two shifts; and that Troy drove that car on the afternoon shift.  Dkt. 22, Ex. 7, pp. 129-136.

127.    Hunt told Dumas that Shreffler missed a gun and never disclosed that Shreffler was working with a partner, who was never disciplined.  Dkt. 22, Ex. 33, pp. 114-115.

128.    Dumas never disciplined anyone other than Shreffler for missing a gun, which Dumas testified is a Level One offense.  Dkt. 22, Ex. 33, pp. 104.

129.    Burke testified that it was also the Union's belief that the discipline was improper and it was suspicious that Shreffler's partner did not receive the same discipline related to this incident.  Dkt. 22, Ex. 32, pp. 54-55.

130.    Shreffler testified that the Chief did not show proof that he violated the policy.  Dkt. 22, Ex. 7, pp. 138.

131.    Mayor Wells-Armstrong chose to site on a grievance panel concerning Shreffler's discipline; it was the only time she ever sat on a grievance panel; and, she was not familiar with the police department's disciplinary process, the process covered by the Collective Bargaining

33

Agreement, Department policy and/procedure, or Illinois law.  Dkt. 22, Ex. 25, pp. 84-85, 98, 100-104.

132.    Mayor Wells-Armstrong never reviewed Shreffler's complimentary or disciplinary history.  Dkt. 22, Ex. 25, pp. 81.

133.    Shreffler testified that this grievance was denied at Step-Three by the Mayor and that he requested a referral for arbitration, the first time he had ever done so on a grievance, but the arbitration never occurred.  Dkt. 22, Ex. 7, pp. 136-137, 240.

134.    Shreffler testified that he asked Kidwell why he was losing Sam as a rookie and Kidwell said because he was told to take him off midnights and put him on a day shift with somebody else.  Dkt. 22, Ex. 7, pp. 163.

135.    Austin testified that Shreffler's Facebook posts were critical of Mayor Wells-Armstrong's administration; the alleged corruption with the Mayor's administration and Auto Lab; and, Austin admitted that complaints about public officials and police officials are protected by the First Amendment.  Ex. B, pp. 118, 165-166.

136.    Austin testified that Hunt believed Shreffler posted negative comments about him and other black leaders on Facebook.  Ex.B, pp. 168.

137.    Hunt conducted an investigation into the February 2018 Facebook posts on the "you're probably from Kankakee if" page because he believed Shreffler or someone from the union was leaking sensitive department information on this Facebook page and Hunt did not follow Department policy while conducting this investigation; but, Hunt admitted that he did not find any evidence that Sheffler posted any of the information.  Dkt. 22, Ex. L, pp. 75-80, Dkt. 22. Ex. 33, pp. 145-146, 182-183.

4814-4316-2599, v. 1

138.    Hunt brought the allegations that led to Shreffler's termination to Dumas' attention and Dumas never recommended that Shreffler be terminated, nor did he conduct any investigation into the allegations which resulted in Shreffler's termination.  Dkt. 22, Ex. 33, pp. 149, 153.

139.    Hunt testified that he never heard Shreffler use racially charged language in the workplace.  Dkt. 22, Ex. L, pp. 197.

140.    Shreffler testified that his Facebook page has always been private, and the only way anyone would be able to see his post would have been if they were friends with one of the five people he tagged in the post.  Shreffler further testified that he never identified himself on Facebook as a Kankakee police officer nor an employee of the City of Kankakee.  Dkt. 22, Ex. 7, pp. 93-94, 236.

141.    Burke testified that the Union also believed that Sheffler's discipline related to the Facebook posts was improper and it violated the Collective Bargaining Agreement.  Dkt. 22, Ex. 32, pp. 60.

142.    Shreffler testified that his union also believed that his February 9, 2016 Facebook posts did not violate department rules; and, that he was speaking on his own time on his own private Facebook account.  Dkt. 22, Ex. 7, pp. 105-106, 109.

143.    Mayor Wells-Armstrong believes police officers have the right per the First Amendment to express themselves as private citizens and could not be disciplined for exercising that right.  Dkt. 22, Ex. 25, pp. 42, 172.

144.    Austin testified that he believed Shreffler's Facebook posts during the Super Bowl were offensive, although Austin never heard Shreffler may any disparaging racial comments.  Ex. B, pp. 63, 65, 67.

145.    Burke testified that Kankakee's new city attorney communicated to him that he was not comfortable with the process of how the City's administration was handling Shreffler's

4814-4316-2599, v. 1

termination; and, Burke further testified that his understanding was the new city attorney was not comfortable with Shreffler's termination being done without a full hearing on charges being filed, evidentiary hearing before the Board of Fire and Police Commission. Dkt. 22, Ex. 32, pp. 67, 70-72.

146. Hunt testified that Sheffler was never provided mediation or intervention prior to Dumas' recommendation to terminate Shreffler and Hunt believed "we failed him." Dkt. 22, Ex. L, pp. 176-179.

147. Hunt testified that the disciplinary process and termination process related to an officer's termination is important and officers are entitled to due process; and Hunt admitted he was not sure if Shreffler was given his full due process when terminated. Dkt. 22, Ex L, pp. 183-184.

148. Kidwell testified that an officer is entitled to receive notice of the allegations made against him, entitled to representation during the stage in which the charges are sought against the officer, ultimately it's only the police and fire commission that can fire or uphold the termination recommendation of the Chief, the Chief is required to put on evidence to prove the allegations against the officer, the burden is on the Chief to prove the allegations are true and termination is warranted, and the officer is allowed to put on evidence to defend, exonerate and mitigate the circumstances. Dkt. 22, Ex. 17, pp. 64-66.

149. Shreffler believes Dumas removed Villagomez from the gang unit based on his complaints to Dumas and Hunt; and, Shreffler heard rumors that Villagomez told people that Shreffler had him taken out of the gang unit. Dkt. 22, Ex. 7, pp. 159-160.

150. Shreffler walked away from some interactions with Deputy Chief Hunt with the personal feeling that Hunt did not like Shreffler because he was white. Dkt. 22, Ex. 7, pp. 166.

151. Shreffler participated in a Step –Three grievance hearing regarding the suspension he received related to the February 2018 Facebook posts wherein the Mayor, Chief Dumas and Deputy Chief Hunt were present; during that hearing no one brought up the allegations regarding the active

36

shooter training incident that Shreffler was alleged to have used the "n" word and threatened Chief

Dumas.  Dkt. 22, Ex. 7, pp. 210.

152.     Shreffler never received any notifications that the Board of Fire and Police

Commission took action to terminate him on June 12, 2018; Shreffler was never told he could

appear at the June 12, 2018 meeting and was not provided a date and time of when the Board was

going to decide the matter.  Dkt. 22, Ex. 7, pp. 228-229.

153.     Sheffler's union attorney emailed Mr. McGrath, the city's attorney inquiring about

Shreffler's employment status and in response to that email, Mr. McGrath responded, "let this email

serve as an official notice of termination."  Dkt. 22, Ex.. 7, pp. 228.

154.     Mayor Wells-Armstrong's administration was the subject of Shreffler's February

2018 Facebook post's criticism and she was an unbiased hearing officer at the Step-Three grievance

hearing.  Dkt. 22, Ex.. 7, pp. 245.

155.     Mayor Wells-Armstrong believes police officers have the right per the First

Amendment to express themselves as private citizens and could not be disciplined for exercising

that right.  Dkt. 22, Ex. 25, pp. 42, 172.

156.     Shreffler never received a copy of Barlett's investigative report related to the training

incident wherein Shreffler was alleged to have threatened Dumas and used a racial epithet, nor did

he ever receive any findings of that investigation, penalties, or discipline.  Dkt. 22, Ex. 7, pp. 246-

247.

157.     Shreffler appeared at the "formal inquiry" on May 29, 2018 but was never asked any

questions.  Dkt. 22, Ex. 7, pp. 248.

158.     The Notice of Termination presented to Sheffler on May 29, 2018 did not include a

date and time the he was supposed to appear before the Board of Fire and Police Commission, nor

did he ever receive a notice of any formal charges being filed before the Board of Fire and Police

Commission, nor was he ever advised that he had the ability to have a hearing before the Board of Fire and Police Commission.  Dkt. 22, Ex. 7, pp. 248-249.

159.    Deputy Chief Hunt threatened Suprenant in Hunt's office and told him that once he found out who gave Hunt's Facebook posts to Shreffler that he would get them back and retaliate; and Hunt weekly interrogated and threatened Suprenant regarding Hunt's Facebook posts that Shreffler showed Chief Regnier .  Ex. A, pp. 22-28.

160.    Once Hunt began interrogating and threatening Suprenant regarding Hunt's Facebook posts that Shreffler showed Chief Regnier that resulted in Hunt receiving a written reprimand, Hunt began cutting Suprenant's hours as an SRO at the school; Hunt failed to provide Suprenant back-up when he was sitting in his office at the station; and gave all of Suprenant's hours at the school to Officer Brooks, an African-American officer.  Ex. A, pp. 32-35.

161.    Shreffler, as a patrol officer, has a duty to report any misconduct that he believes to be occurring with a police officer, chief, deputy chief, or commander.  Dkt. 22, Ex.. 17, pp. 30.

162.    Kidwell testified that he has heard other officers use racial slurs, but has never known of any situation where a police officer has ever been fired for allegedly using a racial slur; and, Kidwell only knew of officers fired from KPD for criminal conduct.  Dkt. 22, Ex.. 17, p. 67-69.

163.    Hunt characterized Shreffler's work as a police officer as excellent.  Dkt. 22, Ex.. L, pp. 146.

164.    Dumas knew Shreffler as a good officer and a go-getter.  Dkt. 22, Ex.. 33, pp. 100.

165.    Austin never documented any negative incidents relating to Shreffler when he worked under Austin's command and found Shreffler to be a good officer, honest and trustworthy. Ex. B, pp. 57.

166.    Carlson believed that Shreffler's termination failed to comply with the CBA between the FOP and the KPD, thus a grievance was filed.  Dkt. 22, Ex.16, pp. 24.

167.    Mayor Wells-Armstrong is a member of the National Association for the Advancement of Colored People and believed the department was too white.  Dkt. 22, Ex. 25, pp. 18-19, 21.

168.    The Board of Fire and Police Commissioners that signed off on Shreffler's termination were appointed by Mayor Wells-Armstrong; and, the same Board members along with Dumas and Hunt donated money to the Mayor's campaign.  Dkt. 22, Ex. 25, pp. 24; Dkt. 22, Ex. 33, pp. 3-37.

169.    Mayor Wells-Armstrong asked Dumas to conduct the search into the Facebook posts that were critical of the Mayor and Chief Dumas through the unauthorized use of the department equipment that eventually led to an Illinois State Police criminal investigation of Dumas. Dkt. 22, Ex. 25, pp. 63-66, 73-75, 77, 88-90, 170-171.

170.    Mayor Wells-Armstrong became aware that Commander Austin, who she promoted to Commander, made a complaint to the FBI about what he believed to be criminal conduct regarding Auto Lab's relationship with the City, Mayor, Dumas and Hunt.  Dkt. 22, Ex. 25, pp. 146-147, 155-156.

171.    Mayor Wells-Armstrong never opposed any employees' unemployment applications, but on July 9, 2018 she sent an email wherein it stated, "there is NO (emphasis in original) way this former employee [Shreffler] should be granted unemployment compensation with the conduct that occurred."  Dkt. 22, Ex. 25, pp. 177-180.

172.    In Mayor Wells-Armstrong's email correspondence regarding Shreffler's unemployment, the Mayor stated, "Pam mentioned that she needs the specific examples of how the employer became aware of his social media postings."  Dkt. 22, Ex. 25, pp 185

173.    Austin donated to Mayor Wells-Armstrong's campaign after she was elected.  Ex. B, pp. 26-27.

174.    Dumas appointed Austin to Commander in or around May 2018 although Austin never expressed interest in the job.  Ex. B, pp. 34, 39.

175.    Austin is a member of Black Law Enforcement Executives.  Ex. E, pp. 41.

176.    Austin was Facebook friends with Mayor Wells-Armstrong and Hunt, but Hunt later unfriended Austin.  Ex. E, pp. 70-71.

177.    Austin believes that there was a "multitude of people" that believe they are supreme to black people.  Ex. E, pp. 75.

178.    Hunt told Austin about the alleged comments made by Shreffler at the training location in March 2018.  Ex. E, pp. 90.

179.    Austin testified that the allegations which led to Shreffler's termination improperly contained discipline from two years prior, which are not supposed to be considered or used in aggravation.  Ex. E, pp. 123, Ex. C.

180.    Austin believed that Facebook posts in the anonymous group were negative towards African-American leadership within the City of Kankakee.  Ex. E, pp. 133-134, 141.

181.    Austin filed a complaint about a post allegedly made about him by a white police officer.  Ex. E, pp. 136-137.

182.    Austin believed Shreffler was responsible for some of the negative posts toward African-Americans.  Ex. E, pp. 138-139.

183.    Austin could not say one or the other whether Shreffler was terminated because Hunt thought Shreffler was responsible for the negative posts.  Ex. E, pp. 170-171.

## PLAINTIFF'S RESPONSE PURSUANT TO LOCAL RULE 7.1(D)(2)(c)
### Argument

The evidence discovered to date and cited herein undoubtedly establishes the existence of genuine factual dispute and warrants the denial of summary judgement. The record in this case is so overwhelming it would be surprising if a reasonable fact finder ***did not*** find for the Plaintiff here. There is direct evidence, much of which is undisputed, that Plaintiff was discriminated against by Defendants for illegal reasons.

## I.     Legal Standard

"Summary judgment is only appropriate when the record reveals that no reasonable jury could find for the nonmoving party." *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 268, 370 (7th Cir. 1992). If the evidence, considered as a whole, would permit a reasonable fact finder to conclude that Plaintiff's race and/or Defendants' retaliatory motives caused an adverse employment action, summary judgment must be denied. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Plaintiff need only make a showing that a jury could find Defendants violated his rights under Title VII – he "need not prove anything at this stage." *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007). Plaintiff here has done so.

The Court is tasked with viewing the record in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). At this stage, Plaintiff does not bear the burden of persuasion, "only that of creating reasonable inferences." *Grace v. Ansul, Inc.*, 64 F. Supp. 2d 788, 791, n.4 (N.D. Ill. 1999). The Court must accept Plaintiff's "version of any disputed facts . . . [and] any differences between [the parties must be] resolved in [his] favor." *Id.* at 789. "At summary judgment, a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Paz v. Wauconda Healthcare and Rehab. Centre, LLC*, 464 F.3d 659, 665 (7th Cir. 2006); *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010). Instead, it must

41

give the Plaintiff "the benefits of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochicinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013).

Under the standards set forth above, Plaintiff asserts that there are genuine factual disputes that would permit the finder of fact to decide that Defendants have unlawfully discriminated and retaliated against Plaintiff in violation of his equal protection rights, due process and free speech under the First and Fourteenth Amendments to the Constitution of the United States pursuant to the Civil Rights Act of 1866, 42 U.S.C. § 1983, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq., in violation of the Illinois Constitution, Article I, §§ 4 and 5, and the Illinois tort of retaliatory discharge.

Defendant's entire argument centers on Plaintiff's inability to prove discrimination and has improperly shifted the burden in this case. Plaintiff can show direct proof that Defendants' decision to terminate Plaintiff were motivated by an impermissible purpose, specifically race, retaliation, and free speech under the First Amendment.  Direct evidence of intent and a convincing mosaic of circumstantial evidence exists to allow a jury to infer intentional discrimination by the decision-maker. For purposes of the direct method of proof, circumstantial evidence demonstrating intentional discrimination includes: "(1) suspicious timing, ambiguous oral or written statements, or behaviors toward other employees in the protected group; (2) evidence that similarly situated employees outside the protected class received systemically better treatment and employer's reason is a pretext for discrimination." *Sun v. Bd. Of Trs. Of Univ. of Illinois*, 473 F.3d 799, 812 (7th Cir. 2007). If Plaintiff is able to obtain direct evidence of discrimination, any chance for the defendant to obtain summary judgment is eliminated. *Phelan v. Cook County*, 463 F.3d 773, 779 (7th Cir. 2006). Plaintiff was terminated improperly. Defendants held negative beliefs toward white people, including white police officers. Plaintiff engaged in protected activities, including his right to free speech under the First Amendment of the Constitution. Plaintiff was improperly terminated. Plaintiff suffered

4814-4316-2599, v. 1

discrimination at the hands of the defendants. For the most part, Defendants do not dispute these facts. The best evidence for the Plaintiff comes from the Defendants themselves.   Thus, Defendants' motion for summary judgment must be denied.

## II.     Plaintiff did not allege Individual Capacity Claims against Defendant Dumas under Title VII.

In Defendants' motion for summary judgment, specifically Section III, Defendants assert that Dumas is entitled to summary judgment in his individual capacity on the Title VII counts.  See Def. SJ Motion, Dkt. 22.  Plaintiff only brought two counts against Dumas in his individual capacity: Count III, under 42 U.S.C. § 1983, First Amendment Retaliation; and Count V, under the Illinois Constitution, Article I, Sections 4 and 5, Free Speech.  See Pl. Compl., Dkt. 1.  Thus, Plaintiff need not address Defendants' argument in Section III of their motion for summary judgment.

## III.     The City of Kankakee's motion for summary judgment must be denied on Plaintiff's Title VII race discrimination claim as the evidence produced would permit a reasonable fact finder to conclude Plaintiff's race caused his Termination.

The question for the Court at the summary judgment state is "whether the evidence would permit a reasonable factfinder to conclude that the Plaintiffs' . . . proscribed factor caused the discharge or other adverse employment action."  *Ortiz, supra*, 834 F.3d at 754.

> *Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself – or whether just the "direct" evidence does so, or the "indirect" evidence.   Evidence is evidence.   Relevant evidence must be considered, and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled "direct" or "indirect."*

*Id.* at 765.

Under Title VII, an employer may not discriminate based on "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  To succeed on a Title VII claim, the plaintiff-employee must prove three elements: (1) he is a member of a class protected by statutes; (2) that he has been the subject of some adverse employment action (or that he has been subjected to a hostile work environment), and (3) that the employer took this adverse action on account of the plaintiff's

43

membership in the protected class. *Morgan v. SVT, LLC,* 724 F.3d 990, 995 (7th Cir. 2013). The legal standard used to evaluate a discrimination claim is "simply whether the evidence," considered as a whole, "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018)(citing *Ortiz*, 834 F.3d at 765).

In their motion for Summary Judgment, Defendants argue that, "The record remains bereft of any evidence from which a reasonable factfinder could conclude that the City terminated Plaintiff's employment because of his race." Def. Mot. P.23.

During her campaign Mayor called for more African-Americans. Shortly after her election, the Mayor met Deputy Chief Passwater for the first time and accused him of being a racist. See Berge trial transcripts, attached hereto as Exhibit "E", p.192. Passwater resigned thereafter. Mayor Well-Armstrong demoted Commander Kidwell, a male Caucasian, and replaced him with Austin, an African-American. The Mayor does not deny that race factored into her decision. Dkt. 22, Ex.25, pp. 93-94, 152-153. Kidwell did not have any performance issues prior to demotion. Dkt. 22, Ex. 33, pp.198-200. Kidwell was upset with the demotion but he offered to help Austin who stated that, "it would be difficult for me to do the job without drawing on his [Kidwell's] expertise." Dkt. 22, Ex. 17, pp.47. Hunt bypassed two higher-ranked white commanders when he was promoted to deputy chief by the Mayor. Dkt.22, Ex. L, pp.138-139. Mayor campaigned on getting more African Americans on KPD command staff; Mayor promoted black officers over white officers; white command officers were demoted and replaced with African-American supervisors once the Mayor took office; white officers' demotion was not performance related. Dkt. 22, Ex. L, pp.115; Hunt believed promotional process discriminated against minorities. Dkt.22, Ex. L, pp.51-53; Dkt. 22, Ex. 33, pp.21, 23, 27. Dumas was not concerned with racial overtones in Hunt's Facebook posts. Dkt. 22, Ex. 33, pp.80-81, 83-89, 91, 93-98, 100. Hunt's Facebook posts were of "white supremacy."

Austin, Ex. B, pp. 72.  Shreffler was a member of protected class, a good employee, suffered adverse employment action, and his employer treated similarly situated employees outside of class more favorably.  Shreffler was never accused of using a racial slur at any point in his employment, other than incident leading to his termination. Dkt. 22, Ex. 17, pp.52-53; Dkt. 22, Ex. L, pp.197. Shreffler was an "excellent employee," a "good officer," and a "go-getter."  Dkt. 22, Ex. 33, pp.100. Also, Shreffler was "honest" and "trustworthy." Ex. E, pp. 57.

Next, Defendants claim that Plaintiff has not identified any person that he claims was similarly situated, but treated differently than he was treated. Dumas never disciplined anyone other than Shreffler for missing a gun which he classified a Level One Offense based upon scale of 1-5 with 1 being least serious. Dkt. 22, Ex. 33, pp.104. Mayor Wells-Armstrong sat on Plaintiff's disciplinary proceedings and she had not done that with any other officers. Dkt. 22, Ex. 25, pp. 81. Other patrolmen had failed to secure a firearm and received no discipline. Dkt. 22, Ex. 7, pp. 141-143. Plaintiff was the only officer to be stripped of his recruit which resulted in Shreffler's loss of pay. Dkt. 22, Ex. L, pp.155-157; Dkt. 22, Ex. 17, pp.43-44. The decision to remove Plaintiff of his recruit was racially motivated and retaliatory. Dkt. 22, Ex. 7, pp. 164-167. Others officers have used racial slurs but never fired for the offense. Dkt. 22, Ex. 17, pp. 30. Mayor never opposed an employee's unemployment claim other that Plaintiff's. Dkt. 22, Ex. 25, pp. 177-180.

The allegations which led to Plaintiff's termination were brought in bad faith and were pretext. An employer cannot provoke an employee to the point..she commits..an indiscretion and then rely on it to terminate employment. *See NLRB V. M&B*, 349 F.2d 170 (4th Cir).  When an employee is fired because he acted to defend himself against harassment, which supervisors failed to take reasonable measures to prevent or correct, the termination process cannot be said to be free from discrimination. *See DeGrace v. Rumsfeld*, 614 F.2d 796, 804 (1st Cir.1980).

4814-4316-2599, v. 1

In a case with similar facts, the United States District for Illinois determined that employer could not terminate an employee for actions done out of frustration held by the employee because his employer did not take his complaint of harassment seriously. *Nichols v. Illinois Department of Transportation*, 152 F.Supp.3d 1106. The facts are on point to the case at issue. Plaintiff's wife was confronted by Dumas at her place of work and stated something about him hoping she was not made at him because of how her husband was being treated by the defendants. Dkt. 22, Ex. 33, pp.172-175, 177.  Dumas' actions were offensive, inappropriate, and potentially threatening. Both Ms. Shreffler and Dumas recognized the confrontation as unseemly. Ms. Shreffler went as far as to file a complaint with the Kankakee Police Department which should speak to her level of concern. Dumas admitted his actions were not appropriate; however he attempted to make light of his conduct, wholly failing to acknowledge or contemplate for that matter, the view of his victim. Dkt. 22, Ex. 33, pp.178. She was approached at work, by a man who may or may not have been armed with a weapon, which she knew to be her husband's chief. She also knew that her husband had been a recent target of discrimination by Dumas and his henchmen. Moreover, she knew that the man confronting her believed that her husband was reporting information about criminal and corrupt activity on behalf of Dumas, Deputy Chief Hunt and Mayor Wells-Armstrong. With this context in mind, Dumas' question, "I hope you are not mad at me," could be subject to many interpretations, including threatening. It would not be unreasonable to conclude that the Chief had already determined he was going to fire Plaintiff and was waiting for the best timing to execute his plan. Along similar lines, one could reasonably conclude that the Chief was using Plaintiff's wife as bait and hoping her husband would take the bait and say something which could be spun into a threat. It would be ironic if not so calculated that Plaintiff was terminated by recommendation of the Chief because of his reaction to the undisputed inappropriate conduct by the Chief towards Plaintiff's wife. Days later at a training facility, an employee of the Chief asks Shreffler about the confrontation

between the Chief and his wife and Shreffler apparently responded with threats of violence to the Chief. However, the evidence is far from convincing. Several officers present did not hear any threat. It is possible that the threat was made and they did not hear it for any number of reasons. However, it is just as likely, if not more than likely, considering the proximity here, that threats were not made by Plaintiff.

Shreffler acknowledged making non-complimentary comments about the Chief, but he has denied making any physical threats toward the Chief. For the sake of argument, assume that Plaintiff made the exact comments that Chief alleged. Does that warrant the draconian reaction of the administration in this case? It is undisputed that Plaintiff was a good, honest, trustworthy, hardworking police officer. Is it unreasonable for a person to be upset when their spouse is threatened, embarrassed and/or scared? Is it wholly irrational for a person to vent raw emotion when challenged by a co-worker in front of his peers? If this threat was made, which Plaintiff firmly denies, even the target of the threat did not find it to be credible. We know this because the Chief was willing to offer a minor suspension upon the execution of signing a last-chance agreement. The defendants were determined to fire Plaintiff because they believed he was exposing their role in corruption and criminality. A last-chance agreement would allow them a simple path to the execution of their plan. However, Plaintiff threw a wrench into the plot when he refused to take the bait in this scenario. Accordingly, the defendants resorted to plan B and fired Plaintiff illegally via trumped up charges which they were willing to overlook until Plaintiff refused to sign the agreement because he recognized doing so was signing away his career with this corrupt and dishonest administration.

This entire case was a sham and unfortunately did not end with Plaintiff here. Months after fabricating charges and orchestrating the illegal termination of Plaintiff, defendants did the same thing to another Caucasian officer within its ranks. This time it was Sgt. Berge. He was confronted,

47

harassed, and berated by Hunt in his office without justification. The following day, the "leaders" of the department provoked Berge until they got the evidence they needed to fire him. Of course, evidence is a relative term with the Kankakee police department. Although Berge was given a full hearing before the Commission on his case, it amounted to the same pathetic, immoral, and unlawful result as that of the Plaintiff here, even though Shreffler was never afforded a hearing. The motive for the department remained the same however: get rid of the white officers who had the audacity to question the Defendants' illegal acts. In an act of blatant, calculated and illegal discrimination, the department discriminated against white Sergeants Berge and Kreissler by promoting a black Sergeant who was ranked below them on the promotional list after a rigorous testing process put in place by the administration, but ignored. The promotion was ratified by the Fire and Police Commission, the same commission that ratified the unlawful termination of Plaintiff in the case at bar. (See Exhibit G).   The United States Supreme Court has held that evidence of other acts of discrimination can be considered here. *Sprint/United Management Co. v. Mendelsohn*, 552 U.S. 379 (2008).

## IV.   Defendants' motion for summary judgment must be denied on Plaintiff's Title VII Retaliation Claim.

Title VII's anti-retaliation provision makes it unlawful for an employer to discriminate against an employee because he has opposed any practice made an unlawful employment practice by statute or because he has made a charge, testified, assisted, or participated in a relevant investigation, proceeding, or hearing. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7h Cir. 2007)(*citing* 42 U.S.C. § 2000e-3(a)).  Under the direct method, a plaintiff can prove retaliation by presenting direct evidence of (1) statutorily protected activity; (2) an adverse action taken by employer; and (3) a causal connection between the two.  *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003).  A plaintiff may offer circumstantial evidence of intentional retaliation, including evidence of suspicious

4814-4316-2599, v. 1

timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn. *Id.*(*citing Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 736 (7th Cir. 1994)). The causal link of retaliation claim is frequently established by showing that there was a suspiciously short period of time between the employee's complaint and the adverse employment action. *Boumehdi*, 489 F.3d at 793.

The Supreme Court of the United States, as well as the Seventh Circuit Court of Appeals has determined that pretext can be proven by employers failure to follow its own policies and/or procedure when taking the adverse action. *Village of Arlington Heights v. Met. Hous. Derv.Corp*, 429 U.S. 252; *Rudin v. Lincoln Land Community Coll.*, 420 F.3d 712, 727 (7th Cir. 2005), *Giacoletto v. Amaz Zinc Co., Inc.*, 954 F.2d 424 (7th Cir. 1992)( Reason for termination false); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097 (2000).

### A. Plaintiff demonstrated that he engaged in Protected Activity under Title VII.

Defendants argue that the record does not affirmatively show that Shreffler reasonably believed that he was opposing an unlawful practice. Def. Motion p. 26. This argument demonstrates that Defendants recognize no bottom to the depths it will go to survive on its motion. Plaintiff spoke of potential corruption, illegal activity and criminal acts of the Defendants. An active player in the Defendants nefarious activity believed there was corruption and criminal activity taking place by the Mayor, the police chief and the deputy chief. Both Plaintiff and Austin reported the ***same*** activity. However, Austin was promoted and Plaintiff was fired. Clearly, the Defendants did not consider Austin's concerns unreasonable; why did Plaintiff lacked reasonable belief? It was nothing more than another example of an argument bereft with any analysis, a common theme throughout its motion in this case.

**B.  Plaintiff produced evidence that demonstrated Defendants' Retaliatory motive caused Plaintiff's Termination.**

Plaintiff's Facebook posts were deemed by the Kankakee administration of being critical of administration and alleged corruption with the Auto Lab deal. Austin, Ex. B, pp. 118, 165-66. There was no competitive bidding for Auto Lab as required in Municipal Code 2-223, Dkt. 22, Ex. 25, pp.106-107, 112, 116, 118-119, 122-123, 124-126, 128, 136-138, 202. Dkt. 22, Ex. 33, pp.204, Dkt. 22, Ex. L, pp.72-73; 94. Auto Lab was provided preferential treatment. Dkt. 22, Ex. 25, pp. 134-135; 144, 221. Criminal conduct was alleged with respect to Auto Labs deal with the City. Ex. B, pp. 184-198. Dkt. 22, Ex. L, pp.72-73. What is more, the investigation which led to Plaintiff's termination involved discussion of Plaintiff's Facebook posts critical of the administration. Ex. B, p. 118. Administration believed posts were negative toward African-Americans and the administration. Ex. B, pp. 133-134; 141, 168.

**V.   Defendants' motion for summary must be denied on Plaintiff's First Amendment Retaliation Claim.**

To prove a First Amendment retaliation claim, a public employee must establish three elements: first, that he engaged in protected speech; second, that he suffered a deprivation likely to deter protected speech; and third, that his protected speech was a motivating factor in the deprivation and ultimately, if the public employer cannot show it would have inflicted the deprivation anyway, its but-for cause.  *See Graber v. Clarke*, 769 F.3d 888, 894-95 (7th Cir. 2014); *Greene v. Doruff*, 660 F.3d 975, 977-80 (7th Cir. 2011)(collecting causation cases); *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).  Whether a public employee's speech is constitutionally protected is a question of law, "even though it may . . . require [ ] predicate factual determinations.  *Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002).  A public employee ultimately satisfies the protected-speech element of a retaliation claim by prevailing in the balance of employee and employer interests required by *Pickering v. Board of Education*, 391 U.S. 563, 88 S. Ct. 1730, L.Ed.2d 811 (1968).

4814-4316-2599, v. 1

The Mayor admitted that police officers have a First Amendment right to express themselves as private citizens and could not be disciplined for exercising that right. Dkt. 22, Ex. 25, pp.42, 172. Plaintiff's Facebook page was private and he never identified him as a Kankakee police officer or an employee of the City of Kankakee. Dkt. 22, Ex.7 pp.93-94, 236. Dumas agreed officers had a right to post anything as long as it was not detrimental to the department. Dkt. 22, Ex. 33, pp.141.

### A. Defendants admit that Plaintiff's Facebook Posts are Protected Speech under the First Amendment.

Defendants Answer and Affirmative Defenses admit that Plaintiff engaged in constitutionally protected activity.  Dkt. 22, Ex. 3.  An affirmative defense is an implicit admission of the factual allegations in the complaint, but avoids liability, in whole or in part, based on additional allegations of excuse, justification or other negating matters.  Fed. R. Civ. P. 8(c); *See Sloan Valve Co. v. Zurn Industries, Inc.*, 712 F. Supp. 2d 743, 749 (N.D. Ill. 2010)("the basic concept of an affirmative defense is an admission of the facts alleged in the complaint, coupled with the assertion of some other reason defendant is not liable.").  Thus, Plaintiff satisfied the first element of a prima facie showing that he engaged in activity protected by the First Amendment.

### 1. Plaintiff's February 2018 Facebook posts relate to a matter of Public Concern.

Plaintiff's Facebook posts alleged improper and unlawful conduct by members of administration. P. 164, 172-173; 180-183. Austin reported criminal activity to FBI for the same conduct Plaintiff posted in Facebook. Ex. B, 184-198.

### 2. Plaintiff's interests in making his February 2018 Facebook posts are not outweighed by the City's interests in promoting the efficiency of the public services provided by its police department.

There are at least two routes to *Pickering* balancing.  *See City of San Diego v. Roe*, 543 U.S. 77, 80, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004).  The better traveled leads across the double threshold

established by *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and *Garcetti v. Caballos*, 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). The employee must show under *Garcetti* that he spoke as a citizen rather than an employee, 547 U.S. at 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), and under *Connick* that he spoke on a matter of public concern rather than "matters only of personal interest." 461 U.S. 147, 103 S.Ct. 1684. When the employee's speech is neither at work nor about work, however, a different path to *Pickering* is available under *United States v. National Treasury Employees Union*, 513 U.S. 454, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995)("NTEU"), largely anticipated in this circuit by *Eberhardt v. O'Malley*, 17 F.3d 1023 (7th Cir. 1994). The key issues under NTEU are whether the employee's speech is "made outside the workplace," *Id.* at 466, 115 S.Ct. 1003; "involve[s] content largely unrelated to [his] government employment," *Id.*; and is "addressed to a public audience," *Id.*, or, what amounts to the same thing, involves "any matter for which there is potentially a public." *Eberhardt*, 17 F.3d at 1026(rejecting pre- and post-publication distinction). If the employee shows these elements, and if the employer cannot show the employee's speech was linked by his "deliberate steps" to the employer's mission, purpose, or image, *See Roe*, 543 U.S. at 81, 125 S.Ct. 521, then NTEU, not *Connick*, controls, and *Pickering* balancing applies.

Defendants argue that Plaintiff's Facebook posts reporting corruption in Kankakee police department, "[S]erves to undermine the personal loyalty and confidence between him and…administration..(and) direct supervisors." Def. Motion p. 33. Defendants' improper and criminal acts undermined any confidence in the Kankakee police department. Defendants argue that, "The rank-and-file officer on the street…cannot effectively perform his duties where the public questions the entire department's legitimacy from the top down." *Id.* This speaks to a code of silence. Are the defendants making the argument that reporting corrupt and illegal behavior somehow should be prohibited? Their argument is absurd.

**B. Plaintiff suffered a deprivation likely to deter Protected Speech.**

The Plaintiff demonstrated on multiple occasions in which the City acted with retaliatory motive and suffered a deprivation likely to deter protected speech.

> **1. The record demonstrates that Dumas acted as the Final Policymaker. The Commission was a mere shill and a rubber stamp for the Defendants.**

The decision of an independent decisionmaker will not shield the employer from liability if the decisionmaker was tainted or influenced by the employers' illegal motives. *Shager v. Upjohn Co.* 913 F.2d 398, 405 (7th Cir. 1990); *Hill v. Potter*, 625 F.3d 998 (7th Cir.2010). The Chief brought the case, deprived Plaintiff of his due process rights and asked the Commission to sign off on it, which they did to no surprise considering they were appointed by the Mayor who was accused of criminal conduct by numerous individuals, including the Plaintiff.

> **2. Plaintiff demonstrated that the Commission terminated his employment with Retaliatory Intent.**

Defendants argue, "[T]here is no evidence that the Commission was made aware of Plaintiff's February 2018 Facebook posts." Def. Motion p.38. Dumas included the charge in the discharge papers filed with the Commission. Also as argued herein, Plaintiff's Facebook posts were the subject of the investigation which led to his termination.

> **Plaintiff's Protected Speech was a motivating factor in the deprivation and the but-for cause of Plaintiff's Termination.**

Defendants argue, "There is no evidence that Dumas has stated that he recommended the termination of Plaintiff's employment in retaliation for Plaintiff's February 2018 Facebook posts." p.38. Defendants argue there is no evidence tying Plaintiff's Facebook posts to the termination recommendation. p. 39. Hunt threatened Suprenant and said he would retaliate against Shreffler for reporting his Facebook posts. Ex. A, pp. 22-28. Immediately, after terminating Shreffler, emails about how employer "became aware of his social media postings." Dkt. 22, Ex. 25, pp.185.

**Dumas is not entitled to Qualified Immunity.**

Whether a municipal official is entitled to qualified immunity depends on whether a reasonable competent public official should have known the law governing the conduct. *Pate v. Village of Hampshire*, 2007 U.S. Dist. LEXIS 79807 (N.D. Ill. 2007). In other words, qualified immunity protects officials from liability as long as they did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Purvis v. Oest*, 614 F.3d 713, 720 (7th Cir. 2010). "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

Shreffler has alleged a protectable property interest in his employment, created by applicable Illinois law and by contract. Dumas knew his conduct violated clearly established rights. Dumas decided to breach Shreffler's contract rights and ignore Illinois law. Because no "final decision" was rendered, the Administrative Review Act was not implicated. Dumas had "final policy making authority" as demonstrated by his recommendation to the Board of Fire and Police Commission that Shreffler's employment with KPD be immediately terminated and his sham process rift of due process. Dkt. 22, Ex. 6.

Further, *Baird v. Educ. School Dist. 205* is instructive. 389 F.3d 685 (7th Cir. 2004). *Baird* is noteworthy because it stated, *inter alia*, "[a] state law breach of contract action is not adequate post-termination remedy for terminated employee who possesses a present entitlement and who has been afforded only a limited pre-termination hearing." *Id.* at 692. Qualified immunity cannot stand on these facts. Dumas clearly violated Shreffler's rights in the way he terminated Shreffler. Specifically, Dumas provided Shreffler a document labeled "Notice of Termination." Dkt. 22, Ex. 6. But what is most important for purposes of the qualified immunity discussion is to recognize that Dumas provided Shreffler with a "Notice of Termination" wherein it states "in accordance with the powers

4814-4316-2599, v. 1

given to me under the Illinois Compiled Statutes and the Rules of the Board of Fire and Police

Commissioners of the City of Kankakee and elsewhere, I am hereby recommending to the Board of

Fire and Police Commissioners that your employment with the Kankakee Police Department be

immediately terminated." Dkt. 22, Ex. 6.

## VI.   Defendants' motion for summary judgment must be denied on Plaintiff's Due Process claim under the Fourteenth Amendment.

The Supreme Court has held that the interest which a public employee has in his job is

property within the meaning of the due process clauses of the Fifth and Fourteenth Amendments if

he has tenure rights in the job – that is, if he can be fired only for misconduct.  If he has tenure in

this sense, and therefore a property interest in his job, he cannot be fired constitutionally unless he is

given the rudiments of fair procedure.  *See e.g., Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532,

538-541, 545-46, 105 S. Ct. 1487, 1495-1496, 84 L.Ed.2d 494 (1985); *Patkus v. Sangamon-Cass

Consortium*, 769 F.2d 1251, 1265 (7th Cir. 1985).  A procedural due process claim under § 1983

requires that the plaintiff allege "(1) deprivation of a protected interest, and (2) insufficient

procedural protections surrounding that deprivation." *Cannici v. Village of Melrose Park*, 885 F.3d 476,

479 (7th Cir. 2018)(*citing Michalowicz v. Vill. Of Bedford Park*, 528 F.3d 530, 534 (7th Cir. 2008).

To determine whether a defendant provided sufficient procedural due process, [the court]

must first determine whether the claim is based on established state procedures or on random and

unauthorized acts by state employees. *Cannici*, 885 F.3d at 479(*citing Leavell v. Ill. Dep't of Nat. Res.,

600 F.3d 798, 804 (7th Cir. 2010).  A claim based on a deprivation from established state procedures

requires more than simply the availability of post-deprivation procedures. *Leavell*, 600 F.3d at 805.

The state's ability to predict when a deprivation will occur provides the state the ability to provide a

pre-deprivation hearing. *Id.*  Conversely, a claim based on random and unauthorized acts by state

officials does not have the same predictability, and thus, only requires a meaningful post-deprivation

remedy.  *Id.*  The plaintiff must "avail herself of state post-deprivation remedies or demonstrate that the available remedies are inadequate." *Id.*

Defendants in their motion mention *Michalowicz v. Vill Of Bedford Park*, but fail to apply any of the facts present here to those in *Michalowicz.*  Simply put, the Defendants simply spewed language from *Michalowicz* but provided no analysis as to how it applies to the present matter.  The district court in *Michalowicz* dismissed the complaint for failure to state a claim because there was an adequate state law remedy.  *Michalowicz*, 528 F.3d at 530.  The Seventh Circuit affirmed, agreeing that the Illinois Administrative Review Act provided an adequate remedy for the violations alleged.  *Id.*

*Michalowicz* is distinguishable from the instant facts for multiple reasons.  First, the *Michalowicz* plaintiff received notice.  *Id.* at 533.  Second, he met with Village officials and discussed the basis of his termination.  *Id.*  Third, he participated in a Village Board meeting.  *Id.*  Fourth, he was allowed to make a statement.  *Id.*  Fifth, he was given a post-termination hearing per the Village code.  Those five, critical facts are missing here.  As no notice or hearing occurred here, Defendants cannot rely on *Michalowicz.*

Defendants regurgitate language from *Michalowicz* but the discourse about pre- and post-termination hearings does nothing other than sow confusion.  *See Id.*  Again, unlike *Michalowicz*, Shreffler received no hearing at any time, and was never given notice.  Additionally, because Shreffler received no process, there was no basis for administrative review.  Shreffler thus appropriately seeks redress of the due process violations here in this Court.  And unlike *Michalowicz*, here there was no "final administrative ruling" to seek state court review.  *See* 528 F.3d at 535. Defendants avoid this critical distinction; and, because Defendants completely disregarded Illinois notice and hearing laws in terminating Shreffler, this Court must deny Defendants' motion for summary judgment.

56

Defendants in their motion rely on the Seventh Circuit's opinion in *Cannici v. Village of Melrose Park*, 885 F.3d 476 (7th Cir. 2018). *Cannici* is distinguishable from the facts present here. In *Cannici*, the Board of Fire and Police Commissioners ("the Board") determined Cannici violated the Village's Residency Ordinance and issued a written Statement of Charges, dated June 28, 2016, seeking to terminate his employment. *Id.* at 478. On August 4, 2016, the matter proceeded to a hearing [before the Board], at which Cannici and his counsel were both present. *Id.* Based on testimony and arguments presented at the hearing, the Board found Cannici had failed to maintain residency throughout his employment. *Id.* On September 26, 2016, Cannici filed a three-count complaint in state court. *Id.* Cannici sought review under the Illinois Administrative Review Act and claimed a violation of his due process and equal protection rights. *Id.* at 479. The defendants removed the case to the Northern District of Illinois and subsequently filed a motion to dismiss. *Id.* On January 27, 2017, the district court granted the motion to dismiss, refused to exercise supplemental jurisdiction over the remaining state law administrative review claim and thus, remanded the case back to the state court. *Id.* The Court in *Cannici* found that the Illinois Administrative Review Act provides sufficient post-deprivation relief. *See* 735 ILCS 5/3-101 *et seq*; *see also Michalowicz,* 528 F.3d at 535-36; *Leavall*, 600 F.3d at 806; *Stachowski v. Town of Cicero*, 425 F.3d 1075, 1078 (7th Cir. 2005).

Here, Shreffler never received a statement of the charges against him that identified the basis of Dumas seeking his termination; never received notice of a hearing before the Board of Fire and Police Commissioners; and never received any findings or a "final administrative ruling." Thus, *Cannici* in completely distinguishable from the facts present here. In contrast to the procedure in *Cannici*, Shreffler had no ability to avail himself of a challenge to state court under the Illinois Administrative Review as there had been no final administrative ruling to challenge.

4814-4316-2599, v. 1

The Defendants make no showing that the CBA in this case contains a clear and unmistakable waiver of Plaintiff Simmons' rights to a judicial forum for his federal claims of employment discrimination. See B*radley v. Village of University Park,* 2020 WL 7390328; 7th Cir.

Additionally, the City's own employment handbook that the City will comply with all state and federal legal requirements relating to notice and an opportunity to be heard in the event of discipline or dismissal.  The City will attempt to ensure that employee terminations are not made in an arbitrary and capricious manner."  City Handbook, Section 2.1.

However, Defendants terminated Shreffler in an arbitrary and capricious manner in direct violation of all state and federal legal requirements relating to notice and an opportunity to be heard before his termination.  "No officer or member of the fire or police department of any municipality subject to this Division 2.1 shall be removed or discharged except for cause, upon written charges, and after an opportunity to be heard in his own defense.  The hearing shall be as hereinafter provided, unless the employer and the labor organization representing the person have negotiated an alternative or supplemental form of due process based upon impartial arbitration as a term of a collective bargaining agreement."  *See* 65 ILCS 5/10-2.1-17.  Defendants failed to provide Shreffler with written charges or a hearing in accordance with the above statute; and, failed to provide Shreffler with access to an impartial arbitration per the Collective Bargaining Agreement between the Illinois FOP Labor Council and the Kankakee Police Department. Officers are entitled to due process in disciplinary and termination procedures. Plaintiff did not received his due process rights. Dkt. 22, Ex. 17, pp. 64-66; Dkt. 22, Ex. 33, pp. 157-158, 159 161-162; 163-164; 169-170.  Ex. B, pp. 98-102, 107, 110-11, 157. Dkt. 22, Ex. 7, pp.248-249.  Thus, Defendants' motion for summary judgment must be denied.

**A. Plaintiff was not afforded sufficient post-deprivation process to satisfy the Fourteenth Amendment in the face of a random and unauthorized deprivation.**

Defendants contend that they provided Shreffler with sufficient post-deprivation process to satisfy the Fourteenth Amendment in the face of a random and unauthorized deprivation. Defendants' argument here is completely meritless. Defendants argue that "the CBA which covered Plaintiff's employment with the City provided extensive grievance and arbitration procedures." See Def. SJ, p. 42, Dkt. 22. Further, the Defendants argue that "Plaintiff's union has sought arbitration through grievance under the CBA, and the grievance remains pending to this day." See Def. SJ, p. 42, Dkt. 22.

Defendants failed to acknowledge the CBA that binds the procedures for police officer's grievances. Specifically, the CBA between the Illinois FOP Labor Council and the City of Kankakee Patrol Officers states in pertinent part, "If the City does not answer a grievance or an appeal thereof within the specified time limits, the aggrieved employee and/or the Union may elect to treat the grievance as denied at that step and immediately appeal the grievance to the next step." CBA, Article 7(E). The CBA clearly outlined the procedure for a grievance being referred to arbitration. Article 7(C) provides that if a grievance is not settled in Step 3 and the Union wishes to appeal the grievance from Step 3 of the grievance procedure, the Union may refer the grievance to arbitration, as described below, within ten (10) business days of receipt of the City's written answer.

Here, on or about June 25, 2018, the Union filed a Step-Two grievance on Shreffler's behalf challenging his termination on the basis that he was terminated without just cause; a copy of the Step-Two grievance was provided to Defendant Dumas. Dkt. 22, Ex. 12. Defendant Dumas never responded to the Step-Two grievance filed on June 25, 2018. Dkt. 22, Ex. 12. Based on the guidelines in the CBA, Dumas' failure to respond to the Step-Two grievance presumably meant that it was denied; and, the Union immediately and appropriately appealed the grievance to the next step, Step-Three. Dkt. 22, Ex. 12. On or about July 11, 2018 the Union, on Shreffler's behalf, sent the

grievance to Mayor Chastity Wells-Armstrong via certified mail. Dkt. 22, Ex. 12. Shreffler's
grievance was never heard at the Step-Three level and on August 10, 2018, the Union sent a
"Formal Notice of Referral to Arbitration" in correspondence addressed to Mayor Chastity Wells-
Armstrong via email and certified mail. Dkt. 22, Ex. 14.

Article 7(C)1 of the CBA provides that the parties shall attempt to agree upon an arbitrator
within five (5) business days after receipt of the notice of referral. In the event the parties are unable
to agree upon the arbitrator within said five (5) day period, the parties shall jointly request the
American Arbitration Association (AAA) to submit a panel of seven (7) arbitrators, or the Federal
Mediation and Conciliation Service. CBA, Article 7(C)1. There is no evidence in the record to show
that Mayor Wells-Armstrong ever responded to the August 10, 2018 correspondence within the
required five (5) calendar days after receipt of the notice. Dkt. 22, Ex. 14. Thus, it is clear that
Defendants violated Shreffler's due process rights by violating the CBA and procedures required
therein. Accordingly, Defendants' motion for summary judgment must be denied.

### B. Dumas is not entitled to Qualified Immunity.

For all the reasons outlined above in Section IV(D), Defendant is not entitled to qualified
immunity; and thus Defendants' motion for summary judgment must be denied.

## CONCLUSION

For all the foregoing reasons, Plaintiff requests that this Honorable Court deny Defendants'
summary judgment motion on all counts, and award Plaintiff any relied deemed just and appropriate
by the Court.

4814-4316-2599, v. 1

Date: April 29, 2021

Respectfully submitted,

 /s/  Daniel Q. Herbert

 /s/  Kelly A. Krauchun

The Herbert Law Firm
206 S. Jefferson, Suite 100
Chicago, IL 60661
(312) 655-7660
Dan.herbert@danherbertlaw.com
Kelly.krauchun@danherbertlaw.com
Terri.ryan@danherbertlaw.com

4814-4316-2599, v. 1

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel for the Defendants hereby certifies that this Motion for Summary Judgment complies with the type-volume limitation of Rules 7.1(D)(5) and 7.1(B)(4)(b)(1) of the Local Rules for the United States District Court for the Central District of Illinois because the argument section of the motion contains 6,715 words.

  /s/  Daniel Q. Herbert

  /s/  Kelly A. Krauchun


Attorneys for Plaintiff
Daniel Q. Herbert (ARDC No. 6273940)
Kelly A. Krauchun (ARDC No. 6322639)
The Herbert Law Firm
206 S. Jefferson, Suite 100
Chicago, IL 60661
(312) 655-7660
Dan.herbert@danherbertlaw.com
Kelly.krauchun@danherbertlaw.com

4814-4316-2599, v. 1

## CERTIFICATE OF SERVICE

The undersigned, one of the attorneys of record herein, hereby certifies that on April 29, 2021, the foregoing **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' LOCAL RULE 7.1(D)(1) MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S LOCAL RULE 7.1(D)(2) RESPONSE AND STATEMENT OF ADDITIONAL FACTS** was electronically filed with the Clerk of the U.S. District Court using the CM/ECF System, which will send notification to all parties of record.

Daniel Q. Herbert dan.herbert@danherbertlaw.com, terri.ryan@danherbertlaw.com

Kelly Ann Krauchun kelly.krauchun@danherbertlaw.com, terri.ryan@danherbertlaw.com

Michael J. Atkus matkus@khkklaw.com, lgreenberg@khkklaw.com

Susan Jacqueline Eberhardt seberhardt@khkklaw.com, kstocco@khkklaw.com

William W. Kurnik bkurnik@khkklaw.com, kstocco@khkklaw.com

/s/ Daniel Q. Herbert