E-FILED
Tuesday, 28 September, 2021  03:55:38 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| **MICHAEL SHREFFLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | **Case No. 19-CV-2170** |
| | ) | |
| **CITY OF KANKAKEE and PRICE DUMAS,** | ) | |
| **Individually and in his Official Capacity,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### ORDER

Plaintiff, Michael Shreffler, brought this claim against Defendants City of Kankakee and former acting Kankakee Police Chief Price Dumas, in his individual and official capacities, alleging violations of Plaintiff's rights under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.), the First Amendment and Due Process Clause of the Fourteenth Amendment of the U.S. Constitution pursuant to 42 U.S.C. § 1983, the Free Speech Clause of the Illinois Constitution, and retaliatory discharge under Illinois state law.

Defendants filed a Motion for Summary Judgment (#22) on March 11, 2021, to which Plaintiff filed a Response (#27) on April 30, 2021. Defendants filed a Reply (#31) on June 7, 2021. Defendants also filed a Motion to Strike (#34) on August 2, 2021. For the following reasons, Defendants' Motion to Strike (#34) is DENIED. Defendants' Motion for Summary Judgment (#22) is GRANTED.

BACKGROUND

The following background facts are taken from Defendants' Statement of Undisputed Material Facts, Plaintiff's Additional Facts section in his Response, and the exhibits attached by the parties to their filings.  The court will list only facts supported by the record and that comply with the Local Rules of the Central District of Illinois.  In addition, the court will list only those facts that the court may legally consider on a motion for summary judgment.  Where the court believes it necessary, the court will explain the basis for considering or refusing to consider an enumerated fact put forth by the parties.

Parties

Plaintiff is a white male who was hired as a patrolman for the Kankakee Police Department ("KPD") on June 16, 2009, and promoted to the position of patrolman first class on May 11, 2011.

Defendant City of Kankakee (the "City") is a municipality incorporated under the laws of the State of Illinois.

Defendant Price Dumas is a black male who served as interim Chief of Police of the KPD from June 2017 to August 2018.

Collective Bargaining Agreement ("CBA")

Plaintiff's employment with the City was subject to a CBA between the City and the Illinois Fraternal Order of Police Labor Council (the "Union").  The CBA included a grievance procedure for contesting disciplinary decisions from command staff.  The grievance procedure contains three steps for resolving disputes internally.

2

Following the third step, the Union may refer the dispute to binding arbitration, at which it has the rights to legal counsel and to request that the arbitrator require the presence of witnesses and documents.

<u>Plaintiff's Pre-2016 Disciplinary History</u>

On January 7, 2013, Plaintiff received a one-day suspension from then-KPD Chief Larry Regnier for several rule violations that Plaintiff committed while responding to a bank alarm call.  On June 20, 2013, Plaintiff received a written reprimand from Chief Regnier for violating a general order by missing a court date.  On March 11, 2015, Plaintiff received a one-day suspension from Chief Regnier for several admitted rule violations that he committed during a motor vehicle pursuit.

<u>Events of 2016</u>

On February 9, 2016, Plaintiff, identifying himself by his first name and surname, made several posts on Facebook concerning the performance of Beyonce during the Super Bowl broadcast.  One of Plaintiff's posts read: "fucking pathetic, NFL is going to let these turds use national spotlight for liberal propaganda!!!"  The larger Facebook conversation led to a back-and-forth between Plaintiff and a poster named Angie Churchill during which Plaintiff called her a "bitch," a "liberal nutcase," a "dumb motherfucker," and told her to "fuck off."

Plaintiff testified that his Facebook page has always been private, and the only way anyone would be able to see his post would have been if they were friends with one of the five people he tagged in the post.  Plaintiff further testified that he never identified himself on Facebook as a Kankakee police officer nor as an employee of the City.

A patrol officer who was offended by Plaintiff's posts forwarded them to KPD Commander Christopher Kidwell by telephone or email, and Kidwell in turn forwarded them to Chief Regnier for him to review and decide what to do. On February 10, 2016, Plaintiff received a written reprimand from Chief Regnier for rule violations relating to the posts. Plaintiff disagreed with Regnier that his February 9, 2016, Facebook posts violated KPD rules.

KPD Lieutenant Donnell Austin, who is black, testified that he believed Plaintiff's Facebook posts during the Super Bowl were offensive, although he never heard Plaintiff make any disparaging racial comments.

On February 10 or 11, 2016, after he heard that Plaintiff had been written up, KPD Officer Michael Suprenant showed Plaintiff some posts that then-KPD Lieutenant Willie Hunt had made on Facebook. Hunt's posts consisted of eight memes that were originally posted by other Facebook users that Hunt reposted. The posts each contained either text superimposed over photographs or text included as captions of photographs. The text of the posts included the following: (1) "white supremacy is convincing millions of black people that their savior is a white man"; (2) "guess who still wants their 40 acres and a mule"; (3) "the white man committed the worst and most violent crimes in history, but somehow managed to convince the World negros is a threat"; (4) :when someone calls your ancestors slaves correct them and say they were prisoners of war"; and (5) "Just some interesting fyi: Did u know that around 25% of white ppl are born with tails. They cut them off at birth. Whites share DNA with the RHESUS MONKEY. They enjoy calling others monkeys because 80% of them don't know the truth about themselves. Whites also share 4% neanderthal DNA."

4

Hunt made other Facebook posts, including a post with a caption from Hunt stating "they never talk about white on white crime."  The post contains a photo with a caption stating "85% of white people that are killed in America each year are murdered by other white people, yet we never hear the term white on white crime, it's only being done to black people to create feelings of self-hatred."  The rhesus monkey post included a picture of a white man with a tail in which another person had commented "this isn't prejudice, this is genetic and knowledge, get you some!"

Plaintiff found Hunt's Facebook posts egregious and racially charged.  Within a week of learning of Hunt's posts, Plaintiff showed them to Chief Regnier because he felt that if his Facebook posts violated KPD policy, then Hunt's posts did too.  He also came to Regnier as a "tit-for-tat" because he was under the impression that Hunt showed Regnier the posts that led to Plaintiff's own discipline.  Plaintiff did not bring Hunt's Facebook posts to Regnier because he believed that they were unlawful, but because he thought they were racist.  Regnier issued Hunt a written reprimand for the Facebook posts.

Hunt admitted his Facebook posts were offensive.  Hunt testified that he was upset that his Facebook posts were brought to Chief Regnier and he asked individuals on his Facebook account if they had any issues with anything he posted.  Lieutenant Austin testified that Hunt's Facebook posts were in bad taste and characterized the posts as "racial rhetoric" and "white supremacy[.]"

5

Chief Regnier wrote a memorandum on May 2, 2016, which he provided to Hunt and explicitly stated the following:

> Lt. Hunt said that he posted nothing on there that was not a fact, which I told him I did not agree with him and that I knew of no people that had to have a tail removed. He told me that it is a well-known fact that white people have the Rh factor, which comes from the Rhesus Monkey. I told him I was aware of the Rh factor but I thought all humans evolved from primates so his facts should include all humans. He said those posts and shares were for his circle of friend and were not intended to be spread all over, and that police officers from this department were responsible for their being published. I advised him that I had no doubt that it was the cops that provided those posts for all to see, and that I had disciplined an officer for what I felt was a much less severe case than this. I then handed him a Letter of Reprimand and told him that he left me know [sic] choice but to issue him the reprimand due to the anti-police and anti-white literature he was sharing. He told me he understood and was accepting the letter, but it ends here. I told him that is exactly what I want is for it to end here. He said that if Shreffler, Lombardi, and the other officers involved keep pushing it then he will have to do what he has to do. I told him it was my job to counteract any type of policy violation, and that if he was being singled out for continued harassment, then he is to put it in writing and give it to me to be investigated. He agreed and I advised him not to give anyone any fuel to start the fire. He said he would not and reiterated that he felt this was done. I agreed. I pointed out several other pictures and posts that were anti-police, and he said, well I guess I am anti-police when it comes to the wrongs committed by officers. I agreed with him and told him it was our jobs to make sure our officers conformed to the law.

Kankakee Mayor Chastity Wells-Armstrong testified that Hunt believed he was improperly disciplined for his Facebook posts, which the Mayor concluded, "could be interpreted as insensitive toward white people."

6

Suprenant testified that he found Hunt's Facebook posts offensive, in that they included racial undertones and unfavorable comments about white people. Suprenant never commented on Hunt's offensive Facebook posts because he feared retaliation from Hunt as he was Suprenant's direct supervisor.

Plaintiff walked away from some interactions with Deputy Chief Hunt with the personal feeling that Hunt did not like Plaintiff because he was white. Austin believes that there are a "multitude of people" that believe they are supreme to black people.

Deputy Chief Hunt threatened Suprenant in Hunt's office and told Suprenant that once he found out who gave Hunt's Facebook posts to Plaintiff that he would get "them back" and retaliate; and Hunt weekly interrogated and threatened Suprenant regarding Hunt's Facebook posts that Plaintiff showed Chief Regnier. Once Hunt began interrogating and threatening Suprenant regarding Hunt's posts, Hunt began cutting Suprenant's hours as a school resource officer. Hunt also failed to provide Suprenant backup when he was sitting in his office at the station and gave all of Suprenant's hours at the school to a black officer, Officer Brooks.

Plaintiff, as a patrol officer, had a duty to report any misconduct that he believed to be occurring with a policy officer, deputy chief, or commander.

On August 16, 2016, Plaintiff received a written reprimand from Regnier for violating KPD policies regarding use of sick time and sick time abuse. On November 15, 2016, Plaintiff received a written reprimand from Regnier for violations of KPD policy regarding sick time.

Changes In City and KPD Administration

Chastity Wells-Armstrong was elected Mayor of Kankakee in April 2017, and was the first black person elected to the position. The next day Chief Regnier announced his planned resignation as Chief of Police.

Upon taking office in May 2017, Mayor Wells-Armstrong appointed Deputy Chief Robin Passwater as Acting Chief of Police. Around Memorial Day 2017, Passwater resigned with very little notice. However, Passwater had accused Wells-Armstrong of calling him a racist over a dispute involving KPD interactions with the minority community, and Passwater had threatened to file an EEOC complaint against her.

In June 2017, Mayor Wells-Armstrong appointed Dumas as Interim Chief of Police, and named Willie Hunt as Deputy Chief. Both Dumas and Hunt are black males. Dumas was aware of Hunt's Facebook posts for which he was disciplined, but Dumas was not concerned with the posts' racial overtones when promoting Hunt to the second in command. Dumas supported Hunt's promotion to Deputy Chief even though he believed Hunt's Facebook posts were detrimental to the KPD.

Mayor Wells-Armstrong demoted Commander Kidwell, who is white. Lt. Austin, who is black, was promoted to Commander. Dumas "reassigned" Kidwell to Lieutenant and replaced him with Austin. Dumas testified that he would not use the word "demoted" even though it did result in a cut in pay for Kidwell. Austin testified that Kidwell was upset with his demotion, but did offer to help Austin, who stated that "it would be difficult for me to do the job without drawing on his [Kidwell's] expertise."

8

Austin donated to Mayor Wells-Armstrong's campaign after she was elected. Dumas appointed Austin to Commander in May 2018 even though Austin had never expressed any interest in the job. Austin is a member of Black Law Enforcement Executives. He is Facebook friends with Mayor Wells-Armstrong and Hunt, but Hunt later unfriended Austin.

Mayor Wells-Armstrong is a member of the NAACP. She believed the KPD was not diverse enough, in that Kankakee has a predominantly minority population, but the KPD is majority white male.

<u>Dumas Disciplines Plaintiff for Failing to Properly Search a Passenger</u>
<u>In His Patrol Vehicle</u>

On September 7, 2017, Plaintiff's field trainee found a handgun underneath the front passenger seat of Plaintiff's squad car during a routine beginning of shift inside-the-squad check. The handgun did not belong to either Plaintiff or his trainee. Either Plaintiff or the trainee reported up the chain of command that they had found the gun.

KPD Officer Troy Johnson initially said that he thought it was his handgun because he was missing a handgun, but he ultimately found it elsewhere. Kidwell testified that, a month or two later, based on information they had received from the Kankakee County State's Attorney's Office, the KPD administration formed the belief that the firearm was left in Plaintiff's patrol car by an individual Plaintiff had arrested.[1]

---

[1]Despite Plaintiff's objection, this is not hearsay. Kidwell testified as to the belief of the KPD administration regarding the handgun found in Plaintiff's patrol car, and the basis for that belief. Kidwell was not testifying to "[a]n out-of-court statement offered to prove the truth of the matter asserted[.]" *Lovelace v. McKenna*, 894 F.3d 845, 849 (7th Cir. 2018), citing Fed. R. Evid. 801(c).

On December 21, 2017, Chief Dumas issued Plaintiff a written reprimand for violation of KPD policies, citing his failure to properly search a passenger that entered his squad car.  Plaintiff believes that Dumas issued him this reprimand because Hunt had issues with him since he brought Hunt's Facebook posts to Chief Regnier's attention in February 2016.

Plaintiff testified that officers share squad cars with two other people, (i.e. one person on each of the other two shifts); and that Officer Troy Johnson drove that car on the afternoon shift.  Hunt told Dumas that Plaintiff missed a gun and never disclosed that Plaintiff was working with a partner, who was never disciplined.  Dumas never disciplined anyone other than Plaintiff for missing a gun, which Dumas testified is a level one offense.  Jeffrey Burke, from the Union, testified that it was the Union's belief that the discipline was improper and it was suspicious that Plaintiff's partner did not receive the same discipline related to this incident.  Plaintiff testified that Dumas did not prove he violated the policy.

Plaintiff filed a grievance concerning the written reprimand because he did not feel that he violated the rules that the reprimand alleged.  He had legal and Union representation through a step 3 grievance hearing with Mayor Wells-Armstrong during which he was given an opportunity to present evidence on his own behalf that he did not violate the rule.  Ultimately, on February 18, 2018, Mayor Wells-Armstrong denied the grievance.  Plaintiff disagreed with the outcome because he does not believe that Chief Dumas showed any proof that Plaintiff violated the rule.  Also, Plaintiff believes it was retaliation by Hunt for Plaintiff's reporting of Hunt's Facebook posts in 2016.

Mayor Wells-Armstrong sat on the grievance panel concerning Plaintiff's discipline; it was the only time she ever sat on a grievance panel; and, she was not familiar with the KPD's disciplinary process, the process covered by the CBA, KPD policy and procedure, or Illinois law.  She never reviewed Plaintiff's complimentary or disciplinary history.  Plaintiff testified that this grievance was denied at step 3 by the Mayor and that he requested a referral for arbitration, the first time he had ever done so on a grievance, but the arbitration never occurred.

<u>Plaintiff Reports Villagomez's Conduct to Dumas and Hunt</u>

In late November or early December 2017, as part of his duties on the gang unit, Plaintiff, along with Officer Erik Villagomez, went to the residence of a woman with an outstanding arrest warrant in order to attempt to serve the warrant.  When they arrived at the residence they walked up the back stairs and knocked on the door twice, but no one answered.  After receiving no answer, Villagomez opened the door and walked into the residence, where they located and arrested the woman on the warrant and took her to jail.

After the arrest, Plaintiff went to Deputy Chief Hunt's office to discuss it with him.  He told Hunt that he and Villagomez went to serve a warrant and that Villagomez entered the residence after knocking a few different times.  He told Hunt that Villagomez admitted to him that he should not have entered the residence.  He told Hunt that Villagomez either did not know how to do his job, or did not mind breaking the rules.  Plaintiff also told Hunt that he had concerns with the way Villagomez conducted himself as a police officer.

11

The next day, Plaintiff spoke with Dumas and raised the same concerns about Villagomez's conduct during the arrest.  Dumas said Hunt had not told him about the prior day's conversation with Plaintiff.

Approximately two days after and as a result of Plaintiff's reports to Chief Dumas and Deputy Chief Hunt regarding Villagomez's improper execution of the arrest warrant in November or December 2017, Villagomez was taken out of the gang unit.

Plaintiff believes Dumas removed Villagomez from the gang unit based on his complaints to Dumas and Hunt; and Plaintiff heard rumors that Villagomez told people that Plaintiff had him taken out of the gang unit.

<u>Plaintiff's Trainee Assignment</u>

In late January 2018, Plaintiff was reassigned a trainee to work with on the midnight shift.  Plaintiff worked with the trainee one day before he was informed by Kidwell that the trainee was being moved to another shift.  Deputy Chief Hunt decided to move the trainee to another shift because he did not think the trainee needed to spend two tours on the midnight shift.  Plaintiff testified that he asked Kidwell why he was losing his trainee as a rookie and Kidwell said because he was told to take him off midnights and put him on a day shift with somebody else.  Hunt testified this was the only time he had taken such an action.  Kidwell had also never heard of something like this happening before.  Plaintiff believes that Hunt moved the trainee to another shift because he and Hunt had a history since the 2016 Facebook incident, and that Hunt's action was racially motivated.

12

<u>Plaintiff's February 2018 Facebook Posts</u>

In February 2018, Plaintiff, identifying himself as "Michael Patrick," posted three comments in a Facebook group dedicated to discussing government and political issues involving Kankakee County.  In order to post comments in the group, one had to be a member of the group.  When Plaintiff posted the comments, he knew they were going out to members of the group, but he did not have any idea how many people they were going out to.  Plaintiff knew that both KPD officers and residents of the City were members of the group who would have the ability to view his comments.

The first two comments were part of an ongoing conversation with a local business owner named Patrick Wilder.  Wilder's original post had showed his displeasure with how the City handled the auction of a building and its eventual gifting of the building to an alleged relative of Mayor Wells-Armstrong.  Wilder thought it was a "shady" deal.  Plaintiff commented in response "Corruption from this Mayor…weird!"  Plaintiff testified at his deposition that the deal was "big talk" at the KPD, as everyone had been hearing the same thing.

In response to Plaintiff's comment, Wilder commented "I would love to know how many people from Sheridan [Illinois] know our mayor in kankakee [sic] so well that she gave them property and the city vehicle contract [the 'Auto Lab deal']."  Plaintiff then responded "Good question, but with this Administration anything is possible!!! Shit show…"

The only investigation Plaintiff personally did into the issue was to look up the people Wilder mentioned to see where they were from.

13

Plaintiff's "shit show" comment referred to the way the City administration was handling situations inside and outside the KPD, including Mayor Wells-Armstrong's choice for Chief of Police (Dumas) and Deputy Chief (Hunt), things happening at City Council meetings, and the job the City administration was doing in general.  Plaintiff disagreed with the Mayor's choice for Chief and Deputy Chief.  He understood that if he wanted to initiate an investigation into public corruption in the Mayor's office, he could have made his statements at a board meeting, contacted the U.S. Attorney's Office, the FBI, the Illinois Attorney General's Office, or reached out to a journalist.  He did not do any of those things.  Plaintiff testified that he believed someone had contacted the U.S. Attorney and the FBI about the situation.

Plaintiff's "shit show" comment was also part of a discussion about the promotion of Steven Hunter to the position of sergeant within the KPD.  Regarding the promotion, Plaintiff wrote: "Regardless of who was promoted or who was more qualified, the point remains the same.  This was racially motivated and a complete hypocrisy."  Plaintiff intended to imply with his comments that Dumas, Hunt, and Wells-Armstrong engaged in racial bias in promotional decisions within the KPD, which Plaintiff found to be hypocritical because Dumas and Hunt had sued the City over racial discrimination in the KPD 10 to 15 years prior.

Plaintiff's understanding, which was based on "regular talk with everyone," was that Hunter was advised of his promotion to sergeant weeks in advance.  Plaintiff felt that two other officers, who were white, were unfairly passed over for Hunter's promotion to sergeant.  Plaintiff understood that if he wanted to initiate an investigation into racial bias and promotions within the KPD or bring such allegations

14

to public light, he could have made his comments at a board meeting, reached out to someone at the Justice Department, the EEOC, or the Illinois Department of Human Rights, but he did not do so.  Plaintiff filed an EEOC and IDHR complaint in his own case.

Plaintiff's motivation in making all three Facebook comments in the manner he did was "frustration."

On February 23, 2018, KPD Lieutenant (now Commander) Austin handed Plaintiff a document advising him to appear for an interrogation with respect to an investigation relating to the Facebook posts.  The document advised Plaintiff that the Chief of Police was conducting an investigation into alleged unprofessional conduct and policy violations relating to several disparaging remarks Plaintiff made on Facebook during February 2018 regarding the KPD, its administration, and the Mayor. The document noted that the remarks "tend to compromise and or damage the mission, function, reputation, and professionalism of the Kankakee Police Department."

Plaintiff gave an interview to City Inspector Ronald Bartlett on February 23, 2018.  Lieutenant Austin, Plaintiff's Fraternal Order of Police ("FOP") attorney, and another FOP representative were present during the interview.  During the interview, Plaintiff advised that he fully understood the KPD's social media policy, and remarked that his comments were personal opinions and that he did not believe they violated policy.  Plaintiff acknowledged that he understood that his opinions could affect what others believed about the operation of the KPD.

On March 5, 2018, Dumas issued Plaintiff a written notice of a five day suspension for several rule violations implicated by Plaintiff's Facebook posts. Plaintiff filed a grievance to challenge the five-day suspension, which was denied at steps 1 and 2. During the grievance process, Dumas agreed to reduce the suspension to four days, but Plaintiff rejected that offer. Austin testified that Plaintiff's Facebook posts were critical of Mayor Wells-Armstrong's administration and of the alleged corruption within the Mayor's administration and Auto Lab, and Austin admitted that complaints about public officials and police officials are protected by the First Amendment.

Hunt conducted an investigation into the February 2018 Facebook posts on the "you're probably from Kankakee if" page because he believed Plaintiff or someone from the Union was leaking sensitive KPD information on the page. Hunt never generated any reports as a result of the investigation, which was in violation of KPD policy regarding internal criminal investigations. Hunt admitted that he did not find any evidence that Plaintiff posted any of the information.

At some point, a step 3 grievance hearing was held at City Hall. Those in attendance at the meeting were Plaintiff, Mayor Wells-Armstrong, Hunt, Dumas, Carolyn Croswell from Human Resources, the Union president, and Plaintiff's FOP attorney. During the hearing, Plaintiff explained to the Mayor his opinion that Deputy Chief Hunt was going out of his way to "mess" with him. They discussed some type of resolution. During that hearing, no one brought up the allegations regarding the active shooter training incident (which will be described below) where Plaintiff was alleged to have threatened and uttered the racial epithet against Chief Dumas.

16

At the end of the hearing, Plaintiff's attorney advised the Mayor that they would accept no resolution that included any suspension, and would only accept a written reprimand.

Plaintiff never received any resolution to the step 3 grievance.  The Union filed for arbitration on the suspension.  According to Jeffrey Burke, Plaintiff's district Union representative, the grievance and request for binding arbitration remains pending.

Burke testified that the Union believed that Plaintiff's discipline related to the Facebook posts was improper and violated the CBA.  Plaintiff testified that his Union also believed that his February 9, 2016, Facebook posts did not violate KPD rules; and, that he was speaking on his own time on his own private Facebook account.

Austin believed that the Facebook posts in the anonymous group were negative towards black leadership within the City.  He filed a complaint about a post allegedly made about him by a white police officer.  He believed Plaintiff was responsible for some of the negative posts toward black people.  Austin could not say one way or the other whether Plaintiff was terminated because Hunt thought Plaintiff was responsible for the negative posts.

Mayor Wells-Armstrong testified that she believes police officers have the right per the First Amendment to express themselves as private citizens and could not be disciplined for exercising that right.  However, Mayor Wells-Armstrong asked Dumas to conduct the search into the Facebook posts that were critical or threatening of the Mayor and Chief Dumas through the unauthorized used of KPD equipment that eventually led to an Illinois State Police criminal investigation of Dumas.  Wells-Armstrong was not aware that the investigation was criminal in nature.  She did

17

become aware that Austin, who had been promoted to Commander, made a complaint to the FBI about what he believed to be criminal conduct regarding the company Auto Lab's relationship with the City, Mayor, Dumas, and Hunt.

<u>Dumas Receives Report of Misconduct and the Department Investigates</u>

Some time prior to Plaintiff's alleged threats against Dumas which led to his termination, Dumas approached Plaintiff's wife at her place of work and said "I hope you're not mad at me," which she said made her uncomfortable.  Plaintiff's wife reported the incident to KPD, and Dumas admitted his conduct was improper.

On March 29, 2018, Plaintiff participated in an active shooter training at Kankakee Junior High School.  Following the training session, KPD Officer Villagomez reported to Deputy Chief Hunt that while the officers at the training were in a SWAT van, Sgt. Tison and Plaintiff were having a conversation and Tison asked something about Chief Dumas meeting with Plaintiff's wife.  Plaintiff blew up and stated "I ought to kill that n[-word]," or something to that effect.  Villagomez further reported that after Plaintiff's remark, Plaintiff looked at Tison and said, "hey man what are you going to do?  I can't believe I said that."

Hunt walked Villagomez over to Dumas' office and Villagomez repeated to Dumas what he witnessed in the van during training.  Hunt called Tison and told him to come back to the station, write a statement about what happened in the back of the van, make a list of everyone that was in the back of the van, and have everyone on the list write a statement about what happened in the back of the van.  Dumas told Commander Kidwell to get statements from the people in the van.

Hunt brought the allegations that led to Plaintiff's termination to Dumas' attention.  Dumas never recommended that Plaintiff be terminated, nor did he conduct any investigation into the allegations which resulted in Plaintiff's termination.  Hunt testified that he never heard Plaintiff use racially charged language in the workplace.

Either later in the day after the training or the next day, Plaintiff received a call from KPD Lt. Edsell and was ordered to come in and write a statement about what happened at the training because "somebody said that [he] said something."  Plaintiff had an idea of what Edsell was referring to based on a conversation Plaintiff had with KPD Officer Herscher the day before.

Austin and Inspector Bartlett, at Dumas' request, conducted an investigation as to what happened inside the van during training.  Bartlett's investigation consisted of reviewing written statements by each of the officers present at the alleged incident and conducting video recorded interviews of each of them.  Bartlett prepared summaries of each interview that he conducted, which he avers truly and accurately summarized the interviews.

Kidwell notified Plaintiff that he had to come in for an interrogation and pick up paperwork; the paperwork advised Plaintiff when he would be interviewed by Bartlett.

On April 18, 2018, Plaintiff gave an interview to Bartlett about what occurred during the training.  Plaintiff was represented by his Union attorney during the interview, and another Union representative was present.

At the start of the interview, Bartlett read aloud the Notice of Allegations, specifically advising Plaintiff that: (1) Chief Dumas was conducting an investigation into allegations that Plaintiff made disparaging and threatening remarks about the

19

Chief during the active shooter training session; (2) the remarks tend to compromise and/or damage the mission, function, reputation, and professionalism of the KPD; (3) that disparaging remarks subvert the good order, efficiency, and discipline of the KPD; and (4) the alleged remarks constituted violations of several specific KPD policies.[2]

During the interview, Bartlett asked Plaintiff to relate, in his own words, the incident in the SWAT van at the active shooter training on March 29, 2018. Plaintiff stated that he recalled that while in the van during the training, he stated in a conversation with Officer Herscher, "What kind of dumbass would involve an employee's wife at her place of employment with regard to my work-related situation?" Bartlett advised Plaintiff that other officers who were present reported that they heard Plaintiff use the racial slur "n-[word]" during the course of the conversation. Plaintiff denied using any racial slurs or threatening words about Dumas. Bartlett advised

_____

[2]Plaintiff, in his deposition testimony, did not specifically testify that Bartlett read aloud the Notice of Allegations at the start of the interview on April 18, 2018. However, at the deposition, Plaintiff was shown Defendant's Deposition Exhibit 14, attached to Defendants' Motion for Summary Judgment as Exhibit 35 (#22-35). This exhibit is the four-page summary of the April 18, 2018, interview prepared by Bartlett, in which Bartlett clearly writes that, at the start of the interview with Plaintiff, Bartlett "proceeded to read aloud the Notice of Allegations so that it would be on the record." At Plaintiff's deposition, he was shown that summary, and told to take a few minutes to read through it, which Plaintiff did. After reading the summary, Plaintiff was asked if it accurately described what the persons in attendance at the interview said, and Plaintiff replied "Yeah. It looks pretty close." He was then asked if there was anything in the summary that he disputed or differed from his recollection of how the interview happened. Plaintiff replied "No. It looks pretty consistent." Plaintiff also disputes that he was read the Notice of Allegations by citing to Plaintiff's Exhibit F (#27-6), wherein Bartlett, in an Investigative Summary, admits he committed an oversight by neglecting to read the Notice of Allegations aloud to Plaintiff during an interview. However, Exhibit F concerns Plaintiff's February 23, 2018, interview over the Facebook posts, *not* the April 18, 2018, interview concerning the March 29, 2018, statements made by Plaintiff during the active shooter training.

Plaintiff that Herscher denied that he was engaged in a direct conversation with him when Plaintiff called Dumas a dumbass.

After Bartlett conducted interviews of all the officers present, including Plaintiff, he prepared an Investigation Summary that included a brief synopsis and a copy of each interview summary including attachments.  Bartlett provided Dumas with a complete copy of the Investigation Summary sometime between April 18, 2018, and May 23, 2018.

On May 23, 2018, Lt. Austin ordered Plaintiff to be at the KPD at 4:00 pm with his Union representative to turn in his police badge, police identification, and key card. When Plaintiff arrived at KPD, Dumas served Plaintiff with a notice of formal inquiry and ordered him to appear for a meeting with administrators on May 29, 2018.  The Notice of Formal Inquiry stated that "[d]uring training at Kankakee Junior High School on March 29th 2018 Ptlm Shreffler made several disparaging/threatening remarks in reference to the Acting Chief Dumas.  In the remarks Ptlm Shreffler used racial epithets to describe the chief and threatened violence against him."  The Notice of Formal Inquiry further advised that Plaintiff's actions violated several policies of the KPD.

Plaintiff never received a copy of Bartlett's investigative report relating to the training incident wherein Plaintiff was alleged to have threatened Dumas and used a racial epithet, nor did he ever receive any findings of that investigation, penalties, or discipline.

On May 29, 2018, Plaintiff appeared for the meeting with Hunt, Dumas, the Union president, and Plaintiff's Union attorney.  At the meeting, Dumas handed Plaintiff two documents, one titled "Notice of Termination," and the second titled "Last

21

Chance Discipline Agreement."  Dumas told Plaintiff that he would be terminated if he did not respond to the Last Chance Agreement.  Dumas read Plaintiff the "Notice of Termination."  The Notice of Termination advised Plaintiff that Dumas was "recommending [to the Fire and Police Commission] that [his] employment with the KPD be immediately terminated."  The Notice of Termination further advised that Plaintiff "has also allegedly used racially-charged language toward the Chief of Police, as well as, threatening to kill him" and that it had been determined "based on the outcome of the investigation and [Plaintiff's] progressive disciplinary actions..." that Plaintiff's "actions on March 29, 2018 are considered gross misconduct and are cause for additional discipline."

Dumas went over the Last Chance Agreement and explained what the stipulations would be if Plaintiff decided to accept it.  On at least three instances during the meeting, Dumas told Plaintiff that he would be recommending Plaintiff's termination to the Commission.  After Dumas read the "Notice of Termination," Plaintiff could have said that he disagreed with it or that he did not do what was alleged, but he did not because he already had expressed such disagreement at other meetings.  Plaintiff testified at his deposition that he was never told he could dispute the charges in the Notice of Termination.  Plaintiff was never told he could ask any questions at the May 29 inquiry.  Plaintiff did not ask to meet again to present his side of the story.  Plaintiff understood that he had about a week to consider the Last Chance Agreement before Dumas recommended the termination.  Plaintiff decided not to take the Last Chance Agreement.

The Notice of Termination presented to Plaintiff on May 29, 2018, did not include a date and time that he was supposed to appear before the Fire and Police Commission, nor did he ever receive a notice of any formal charges being filed before the Commission, nor was he ever advised that he had the ability to have a hearing before the Commission.

### The Commission Terminates Plaintiff's Employment; Plaintiff's Union Files Grievance[3]

The City and Union had a decades-long practice and agreement regarding termination of patrol officers. If the Chief of Police wanted to terminate a patrol officer, he would go to the Commission informally and seek approval. If the Commission approved the recommendation, the officer would be sent a letter advising him of the action, and the Union would file a grievance seeking a remedy through arbitration.

Someone leaked internal KPD documents relating to the investigation into Plaintiff to people outside the department during the investigation process but before Plaintiff was terminated.

Dumas recommended that the Commission terminate Plaintiff's employment because Plaintiff threatened to kill him. The Commission met on June 12, 2018. Plaintiff did not appear at the meeting, but Dumas did appear. Dumas submitted documents to the Commission and had a discussion with the Commission about the investigation.

---

[3]The court would note that Plaintiff, in his Response, failed to respond to the facts listed by Defendants under this section. Thus, these facts are deemed admitted pursuant to Central District of Illinois Local Rule 7.1(D)(2)(b)(6). *McCurry v. Kenco Logistics Services, LLC*, 942 F.3d 783, 787 (7th Cir. 2019).

After coming out of executive session, the Commission voted 3-0 to terminate Plaintiff's employment.  Plaintiff learned of his termination a few weeks later by an email from the City's attorney.  On June 25, 2018, the Union filed a grievance on Plaintiff's behalf challenging the Commission's action in terminating his employment. On August 10, 2018, the Union submitted a Formal Notice of Referral to Arbitration to the City pursuant to step 4 of the CBA.  The grievance challenging Plaintiff's termination remains open.  Plaintiff has never filed any action for administrative review of the Commission's decision to terminate his employment.

The Fire and Police Commissioners that voted on Plaintiff's termination were appointed by Mayor Wells-Armstrong.  Those same Commission members, along with Dumas and Hunt, donated money to the Mayor's campaign.

Plaintiff was never told he could appear at the June 12, 2018, meeting and was not provided with the date and time when the Fire and Police Commission was going to decide the matter.  Plaintiff testified that he found out by email that he had been terminated, a week after the Fire and Police Commission made the decision.

Plaintiff's Union attorney emailed City attorney McGrath inquiring about Plaintiff's employment status, and in response to that email McGrath responded: "let this email serve as official notice of termination."

Mayor Wells-Armstrong had never opposed any employees' unemployment applications, but on July 9, 2018, she sent an email wherein it stated "there is NO way this former employee [Plaintiff] should be granted unemployment compensation with the conduct that occurred."  She testified that she was not involved in deciding whether Plaintiff received unemployment.

<u>Reaction to Plaintiff's Termination</u>

Dumas and Austin admit that Plaintiff was entitled to a full due process hearing including service of specific allegations, right to notice of specific charges filed against him, and the right to present evidence on his behalf to challenge the charges at a hearing especially because Plaintiff has a property interest in his employment with the City. Dumas further admits that Plaintiff was never provided written notice of charges or a hearing, that KPD improperly added allegations that were beyond the scope of the complaint, and that KPD violated its own procedures when it terminated Plaintiff.

Jeffrey Burke from the Union testified that the City's new city attorney communicated to him that he was not comfortable with the process by which the City's administration was handling Plaintiff's termination. Plaintiff testified that his understanding was that the new city attorney was not comfortable with Plaintiff's termination being done without a full hearing on charges being filed and an evidentiary hearing before the Fire and Police Commission.

Hunt testified that the disciplinary process and termination process related to an officer's termination are important and officers are entitled to due process. Hunt admitted he was not sure if Plaintiff was given his due process when he was terminated. Likewise, Kidwell testified that an officer is entitled to receive notice of the allegations made against him and entitled to representation during the stage in which the charges are sought against the officer, that only the Fire and Police Commission can fire or uphold the termination recommendation of the Chief of Police, that the Chief of Police is required to put on evidence to prove the allegations against the officer, that the burden is on the Chief to prove the allegations are true and termination is warranted,

25

and that the officer is allowed to put on evidence to defend, exonerate, and mitigate the circumstances.

Kidwell testified that he has heard other officers use racial slurs, but has never known of any situation where a police officer has been fired for allegedly using a racial slur.  Kidwell only knew of officers fired from KPD for criminal conduct.

Hunt characterized Plaintiff's work as a police officer as excellent.  Dumas knew Plaintiff as a good officer and go-getter.  Austin never documented any negative incidents relating to Plaintiff when he worked under Austin's command and found Plaintiff to be a good officer, honest and trustworthy.

Hunt told Austin about the alleged comments made by Plaintiff at the training location in March 2018.  Austin testified that the allegations which led to Plaintiff's termination improperly contained discipline from two years prior, which are not supposed to be considered or used in aggravation.

Ray Carlson, FOP attorney, believed that Plaintiff's termination failed to comply with the CBA between the FOP and KPD, thus a grievance was filed.

 Procedural Background

Plaintiff's Complaint (#1), filed June 24, 2019, alleges the following claims against Defendants: Count I - racial discrimination pursuant to Title VII; Count II - retaliation against Plaintiff for engaging in protected activities under Title VII; Count III - violation of Plaintiff's First Amendment rights pursuant to 42 U.S.C. § 1983 because Plaintiff's employment was terminated in retaliation for his speaking out on a matter of public concern; Count IV - retaliatory discharge under Illinois state law; Count V - violation of Plaintiff's right to free speech under Article I §§ 4 and 5 of the Illinois Constitution; and

Count VI - violation of the U.S. Constitution's Due Process Clause in that he was deprived of his employment without being provided notice and opportunity to be heard regarding the charges against him.

ANALYSIS

*Motion to Strike*

On June 29, 2021, Plaintiff filed a Motion to Supplement His Brief In Opposition to Defendants' Motion for Summary Judgment (#32), seeking to alert the court to the U.S. Supreme Court's recent decision in *Mahanoy Area School District v. B.L.*, 141 S.Ct. 2038 (2021). Defendants, believing Plaintiff only sought to alert the court to the Supreme Court's recent decision, did not oppose Plaintiff's motion (#32) and filed no response in opposition. Noting that Defendants had filed no objection, this court granted Plaintiff's motion (#32) on July 16, 2021.

On July 21, 2021, Plaintiff filed his Supplemental Brief In Opposition to Defendants' Motion for Summary Judgment (#33), revealing that he desired not just to alert the court to the *Mahanoy* decision, but wished to file an entirely new five pages of argument as to why *Mahanoy* applied, to defeat Defendants' summary judgment motion on Plaintiff's First Amendment claim. Defendants have now, understandably, filed a Motion to Strike (#34), detailing their arguments on why Plaintiff should not be permitted to supplement his Response with five new pages of argument or why, in the alternative, Defendants should be allowed to file a brief explaining why the *Mahanoy* decision does not apply to preserve Plaintiff's First Amendment claim.

27

"Motions to strike are disfavored because they potentially only serve to delay." *Crowder v. Foster Wheeler, LLC*, 265 F.R.D. 368, 370 (S.D. Ind. 2009), citing *Heller Financial, Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir. 1989).  In this case, the court is sympathetic to Defendants' position, in that Plaintiff, in his motion (#32), gave no indication that he wished to file a substantive brief arguing why *Mahanoy* supported denying summary judgment on his First Amendment claim.  Rather, the motion appeared to only ask the court to note the *Mahanoy* decision itself, which was attached as an exhibit to the motion (#32-1).  Out of an abundance of caution, the court DENIES the Motion to Strike (#34).  However, the court will allow and consider Defendants' attached Memorandum In Response (#34-1), which the clerk is directed to file.  Indeed, as will be discussed more fully below in the section of this Order on the First Amendment claim, the court finds Defendants' argument persuasive as to *Mahanoy*'s applicability to this case.

*Motion for Summary Judgment*

Defendants argue that summary judgment should be granted in their favor on all of Plaintiff's claims because: (1) Plaintiff cannot show his race was a motivating factor for the termination of his employment; (2) Plaintiff did not engage in activity protected by Title VII; (3) Plaintiff did not engage in activity protected by the First Amendment; (4) Plaintiff cannot show that any of his allegedly protected activities motivated or caused the termination of his employment; (5) Plaintiff was afforded all the process due to him by the Fourteenth Amendment vis-a-vis the termination of his employment; and (6) Defendant Dumas is entitled to qualified immunity.

28

Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).  In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010).  However, a court's favor toward the nonmoving party does not extend to drawing inferences which are only supported by speculation or conjecture.  See *Singer*, 593 F.3d at 533.  In addition, this court "need not accept as true a plaintiff's *characterization* of the facts or a plaintiff's legal conclusion." *Nuzzi v. St. George Cmty. Consol. Sch. Dist. No. 258*, 688 F. Supp. 2d 815, 835 (C.D. Ill. 2010) (emphasis in original).

The party opposing summary judgment may not rely on the allegations contained in the pleadings.  *Waldridge*, 24 F.3d at 920.  "[I]nstead, the nonmovant must present definite, competent evidence in rebuttal."  *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004).  Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events."  *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004), quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th

Cir. 2003). Specifically, to survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007), citing *Celotex Corp.*, 477 U.S. at 322-23.

  I.  <u>Illinois Claims and Defendant Dumas' Official and Individual Capacities</u>

  As a preliminary matter, Defendants' Reply argues that Plaintiff, based on his Response, has abandoned several of his claims. Defendants note that at page 43 of his Response, Plaintiff explicitly states that he is only bringing two counts against Defendant Dumas in his individual capacity: Count III's First Amendment retaliation claim pursuant to § 1983 and Count V's Illinois Constitution First Amendment claim. Thus, Defendants assert, Plaintiff has withdrawn, abandoned, and/or waived any claims against Defendant Dumas in his individual capacity under Counts I, II, IV, or VI. The court agrees. Judgment is granted in favor of Defendant Dumas in his individual capacity on those counts.

  Defendants also argue that Plaintiff has failed to respond to Defendants' arguments directed at the official capacity claims against Defendant Dumas. Defendants, in their Motion for Summary Judgment (#22) at page 22, argued that the official capacity claims against Dumas are tantamount to a claim against the entity of which Dumas is an agent, Defendant City of Kankakee, and as such, the official capacity claims are redundant. "[A]n official capacity suit is another way of pleading an action against an entity of which the officer is an agent." *Sow v. Fortville Police Department*, 636 F.3d 293, 300 (7th Cir. 2011). Thus, Plaintiff's official capacity claims against Dumas can be treated as claims against the City of Kankakee, whom Plaintiff has also named as a

defendant on the same counts, and thus the suit against Dumas in his official capacity is redundant. See *Sow*, 636 F.3d at 300; *Lugg v. Sutton*, 368 F.Supp.3d 1257, 1264 (C.D. Ill. 2019). In any event, Plaintiff failed to respond to this argument and the court may therefore presume Plaintiff has waived any opposition to Defendants' arguments on this point. See *Candell v. Shiftgig Bullpen Temporary Employment Agency*, 2019 WL 2173797, at *3 (N.D. Ill. May 20, 2019) ("A non-movant's failure to respond to arguments addressed in a summary judgment motion results in a waiver."). Summary judgment is granted in favor of Defendant Dumas on all of Plaintiff's claims against him in his official capacity.[4]

Defendants further argue that judgment should be granted on both of Plaintiff's Illinois state law claims, Count IV retaliatory discharge and Count V Illinois Constitution free speech, because Plaintiff failed to respond, in any fashion, to Defendants' arguments on those claims contained on pages 45 through 48 of Defendants' Motion for Summary Judgment (#22). Defendants are correct in that Plaintiff has completely failed to respond to those arguments. A complete failure to respond results in waiver. *Candell*, 2019 WL 2173797, at *3; *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010); *Brach v. City of Wausau*, 617 F.Supp.2d 796, 806 (W.D. Wis. 2009) ("Because plaintiffs do not respond to defendants' arguments, they have waived the right to challenge defendants' arguments..."). By failing to respond, the court finds Plaintiff has waived any arguments against Defendants' summary judgment arguments

---

[4]For purposes of consistency and simplicity, the court will continue, throughout its analysis, to refer to Defendants as "Defendants" plural, even when addressing claims where only the City remains as a Defendant. If the court intends to single out only one Defendant, it will refer to "Defendant City" or "Defendant Dumas."

on these claims, and thus the court may infer Plaintiff has conceded those arguments. See *Cintora v. Downey*, 2010 WL 786014, at *4 (C.D. Ill. Mar. 4, 2010) (finding that the plaintiff's failure to address the defendants' argument that their lack of personal involvement entitles them to summary judgment on [the plaintiff's] excessive force claims conceded the point, as the general rule in the Seventh Circuit is that a party's failure to respond to an opposing party's argument implies concession).  Summary judgment is granted in Defendants' favor on Plaintiff's Illinois state law claims in Counts IV and V.

Therefore, the remaining claims for the court to address in this Order are Plaintiff's Title VII claims of discrimination and retaliation against the City (Counts I and II), First Amendment claim against the City and Dumas in his individual capacity (Count III), and Fourteenth Amendment due process claim against the City (Count VI).

II.     Title VII Claims (Count I & II)

A.     **Discrimination (Count I)**

Defendants argue that they are entitled to summary judgment on Plaintiff's claim of racial discrimination under Title VII because the record is "bereft of any evidence from which a reasonable factfinder could conclude that the City terminated Plaintiff's employment because of his race."  Specifically, Defendants argue that there are no ambiguous or suggestive comments in the record to show discriminatory feelings against Plaintiff because of his race, Plaintiff has not identified any person that he claims was similarly situated but treated differently from him, and there is no evidence of dishonest employer justifications for his termination.

In response to Defendants' arguments, Plaintiff cites to the City leadership's decisions to demote white officers at the expense of promoting black officers in the KPD, and how Dumas treated Hunt's Facebook postings more leniently than Plaintiff's. Plaintiff also points to various instances where he was subject to discipline or unfair procedures, whereas other officers who committed similar infractions were not. Plaintiff further argues that the allegations which led to his termination were brought in bad faith.

In racial discrimination suits, the question the court seeks to answer is whether a reasonable juror could conclude that the plaintiff would have kept his job if he had a different ethnicity, and everything else had remained the same. *LaRiviere v. Board of Trustees of Southern Illinois University*, 926 F.3d 356, 359 (7th Cir. 2019). Put differently, the plaintiff must present evidence which, taken as a whole, would permit a reasonable factfinder to conclude that the plaintiff's race caused the discharge. *Bless v. Cook County Sheriff's Office*, 9 F.4th 565, 574 (7th Cir. 2021). "Unmistakable evidence of racial animus—racial epithets or explicitly race-motivated treatment—makes for simple analysis. The more complicated cases arise when there is no smoking gun showing intentional discrimination." *LaRiviere*, 926 F.3d at 359.

In such cases, the district court may then draw upon the familiar burden-shifting framework established by the U.S. Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to determine if triable issues exist. Although the Seventh Circuit, in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), "rejected unhelpful distinctions between evidence, and emphasized that 'all evidence belongs in a single pile and must be evaluated as a whole[,]'" the court did leave the *McDonnell Douglas*

33

burden-shifting test "as a viable option for pursuing employment discrimination claims." *Barbera v. Pearson Education, Inc.*, 906 F.3d 621, 628-29 (7th Cir. 2018), quoting *Ortiz*, 834 F.3d at 766. Indeed, where the parties organize their arguments in terms of the burden-shifting test, a district court may follow that framework in its analysis, keeping in mind *Ortiz*'s admonition to consider all the evidence as a whole. *Barbera*, 906 F.3d at 629-31; *de Lima Silva v. Department of Corrections*, 917 F.3d 546, 559-61 (7th Cir. 2019).

In the instant case, Plaintiff appears to rely primarily on the *McDonnell Douglas* burden-shifting test to organize his arguments, and the court agrees that the burden-shifting framework is useful in analyzing Plaintiff's claim, based on the arguments and evidence presented.

Plaintiff is pursuing a reverse-discrimination claim, *i.e.*, a claim brought by a white plaintiff. See *Hosick v. Chicago State University Board of Trustees*, 924 F.Supp.2d 956, 966 (N.D. Ill. 2013), citing *Mills v. Health Care Service Corp.*, 171 F.3d 450, 455-57 (7th Cir. 1999). The Seventh Circuit has modified the *McDonnell Douglas* framework in such a context to require evidence of "background circumstances" supporting a race-discrimination claim brought by a white plaintiff. *Bless*, 9 F.4th at 574. To survive summary judgment under the burden-shifting approach in a reverse discrimination case, a plaintiff must show: (1) background circumstances exist to show an inference that the employer has reason or inclination to discriminate invidiously against whites or evidence that there is something "fishy" about the facts at hand; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated

34

individuals who are not members of his protected class.  *Formella v. Brennan*, 817 F.3d
503, 511 (7th Cir. 2016); *Bless*, 9 F.4th at 574.  If the plaintiff makes this prima facie
showing, then the burden would shift to the defendant to present a legitimate,
non-discriminatory reason for the challenged employment action.  *Formella*, 817 F.3d at
511.  If the defendant carries this burden, then the burden would shift back to the
plaintiff to show pretext, or at least to produce evidence establishing a genuine factual
dispute about pretext to defeat summary judgment.  *Formella*, 817 F.3d at 511.

Plaintiff cites to Mayor Wells-Armstrong's' statements about the lack of diversity
on the KPD and the demotion of several white officers and promotion of black officers
in their place as evidence of "background circumstances" necessary to  show an
inference that the City had reason or inclination to discriminate against him, as a white
officer.  However the Mayor's statements on diversity are of little value in assessing
Plaintiff's discrimination claim, because the comments were not made around the time
of Plaintiff's termination and were not made in reference to Plaintiff's termination or
other disciplinary actions taken against Plaintiff.  See *Teruggi v. CIT Group/Capital
Finance, Inc.*, 709 F.3d 654, 661 (7th Cir. 2013).  Plaintiff also cites to testimony from
fellow officers that he was a good officer and excellent employee who was honest and
trustworthy.  Plaintiff also clearly suffered an adverse employment action in that he
was fired and suffered other forms of discipline for various infractions and rule
violations.  Plaintiff cannot, however, demonstrate the fourth prong necessary to make
a prima facie case under the burden-shifting framework.  He cannot show that he was
treated less favorably than similarly situated individuals who are not members of his
protected class.

35

In his Response at page 45, Plaintiff does not actually identify any similarly situated comparators who were not members of his class who received more favorable treatment than he did.  He argues that Dumas never disciplined anyone other than Plaintiff for missing a gun in a squad car, other officers failed to secure firearms and received no discipline, that the Mayor never sat on any other officers' disciplinary proceedings, he was the only officer to be stripped of a trainee, the Mayor never opposed any other employee's unemployment claims other than Plaintiff's, and that other officers have used racial slurs but were never fired for those offenses.

To determine whether employees are similarly situated, courts ask "whether the other employees' situations were similar enough to the plaintiff's that it is reasonable to infer, in the absence of some other explanation, that the different treatment was a result of race or some other unlawful basis."  *de Lima Silva*, 917 F.3d at 559, quoting *Luster v. Illinois Department of Corrections*, 652 F.3d 726, 730 (7th Cir. 2011).  To be "similarly situated," co-workers must be directly comparable to the plaintiff in all material aspects, but they need not be identical in every conceivable way.  *Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 802 (7th Cir. 2014).  There must be enough common factors to allow for a meaningful comparison in order to divine whether intentional discrimination was at play, which, in the usual case, means a plaintiff must at least show that the comparators (1) dealt with the same supervisor; (2) were subject to the same standards; and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012).

36

Still, this is not a "magic formula," and the similarly situated inquiry should not devolve into a mechanical, one-to-one mapping between employees. *Coleman*, 667 F.3d at 847.

Plaintiff has not provided enough information about these supposed comparators to satisfy this element of the prima facie case at summary judgment. First, arguing "no other officer" does not identify a similarly situated comparator. As noted by Defendants, Plaintiff points to no evidence that Dumas failed to discipline nonwhite officers for missing a gun or to evidence that the Mayor had declined to sit in on disciplinary proceedings of nonwhite officers under similar circumstances.

Next, for other examples, Plaintiff merely argues that "other officers" were not treated as harshly or disciplined for committing similar infractions to himself. Plaintiff provides no details about the proposed comparators and makes no specific argument as to why they are similarly situated to himself. On summary judgment, Plaintiff cannot rely on mere legal conclusions unsupported by citation to the record, see *Nuzzi*, 688 F.Supp.2d at 835, but rather must present definite, competent evidence in rebuttal to Defendants' arguments. See *Butts*, 387 F.3d at 924. Blanket arguments that Plaintiff is similarly situated to every other officer in the KPD who may have committed similar infractions will not suffice. See *Jones v. National Council of Young Men's Christian Assoc. of the United States of America*, 48 F.Supp.3d 1054, 1104-05 (N.D. Ill. 2014). Rather, "[i]t is well established that a plaintiff must provide specific evidence and specific examples of employees who have been treated more favorably in order to establish this element." *Dority v. City of Chicago*, 2001 WL 1155286, at *14 (N.D. Ill. Sept. 28, 2001).

37

Plaintiff has not done that here.  Plaintiff has provided no evidence of the racial background of the supposed comparators, or any evidence of their job performance or what specific infractions or rule violations they committed, to make a prima facie case as to why they are directly comparable to him in all material aspects.  See *Langenbach*, 761 F.3d at 802.  Even if the court were to presume that Plaintiff was referring to Hunt not being terminated for his 2016 Facebook posts, Plaintiff makes no argument as to how Hunt was a similarly situated comparator.  Hunt's racial posts took place two years earlier, under a different City administration and police chief, were done on his private Facebook page, as opposed to being said to fellow officers on the job during active shooter training at the local middle school, and did not contain a threat to kill the chief of police.

Finally, even if Plaintiff could make a prima facie case of racial discrimination as to his termination, Defendants have proffered a legitimate, non-discriminatory reason for his termination: the fact that Plaintiff called Dumas a racial slur and threatened to kill him.  Plaintiff argues that "[t]he allegations which led to Plaintiff's termination were brought in bad faith and were pretext."  Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action.  *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 564 (7th Cir. 2016).  When assessing a plaintiff's claim that an employer's explanation is pretextual, the court cannot second-guess the employer's facially legitimate business decisions.  *Lord*, 839 F.3d at 564.  An employer's reasons for firing an employee can be foolish or trivial or even baseless, but as long as they are honestly believed, they are not pretextual.  *Lord*, 839 F.3d at 564.

38

Plaintiff argues that Defendants' stated reason for his termination is a pretext to cover up their racially discriminatory goal of "get[ting] rid of the white officers who had the audacity to question the Defendants' illegal acts."  As evidence of this pretext, Plaintiff points to Dumas' interaction with Plaintiff's wife as intention on Dumas' part to provoke Plaintiff into an overreaction to justify his termination.  Plaintiff argues that an employer cannot terminate an employee for actions done out of frustration held by the employee because the employer did not take his complaint of harassment seriously. Plaintiff cites to *Nichols v. Illinois Department of Transportation*, 152 F.Supp.3d 1106 (N.D. Ill. 2016), to support his argument.  In that case, the court allowed a discrimination claim involving a plaintiff who had been terminated for threatening violence at work to survive summary judgment where the employer had ignored the plaintiff's reports of *threats against him*, including that the plaintiff would get "fucked up."  *Nichols*, 152 F.Supp.3d at 1114-15.  The court reasoned "that '[w]here the employer provokes a reaction from an employee, that reaction should not justify a decision to impose a disproportionately severe sanction.'"  *Nichols*, 152 F.Supp.3d at 1132, quoting *Sumner v. U.S. Postal Service*, 899 F.2d 203, 210 (2d Cir. 1990).

The instant case is distinguishable from *Nichols*.  First, in this case, the action that allegedly provoked Plaintiff's use of the racial slur and threat to kill Dumas is entirely distinguishable from the direct threat of physical violence towards the plaintiff in *Nichols*.  Here, Dumas was walking into his bank, where Plaintiff's wife worked, and said "I hope you're not mad at me[,]" in reference to Plaintiff's disciplinary issues at work with which Dumas, as Chief, had been involved.  Plaintiff's wife felt the comment was inappropriate, and complained to the KPD.  Plaintiff's resultant threat to kill

39

Dumas, and calling him the n-word, is wholly out of proportion to Dumas' comments, and cannot seriously be considered evidence of an attempt on Defendants' part to provoke Plaintiff into making such a slur and threat, so as to provide a pretextual reason to terminate Plaintiff's employment due to his race.

Plaintiff also posits, "[f]or the sake of argument," that even if Plaintiff did make the racial and threatening comments as alleged, it does not warrant "the draconian reaction of the administration" in firing him. Plaintiff points to his good record as a police officer, and argues that it is reasonable for a person to be upset when their spouse is threatened, embarrassed,or scared. Plaintiff also questions why, if the threat and slur were so serious, he was offered the possibility of a minor suspension if he took the Last Chance Agreement. Plaintiff's arguments in this regard are unavailing. In adjudicating claims under federal employment discrimination statutes, federal district courts do not sit as a "super-personnel department," second-guessing employers' business decisions as to whether someone should be fired or disciplined because of a work-rule violation. *Coleman*, 667 F.3d at 862. The ultimate decision to terminate Plaintiff was not disproportionate to the infractions he was accused of, and even if he believes the decision to be mistaken or foolish, Plaintiff has not provided competent evidence that Defendants' purported reason for his termination is a lie to cover up a racially discriminatory motive. See *Lord*, 839 F.3d at 564.[5]

---

[5]The court puts little, if any, evidentiary value on Plaintiff's citation to a similar reverse discrimination claim brought by KPD officers in *Berge, et al. v. City of Kankakee*, 20-CV-2310. First, Plaintiff, in his Response at pages 47 to 48 citing *Berge*, cites only to his attached "Exhibit G,"(#27-7), which is the *Berge* plaintiffs' Complaint (#1 in Case No. 20-CV-2310), and not competent evidence at summary judgment. Indeed, that case is still in the pleading stage. To the extent Plaintiff is basing his argument regarding *Berge* in the Response at 47 to 48 on competent evidence in the record, he has not supported it with a specific citation to that evidence via exhibit number, page number, etc.

Plaintiff certainly *believes* that he was the victim of racial discrimination over his termination of employment with the KPD.  However, Plaintiff's personal beliefs are insufficient to give rise to a genuine factual dispute over whether he was the victim of racial discrimination.  See *Abrego v. Wilkie*, 907 F.3d 1004, 1014 (7th Cir. 2018).  Taking all of the evidence presented into account, the court cannot say that the evidence would permit a reasonable factfinder to conclude that Plaintiff's race caused his discharge.  See *Ortiz*, 834 F.3d at 765.  Thus, for the reasons stated above, summary judgment is granted in Defendants' favor on Plaintiff's Title VII racial discrimination claim in Count I.

### B.      Retaliation (Count II)

Defendants next argue that they are entitled to summary judgment on Plaintiff's Title VII retaliation claim because Plaintiff cannot demonstrate that he engaged in an activity protected by Title VII and because the evidence would not permit a reasonable factfinder to conclude retaliatory motive caused Plaintiff's termination.  Plaintiff, in response, argues that he did engage in protected activity under Title VII, in that he reported potential corruption, illegal activity, and criminal acts of Defendants.  Plaintiff also argues that the investigation which led to his termination involved discussion of Plaintiff's Facebook posts critical of the City's administration.

"Title VII prohibits an employer from retaliating against an employee for opposing or participating in an investigation of an unlawful employment practice." *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018), citing 42 U.S.C. § 2000e-3(a).  "To prevail on a Title VII retaliation claim, the plaintiff must prove that (1) he engaged in an activity protected by the statute; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action."  *Lewis*, 909 F.3d at 866.  The district court must consider the evidence as a whole and conduct a

straightforward inquiry: does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the materially adverse action? *Abrego*, 907 F.3d at 1014.

In order to satisfy the first prong, Plaintiff must demonstrate that he engaged in activity protected by Title VII, such as reporting an action by his employer that violated Title VII. However, § 2000e–3(a) "does not protect employees for opposing *all* adverse actions by their employers but rather only for opposing *certain* practices that have been 'made an unlawful employment practice' by federal law." *Gomez v. Federal Express, Inc.*, 72 F.Supp.3d 902, 908 (N.D. Ill. 2014) (emphasis in original). "These practices encompass discrimination on the basis of race, color, religion, sex, and national origin." *Gomez*, 72 F.Supp.3d at 908, citing § 2000e–2. To establish a retaliation claim, employees must show that they actually communicated to their employer a belief that the employer has engaged in status-based discrimination, *i.e.* they must actually take a stand against the employer's discriminatory practices. *Gomez*, 72 F.Supp.3d at 908, citing *Crawford v. Metro. Government of Nashville & Davidson County, Tenn.*, 555 U.S. 271, 276–77 (2009).

Here, Plaintiff could be said to be engaging in whistleblowing activity about financial improprieties and corruption in the City administration and KPD, but he is not engaging in a protected activity under Title VII, *i.e.* he is not complaining about harassment or discrimination based on gender, race, national origin, etc.

Plaintiff states he "spoke of potential corruption, illegal activity, and criminal acts of the Defendants[,]" but he does not elaborate, in any way, nor does he point to any facts of the record, on page 49 of his Response, as to how he was opposing status-based discrimination. See *Gomez*, 72 F.Supp.3d at 908. Plaintiff does not even specify

what action he took that represented a stand against the City's discriminatory practices. See *Gomez*, 72 F.Supp.3d at 908. To the extent he is citing his Facebook posts from 2018, that may qualify as a general whistleblower action against corruption and incompetent leadership, but it does not fall under Title VII retaliation.

Even if Plaintiff could demonstrate that he engaged in a protected activity, he could not show that the protected activity led to his adverse employment action. Plaintiff considers the retaliatory adverse employment action to be his June 2018 termination. On page 50 of his Response, Plaintiff argues that he "produced evidence that demonstrated Defendants' retaliatory motive caused Plaintiff's termination." Once again, he cites to his February 2018 Facebook posts about municipal corruption involving the Auto Lab deal, in that Auto Lab received preferential treatment and the deal involved no competitive bidding, in violation of the City's Municipal Code. As explained above, however, nothing in Plaintiff's February 2018 Facebook posts implicated Title VII protected activity.

Perhaps the only incident in the record that even comes close is Plaintiff's complaint to Chief Regnier in February 2016 of then-Lt. Hunt's racist Facebook posts. But that activity occurred more than two years before Plaintiff's termination, and Plaintiff has provided no additional evidence linking the February 2016 complaint about Hunt to his termination more than two years later. Indeed, Plaintiff, in his Response on this issue at page 50, has not even made the argument. A temporal connection of more than two years between possible protected activity and the adverse employment action in question, by itself, is not enough to establish a causal connection between the two. See *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2008) (four months too remote); *Igasaki v. Illinois Department of Financial and Professional*

*Regulation*, 988 F.3d 948, 959 (7th Cir. 2021) (two month gap between the plaintiff's protected activities and his termination cannot show retaliation on its own).  Plaintiff cannot satisfy this element of retaliation.

Plaintiff has not demonstrated a genuine issue of material fact exists as to whether he was retaliated against in violation of Title VII.  Summary judgment is granted for Defendants on Plaintiff's Title VII retaliation claim in Count II.

III.    First Amendment Claims (Count III)

Defendants argue that summary judgment should be granted in their favor on Plaintiff's First Amendment retaliation claim because: (1) Plaintiff's February 2018 Facebook posts are not protected speech under the First Amendment; (2) Plaintiff cannot demonstrate the City acted with a retaliatory motive; (3) Plaintiff cannot demonstrate Dumas acted with a retaliatory motive; and (4) Dumas is entitled to qualified immunity.  Plaintiff responds that the February 2018 posts were protected activity, he suffered a deprivation likely to deter protected speech, the protected speech was a motivating factor in the deprivation and but-for cause of Plaintiff's termination, and Dumas is not entitled to qualified immunity.

**A. Applicability of the *Mahanoy* Decision**

"The First Amendment generally prohibits government officials from dismissing or demoting an employee because of the employee's engagement in constitutionally protected political activity."  *Heffernan v. City of Paterson*, 136 S.Ct. 1412, 1416 (2016).  As a preliminary matter, the court must address the applicability and importance of the U.S. Supreme Court's decision in *Mahanoy* to this case.  Plaintiff cites to *Mahanoy* and argues the facts of the instant case are similar, that Plaintiff's February 2018 Facebook posts fall under First Amendment protection just as the student's speech in *Mahanoy*

44

did, and that this court should take *Mahanoy*'s analysis and opinion into consideration when deciding his First Amendment claim.  Defendants respond that *Mahanoy* is not applicable, as that case involved school regulation of off-campus student speech, and this case involves government employer regulation of government employee speech.

The court concludes Defendants have the better argument.  The U.S. Supreme Court, and subsequent federal circuit court decisions, have developed separate case law and analyses for evaluating First Amendment claims involving public school students on the one hand, and government employees on the other.  Student speech cases primarily involve the U.S. Supreme Court's 1969 decision in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969).  Indeed, the *Mahanoy* decision extensively cited to *Tinker*, and focused its decision exclusively on student speech and the special relationship between students and their schools and on-campus speech versus off-campus speech.  *Mahanoy*, 141 S.Ct. at 2044-48.

On the other hand, the line of cases concerning government employee speech do not mention or discuss *Tinker* at all.  Rather, those cases rely on a different and distinct line of precedent to deal with a different and distinct set of circumstances.  See, e.g., *Heffernan*, 136 S.Ct. at 1417-1419; *Bless*, 9 F.4th at 571-72.  For example, in a Seventh Circuit decision where a police officer sued alleging the municipality retaliated against him for exercising his First Amendment rights, the court applied the traditional First Amendment analysis for government employee speech, and *Tinker* is nowhere to be found.  See *Kidwell v. Eisenhauer*, 679 F.3d 957, 964-66 (7th Cir. 2012).  Government employers have a different relationship to government employees than school districts do to their students, and the courts do not treat their First Amendment claims the same, but rather utilize different approaches to each.

45

Since *Mahanoy* was issued, there have been a number of decisions rendered by the federal courts of appeal concerning First Amendment retaliation claims by public employees who suffered adverse actions due to their public speech. None of them have cited to *Mahanoy*. See *Bless*, 9 F.4th at 571-72; *Sivella v. Township of Lyndhurst*, — Fed.Appx. —, 2021 WL 3356934, at *2-3 (3d Cir. Aug. 3, 2021); *Bell v. Sheriff of Broward County*, 6 F.4th 1374, 1377 (11th Cir. 2021); *Duda v. Elder*, 7 F.4th 899 (10th Cir. 2021); *Dondero v. Lower Milford Township*, 5 F.4th 355, 361-62 (3d Cir. 2021); *Post v. City of Munroe Falls, Ohio*, — Fed.Appx. —, 2021 WL 2769214, at *5-6 (6th Cir. July 1, 2021).

The court will take note of *Mahanoy* as general U.S. Supreme Court First Amendment precedent, but finds that its applicability is more specifically limited to the issues surrounding student speech and the ability of schools to regulate said speech.

**B.** **Analysis**

On First Amendment claims such as Plaintiff's, the Seventh Circuit applies a burden-shifting analysis to determine whether First Amendment liberty has been denied. *Bless*, 9 F.4th at 571. "To make out a prima facie claim for a violation of First Amendment rights, public employees must present evidence that (1) their speech was constitutionally protected; (2) they suffered a deprivation likely to deter free speech; and (3) their speech was at least a motivating factor in the employer's actions." *Bless*, 9 F.4th at 571.

Defendants argue that Plaintiff cannot demonstrate the first and second prongs of a First Amendment retaliation claim.

46

1.      Protected Speech[6]

"For a public employee's speech to be protected under the First Amendment, the employee must show that (1) he made the speech as a private citizen, (2) the speech addressed a matter of public concern, and (3) his interest in expressing that speech was not outweighed by the state's interests as an employer in promoting effective and efficient public service."  *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013) (citation and internal quotation marks omitted); *Kristofek v. Village of Orland Hills*, 832 F.3d 785, 792 (7th Cir. 2016).

a.      Were the February 2018 Facebook Posts Made as a Private Citizen?

Defendants do not make any argument regarding whether Plaintiff was speaking as a private citizen when he made the February 2018 Facebook posts.  The court finds that Plaintiff has satisfied this element.  See *Kristofek*, 832 F.3d at 793-94.

b.      Was Plaintiff Speaking on a Matter of Public Concern?

Defendants argue that Plaintiff's February 2018 Facebook posts do not address a matter of public concern based on their content and context.  Plaintiff argues in response that his February 2018 posts alleged improper and unlawful conduct by members of the City and KPD administration.

---

[6]Plaintiff argues at page 51 of his Response that Defendants' Answer and Affirmative Defenses, attached as Exhibit 3 to Defendants' motion (#22-3), "admit that Plaintiff engaged in constitutionally protected activity."  Plaintiff does not provide a page citation in his argument.  Defendants, at page 13 of their Answer, specifically deny the allegations in paragraph 69 of Plaintiff's Complaint that Plaintiff's actions "constituted speech on matters of public concern, and thus his speech was protected by the First Amendment to the United States Constitution." This assertion as part of Plaintiff's argument is rejected on this ground.

"Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (citations and internal quotation marks omitted). When undertaking public-concern inquiries, courts examine the "content, form, and context" of the statements at issue, and, while none of the three factors is dispositive, content is the most important. *Kristofek*, 832 F.3d at 794.

Defendants concede that the form of Plaintiff's speech, in social media posts, was public. Defendants argue, however, that the "profanity-laced and unsupported assertions of public corruption and misconduct cannot reasonably be characterized as informing public debate" because the language used did nothing to further any purpose of provoking public discussion or airing the merits of any dispute. Defendants further argue that, examining the context, Plaintiff's comments were made in the context of his ongoing Union grievance with the City over discipline he received in December 2017 and that he believed to be unfair. Defendants further argue that Plaintiff's testimony that he posted the comments out of "frustration" reveal that his motive in posting them was purely personal, "especially in light of [his] testimony that he understood there were other avenues by which he could have raised his concerns if his goal was to air the merits of the issues."

The Seventh Circuit has held that content concerning government malfeasance, corruption, or inefficiency clearly involve matters of public concern. *Kristofek*, 832 F.3d at 794. Indeed, "[a] public employee, familiar with an agency's use of public resources, may be in the best position to raise issues vital to efficient, successful, and legal governance. As the Supreme Court has noted, 'public employees are often the members

48

of the community who are likely to have informed opinions as to the operations of their public employers.... Were they not able to speak on these matters, the community would be deprived of informed opinions on important public issues.'"  *Milwaukee Deputy Sheriff's Association v. Clarke*, 574 F.3d 370, 377 (7th Cir. 2009), quoting *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 82 (2004).  The core of the First Amendment "protect[s] speech that *intends* to raise such issues."  *Clarke*, 574 F.3d at 377 (emphasis in original).

However, "[w]hen examining the 'context' of a public employee's speech, the employee's motive for speaking is a relevant consideration."  *Clarke*, 574 F.3d at 377.  Still, a public employee's motive for speaking is not necessarily a dispositive factor, and the fact that a public employee speaks out in part for personal reasons will not necessarily remove the speech from the scope of public concern.  *Clarke*, 574 F.3d at 377.  "The motive of a statement, rather, 'matters to the extent that even speech on a subject that would otherwise be of interest to the public will not be protected if the expression addresses only the personal effect upon the employee, or if the *only* point of the speech was to further some purely private interest.'"  *Clarke*, 574 F.3d at 378, quoting *Gustafson v. Jones*, 290 F.3d 895, 908 (7th Cir. 2002).  The court "must analyze the extent that an employee's speech was made for personal reasons in conjunction with the extent to which the content relates to a matter of public concern."  *Clarke*, 574 F.3d at 378.  "'[W]here considerations of motive and context indicate that an employee's speech raised a topic of general societal interest merely for personal reasons rather than a desire to air the merits of the issue, ... these factors militate against the conclusion that the employee's speech is entitled to First Amendment protection."  *Metzger v. DaRosa*, 367 F.3d 699, 702 (7th Cir. 2004), quoting *Campbell v. Towse*, 99 F.3d 820, 827 (7th Cir. 1996).

In *Clarke*, cited by Defendants, the Seventh Circuit found that comments made by a sheriff's deputy about the sheriff in a newsletter for current and retired officers, although made in a public forum, were not protected by the First Amendment because they were made for purely personal reasons. *Clarke*, 574 F.3d at 379. The sheriff had posted a quote from the Bible that seemed to call into question the courage of his deputies, and one deputy, the plaintiff, wrote a letter to the newsletter stating the following:

> If you are afraid or you have lost your courage and need two deputies and a sergeant to escort you every time you fly in and out of the airport and patrol deputies to drive by your house when you're out of town you should resign and go home! Then you would lift the morale of this whole department (a.k.a. office).

*Clarke*, 574 F.3d at 373-74.

The Seventh Circuit wrote that the plaintiff did not comment directly on the department's waste of taxpayer dollars or the impact of the sheriff's conduct on the availability of officers for more legitimate purposes; rather, their reading of the statement suggested that he focused instead on the sheriff's lack of courage, and although the court ultimately agreed that the content of the plaintiff's statement "related to" a matter of public interest, the court did not examine the speech's content in a vacuum, nor did it rely solely on the express language. *Clarke*, 574 F.3d at 378-79. The court commented on the content of the "statement merely to note that any reference to government waste was indirect and tangential, making the context a more important consideration when determining whether the speech was on a matter of public concern." *Clarke*, 574 F.3d at 379.

50

After examining the content and context of the statement, the court found that the plaintiff was speaking on a matter of purely private concern because the context of the speech, which included the circumstances surrounding its publication and the plaintiff's motive, indicates that the plaintiff responded to what he considered to be a personal challenge to his courage by issuing his own personal challenge to the sheriff's courage.  *Clarke*, 574 F.3d at 379.  The court found that there was nothing suggesting that the plaintiff intended to bring to light the sheriff's abuse of county resources, to provoke public discussion about the sheriff's conduct, or to air the merits of any related dispute.  *Clarke*, 574 F.3d at 379. "And most importantly, the language he used in the two-sentence statement does nothing to further such a purpose[,]" because, although the plaintiff's speech may have been of general public interest, it focused solely on the personal effect upon the plaintiff and the only point of the speech was to further some purely private interest.  *Clarke*, 574 F.3d at 379.

The Seventh Circuit found that the plaintiff's own testimony reinforced this conclusion, because the plaintiff testified that he was simply trying to "throw back" at the sheriff the personal challenge that he felt the sheriff threw at the deputies, and the court could "find no evidence in the record that supports plaintiffs' contention that [the deputy] had anything but a personal motive for making his statement."  *Clarke*, 574 F.3d at 379.

The instant case presents a closer question than that which faced the court in *Clarke*.  Still, the court finds that, examining the content of the statements in context, they were made for purely personal reasons and are thus not protected speech under the First Amendment.  The content of the statements, by themselves, speak to a matter of public concern.  Plaintiff is opining, in response to a post by another citizen, on

corruption in the City government over the awarding of the building and business
contract to a relative of the Mayor.  However, Plaintiff's other comments, about racially
motivated promotions in the KPD and the "shit show" of City administration in
general, can be read as personal in nature, because they directly affected and impacted
his personal position and opportunities within the KPD.

Further, on the situation in the KPD, the context and motivation matter even
more because Plaintiff was, at the time, involved in a grievance with the City over
discipline he had received.  The court does not examine the content of Plaintiff's
statements in a vacuum.  See *Clarke*, 574 F.3d at 379.  Further, Plaintiff testified that his
motivation in making the comments was "frustration," and that he knew if he had
specific concerns about corruption in the mayor's office or KPD, he could have taken his
concerns to the Attorney General's Office, U.S. Attorney's Office, the city inspector, or a
journalist, but did not do so.  Plaintiff took no clear steps to alert outside law
enforcement that official misconduct may have occurred, nor did he encourage others to
do so.  See *Kristofek*, 832 F.3d at 795.  This indicates that Plaintiff was addressing this
topic of general societal interest merely for personal reasons, as opposed to a desire to
bring to light public corruption and air the merits of the issue, militating against the
conclusion that the speech is entitled to First Amendment protection.  See *Metzger*, 367
F.3d at 702.

It should also be noted that the portion about the corruption in the Mayor's office
concerning the gift of the building was not brought up by Plaintiff, but rather he only
accused the Mayor of corruption in that regard in response to a post by someone else.
The bulk of the statements made by Plaintiff, and which he brought up on his own,
were statements about race-based promotions and favoritism in the KPD.  Plaintiff also

admitted that he had no personal knowledge of corruption in the Mayor's office in response to Wilder's comments, but just based his comments on "talk" he had heard around the KPD.  Thus, the reference to a matter of public concern not directly implicating Plaintiff's personal situation and motivation, mayoral corruption in awarding of the building and city contracts, was essentially indirect and tangential, making the context a more important consideration in this instance in determining whether Plaintiff's speech was on a matter of public concern.  See *Clarke*, 574 F.3d at 379.

Also, the language used by Plaintiff and the manner in which Plaintiff expressed himself in the Facebook comments, did nothing to further a purpose of raising a topic of general societal concern to discuss the merits of an issue.  See *Clarke*, 574 F.3d at 379.  The comments were not measured, succinct, brief, and calm, so as to avoid creating a potentially disruptive atmosphere and foster reasoned debate on a matter of public concern.  See *Kristofek*, 832 F.3d at 796, citing *Graber v. Clarke*, 763 F.3d 888, 896 (7th Cir. 2014) (in the context of the *Connick-Pickering* analysis, to be discussed below).

In sum, the court finds that, as it concerns mayoral corruption unrelated to events impacting Plaintiff's own personal situation, Plaintiff had a limited interest in speaking out on that subject, as it was a general statement (which could also be read in reference to Plaintiff's own grievance and disciplinary issues in KPD at the time) in response to another person's more specific statement concerning allegations Plaintiff knew little about, and the 2018 Facebook comments were made simply to further his own goal of expressing his displeasure with KPD and City policies.  See *Clarke*, 574 F.3d at 380, citing *Kokkinis v. Ivkovich*, 185 F.3d 840, 844 (7th Cir. 1999).

The court would also note that Plaintiff's substantive response to Defendants' entire argument on this issue was one sentence, stating: "Plaintiff's Facebook posts alleged improper and unlawful conduct by members of the administration."[7] (Plaintiff's Response, (#27), at p. 51).  Plaintiff provides no further argument, and no further support for this assertion with citation to evidence in the record.  Because this argument is perfunctory and undeveloped, the court will not consider it.  See *Marcatante v. City of Chicago*, 657 F.3d 433, 444 (7th Cir. 2011) (a passing reference to a due process claim is undeveloped, and therefore waived); *White Eagle Co-Op Association v. Conner*, 553 F.3d 467, 476 (7th Cir. 2009) ("... it is not the province of the courts to complete litigants' thoughts for them, and we will not address this undeveloped argument."); *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).").

Because Plaintiff cannot satisfy the matter of public concern element of the analysis, summary judgment is granted to Defendants on Plaintiff's First Amendment claim.

    c.  Whether Plaintiff's interest in expressing that speech was outweighed by the state's interests as an employer in promoting effective and efficient public service

Defendants argue that, even if the court determines that Plaintiff's speech addressed a matter of public concern, Defendants remain entitled to summary

---

[7]Plaintiff had a second sentence in this section stating that Austin had reported "criminal activity" to the FBI for the same conduct Plaintiff posted on Facebook, but that is irrelevant to the comments made by Plaintiff on Facebook or the context in which Plaintiff made the comments, and his motivation for doing so.

judgment because "'the interests of the [plaintiff] as a citizen in commenting upon the matters of public concern' are outweighed by 'the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Coady v. Steil*, 187 F.3d 727, 731 (7th Cir. 1999), quoting *Pickering v. Board of Education of Township High School Dist. 205*, 391 U.S. 563, 568 (1968).

"The *Connick–Pickering* test, derived from *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and *Pickering*, 391 U.S. 563, 88 S.Ct. 1731, is a two-part test used to determine whether a public employee's speech is constitutionally protected." *Lalowski v. City of Des Plaines*, 789 F.3d 784, 790 (7th Cir. 2015).

First, the speech is protected only if it addressed a matter of public concern, and if it did, the court must then apply the *Pickering* balancing test described in the above paragraph. *Lalowski*, 789 F.3d at 790-91. *Pickering* balancing requires the court to weigh the following factors: (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform their responsibilities; (4) the time, place, and manner of the speech; (5) the context within which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision-making; and (7) whether the speaker should be regarded as a member of the general public. *Lalowski*, 789 F.3d at 791.

The court begins its analysis by noting that Plaintiff attempts to argue that, under *United States v. National Treasury Employees Union*, 513 U.S. 454 (1995) ("*NTEU*"), "a different path to *Pickering* is available" when "the employee's speech is neither at work nor about work[.]" However, as noted by Defendants, Plaintiff does not then go on to

provide any sort of *Pickering* analysis pursuant to *NTEU* and, in any event, the court agrees with Defendants that this case is governed by *Connick*, not *NTEU*.

The *NTEU* modification of *Pickering* would be beneficial to Plaintiff.  In such cases the government must shoulder a heavier burden and is entitled to considerably less deference in its assessment that a predicted harm justifies a particular impingement on First Amendment right.  *Janus v. American Federation of State, County, and Municipal Employees, Council 31*, 138 S.Ct. 2448, 2472 (2018).  However, an *NTEU*-modified *Pickering* analysis only applies in considering general rules that affect broad categories of employees, because a speech-restrictive law with "widespread impact" gives rise to far more serious concerns than could any single supervisory decision.  *Janus*, 138 S.Ct. at 2472.  Here, by contrast, the court is concerned with a specific act of speech (the February 2018 Facebook posts) by a specific employee (Plaintiff).

Further, *NTEU* only applies when the employee's speech is neither at work *nor about work*, and the key issues under *NTEU* are whether the employee's speech is made outside the workplace, involves content largely unrelated to their government employment, and is addressed to a public audience.  *Harnishfeger v. United States*, 943 F.3d 1105, 1113 (7th Cir. 2019).  In *NTEU*, the "record included examples such as a mail handler who was paid for lecturing on Quaker history, an aerospace engineer who was paid for lecturing on African American history, and a biologist who earned money by writing and speaking about dance performances."  *Harnishfeger*, 943 F.3d at 1113.  Here, by contrast, Plaintiff's speech related directly to his job, and commented on corruption and favoritism in the City and KPD administrations.  *Connick-Pickering* applies, not *NTEU*.

56

Defendants argue that the *Connick-Pickering* factors weigh in their favor.  As to the first factor, Defendants argue Plaintiff's posts directly called into doubt the integrity of the new KPD and City administration and its recent promotional decisions within the KPD, claiming those promoted were not deserving of promotion and that the promotions were racially motivated.  Defendants posit that Plaintiff's speech had the potential to create disharmony between leadership and rank and file officers, and undermine the functioning of the KPD where officers publicly question whether their superiors deserve their positions or owe them to corruption, incompetence, or racial bias.

For the second factor, Defendants argue the potential for disruption is exacerbated because the employment relationship in the police context is one in which personal loyalty and confidence are greatly necessary.  The Seventh Circuit has recognized that there is a particularly urgent need for close teamwork among those involved in the "high stakes" field of law enforcement, and that "'[s]peech that might not interfere with work in an environment less dependent on order, discipline, and esprit de corps could be debilitating to a police force.'" *Lalowski*, 789 F.3d at 792, quoting *Breuer v. Hart*, 909 F.2d 1035, 1041 (7th Cir. 1990).  "Thus, '[d]eference to the employer's judgment regarding the disruptive nature of an employee's speech is especially important in the context of law enforcement.'" *Lalowski*, 789 F.3d at 792, quoting *Kokkinis*, 185 F.3d at 846.

For the third factor, Defendants argue that Plaintiff's speech directly conflicted with his responsibility as a police officer to foster a relationship of trust and respect with the public, alleging that the KPD was biased against white people, and that the City and KPD were corrupt and questioning the legitimacy of officers in positions of authority.

Fourth, Defendants argue the manner of the speech weighs in favor of Defendants being able to restrict it, because Plaintiff had no actual knowledge of his accusations of racism and bias and imparted no new information about the issues to public discourse other than his own unsubstantiated suspicions. See *Greer v. Amesqua*, 212 F.3d 358, 372 (7th Cir. 2000). Further, Defendants argue that Plaintiff's "posture under *Pickering* would be stronger if he 'had followed authorized procedures, appealed to more appropriate authorities[.]'" *Greer*, 212 F.3d at 372, quoting *Wright v. Illinois Department of Children and Family Services*, 40 F.3d 1492, 1504 (7th Cir. 1994).

Fifth, Defendants argue that the context in which the speech arose supports their position as well, because it occurred during an ongoing grievance process and was motivated only by a personal desire to vent frustration.

Sixth, Defendants admit that topics of public corruption and racial bias in police department promotions are matters on which debate is vital to informed decisionmaking, but argue that Plaintiff's "profanity-laced bald assertions, unsupported by fact or personal knowledge, failed to inform that debate in any meaningful way."

Finally, with regard to the last *Pickering* factor, Defendants argue that, based on the context of the disciplinary grievance dispute and personal "frustration" in which Plaintiff made the comments, Plaintiff "is more properly regarded as an aggrieved employee than a member of the public."

Once again, Plaintiff offered little if any substantive response to Defendants' argument. At page 52 of Plaintiff's Response, Plaintiff spends most of his space arguing a general legal argument about why *NTEU* should apply to the *Pickering* analysis instead of *Connick*. Then, in the paragraph below that, Plaintiff, in response to the second *Pickering* factor, states: "Defendants' improper and criminal acts undermined any confidence in the Kankakee police department." Then, in addressing the third

58

*Pickering* factor, Plaintiff states that Defendants' argument "speaks to a code of silence. Are the defendants making the argument that reporting corrupt and illegal behavior somehow should be prohibited? Their argument is absurd." That is the sum total of Plaintiff's response to Defendants' argument on the *Connick-Pickering* balancing test.

Again, the court will not consider perfunctory and undeveloped arguments. See *Marcatante*, 657 F.3d at 444); *White Eagle Co-Op Association*, 553 F.3d at 476; *Berkowitz*, 927 F.2d at 1384. Defendants have provided well-taken, detailed argument in support of why each of the *Connick-Pickering* factors weighs in their favor. Plaintiff has failed to engage with and respond to Defendants' argument in a substantive way, and has addressed only two out of the seven factors at issue, and even then only in the briefest and most conclusory of manners. Plaintiff has not bothered to weigh all of the factors. It is not the job of the court to make a plaintiff's argument for him. See *Tyler v. Runyon*, 70 F.3d 458, 466 (7th Cir. 1995) ("This argument is raised in a short conclusory paragraph which contains no substantive argument, legal citations, or references in the record. This court has no duty to research and construct legal arguments available to a party, especially when he is represented by counsel.") (internal quotations omitted); *Minemyer v. B-Roc Representatives, Inc.*, 695 F.Supp.2d 797, 809 (N.D. Ill. 2009) ("[T]his is an adversarial system. It is not a court's task to research legal arguments on a party's behalf."); *Polk v. Sears, Roebuck, and Co.*, 2012 WL 1640708, at *3 (S.D. Ala. May 8, 2012) ("It is well-established that courts cannot make a party's arguments for it or 'fill in the blanks' on that party's behalf.").

Thus, because the *Connick-Pickering* balancing test favors Defendants, Plaintiff cannot show his speech was protected under the First Amendment, and summary judgment must be granted in Defendants' favor on Count III.

2.      Whether Plaintiff Suffered a Deprivation Likely to Deter Free Speech

Defendants appear to concede that Plaintiff can satisfy this factor.  Plaintiff, in his Response at page 53, identifies his termination as the deprivation he suffered that is likely to deter free speech.

3.      Whether Plaintiff's Speech was at Least a Motivating Factor in his Employer's Actions

Defendants argue that, even if Plaintiff could show that a genuine issue of material fact with regard to the first two factors in a First Amendment retaliation claim exists, Plaintiff cannot demonstrate a genuine issue of material fact with regard to the third factor.  Defendants argue that Plaintiff cannot demonstrate that either the City or Dumas acted against him with a retaliatory motive.

a.      Whether Plaintiff Can Demonstrate the City
Acted with a Retaliatory Motive

Defendants argue that Plaintiff cannot demonstrate that the City acted with a retaliatory motive because Plaintiff cannot show: (1) that Dumas was the final policymaker; and (2) that the Fire and Police Commission terminated his employment with retaliatory intent.

A municipality may be held liable for a constitutional deprivation under *Monell v. Department of Social Services.*, 436 U.S. 658 (1978), but to establish said municipal liability under § 1983, a plaintiff must present sufficient evidence to show that the constitutional violation resulted from a municipal policy, custom, or practice.  *Waters v. City of Chicago*, 580 F.3d 575, 580 (7th Cir. 2009).

A plaintiff may establish municipal liability by showing (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation

that the constitutional injury was caused by a person with final policymaking authority. *Waters*, 580 F.3d at 581.  Plaintiff did not offer any evidence of an express policy or a widespread practice at summary judgment and does not attempt to establish the City's liability under either of those avenues in his Response, but rather argues only that Dumas had final policymaking authority and/or the Commission terminated his employment with retaliatory intent.  See Plaintiff's Response (#27) at p. 53.  Therefore, to establish municipal liability, he was required to present evidence that his constitutional injury was caused by an individual with final policymaking authority with respect to the subject matter in question.  See *Waters*, 580 F.3d at 581.

With regard to whether Dumas was a final policymaker for the City, Plaintiff argues that Dumas brought the case against him, deprived Plaintiff of his due process rights, and asked the Commission to sign off on it, "which they did to no surprise considering they were appointed by the Mayor who was accused of criminal conduct by numerous individuals, including Plaintiff."

Plaintiff also argues that Dumas, in the Notice of Termination he provided to Plaintiff, stated:

> [I]n accordance with the powers given to me under the Illinois Compiled Statutes and the Rules of the Board of Fire and Police Commissioners of the City of Kankakee and elsewhere, I am hereby recommending to the Board of Fire and Police Commissioners that your employment with the Kankakee Police Department be immediately terminated.

In his Complaint at paragraph 73, Plaintiff claims that Dumas had de facto policymaking authority regarding the firing of KPD patrolmen, and that he was empowered to establish the criteria by which termination was applied to KPD patrolmen.

Defendants respond that final policymaking authority in the termination of police officers is vested in the Commission under Illinois law, and that Plaintiff cannot succeed on a de facto theory of policymaking with regard to Dumas.

Under Illinois law, final policymaking authority for issuing disciplinary measures against police officers is vested exclusively in the Board of Police and Fire Commissioners, not the chief of police.  65 Ill. Comp. Stat. 5/10-2.1-17; *DiGuiseppe v. Village of Bellwood*, 68 F.3d 187, 190 (7th Cir. 1995).  Plaintiff argues that Dumas is a de facto policymaker because the Commission essentially adopted his recommendation to terminate Plaintiff without an independent review.  However, the Commission following Dumas' recommendation is not enough to prove that Dumas was a final policymaker; rather, to maintain his § 1983 claim, Plaintiff must demonstrate that the Commission either delegated final policymaking authority to Dumas or ratified Dumas' action.  See *Darchak v. City of Chicago Board of Education*, 580 F.3d 622, 630 (7th Cir. 2009).

"Under the delegation theory, the person or entity with final policymaking authority must delegate the power to make policy, not simply the power to make decisions[,]" in that "'[t]here must be a delegation of authority to set policy for hiring and firing, not a delegation of only the final authority to hire and fire.'" *Darchak*, 580 F.3d at 630, quoting *Kujawski v. Board of Commissioners*, 183 F.3d 734, 739 (7th Cir. 1999) (citations omitted).

As stated by Defendants, Plaintiff presents no evidence that the Commission abandoned its independent role and terminated Plaintiff purely on Dumas' order, let alone that they entrusted Dumas with the power to create employment policy.  See *Darchak*, 580 F.3d at 630.  Dumas' *recommended* Plaintiff's termination, and the Commission, following a hearing and after going into executive session, agreed and voted 3-0 to do so. Most importantly, Plaintiff has presented zero evidence, as he must

62

at summary judgment, that the Commission entrusted any sort of *policymaking* to Dumas.  Plaintiff essentially ignores this argument at page 53 of his Response. Policymaking is broader than decisionmaking; even if the Commission failed to review one personnel recommendation (which the Commission did not do), this does not mean that the Commission systematically allowed Dumas to set policy on employment decisions or to make final decisions without Commission review.  See *Darchak*, 580 F.3d at 630.  Plaintiff has also presented no evidence that the Commission failed to retain authority to review Dumas' decisions, and, thus, Dumas clearly did not have final policymaking authority.  See *Rasche v. Village of Beecher*, 336 F.3d 588, 600 (7th Cir. 2003).

Nor can Plaintiff succeed on a ratification theory.  Plaintiff argues that the Commission cannot be shielded from liability "if the decisionmaker was tainted or influenced by [Dumas'] illegal motives."  This sort of "cat's paw" theory is not enough for municipal liability however, as "[a] municipality can be held liable under § 1983 only if culpable; it cannot be held liable under respondeat superior."  *Waters*, 580 F.3d at 584.  Rather, "a § 1983 claim ... based on a 'ratification' theory must allege that a municipal official with final policymaking authority approved the subordinate's decision *and the basis for it.*"  *Darchak*, 580 F.3d at 630 (emphasis added).

Plaintiff argues that the Commission knew about the February 2018 Facebook posts because "Dumas included the charge in the discharge papers filed with the Commission."  Plaintiff does not provide a citation to the record as to where this evidence is located.  It is possible, as suggested by Defendants, that Plaintiff is referring to the "Charges Against Employee of the Police or Fire Department" submitted by Dumas to the Commission regarding Plaintiff's March 29, 2018, incident, attached to Defendant's summary judgment motion (#22-5) as Exhibit 5, pp. 54-59 (Bates Stamped 50-55).  However, that document makes no direct reference whatsoever to the fact that

Plaintiff posted anything on Facebook in February 2018 critical of the City or KPD administration or the content of those posts.  At best, there is an oblique reference to Plaintiff believing "employees are being disciplined without just cause" as well as a reference to Plaintiff having received a 2-day suspension on March 5, 2018.

Plaintiff also argues that Deputy Chief Hunt told Suprenant that he would retaliate against Plaintiff for reporting Hunt's 2016 Facebook posts, but that has nothing to do with Plaintiff's February 2018 Facebook posts involved in Plaintiff's First Amendment claim, and is also irrelevant to anything involving Dumas' recommendation and the Commission's decision to terminate Plaintiff.  There is no evidence Dumas or the Commission acted on Hunt's behalf or insistence.  It is completely irrelevant.

Plaintiff also argues that "[i]mmediately, after terminating [Plaintiff] emails about how employer 'became aware of his social media postings."  The court finds that Plaintiff's point is indiscernible, and that upon examining the portion of Dumas' deposition transcript referenced by Plaintiff, it is not clear *who* exactly became aware of Plaintiff's social media postings and *when* they became aware of them, and whether any members of the Fire and Police Commission were involved.

Plaintiff has provided no evidence that Dumas had, as the basis for his recommendation that Plaintiff be fired, the February 2018 Facebook posts as opposed to Plaintiff's March 29, 2018 comments at the active shooter training, and has certainly provided no evidence that the Commission, as the body with final policymaking authority, approved of that *as the basis* for Plaintiff's termination.  See *Darchak*, 580 F.3d at 630.  Plaintiff has not demonstrated a genuine issue of material fact that the City acted with retaliatory intent in terminating his employment.

b.      Whether Plaintiff Can Prove Dumas Acted with a Retaliatory Motive

Even if Plaintiff could show that Dumas acted as the final policymaker, he cannot

demonstrate that Dumas acted with a retaliatory motive.  To make out a prima facie

case for retaliation at summary judgment, Plaintiff must produce sufficient evidence to

show that his purportedly protected speech was at least a motivating factor in the

Defendants' alleged retaliatory employment actions taken against him, which he may

do by presenting either direct or circumstantial evidence.  *Kidwell*, 679 F.3d at 965.

Direct evidence is evidence which, if believed by the trier of fact, will prove the

particular fact in question without reliance upon inference or presumption, whereas

circumstantial evidence is evidence from which a trier of fact may infer that retaliation

occurred.  *Kidwell*, 679 F.3d at 965.  "Circumstantial evidence may include suspicious

timing, ambiguous oral or written statements, or behavior towards or comments

directed at other employees in the protected group."  *Kidwell*, 679 F.3d at 966.

Importantly, regardless of which type of evidence is offered, to demonstrate the

requisite causal connection in a retaliation claim a plaintiff must show that the protected

activity and the adverse action are not wholly unrelated.  *Kidwell*, 679 F.3d at 966.

Plaintiff has not demonstrated any direct evidence of a retaliatory motive on

Dumas' part.  "Because direct evidence 'essentially requires an admission by the

employer,' such evidence 'is rare.'"  *Argyropoulos v. City of Alton*, 539 F.3d 724, 733 (7th

Cir. 2008), quoting *Benders v. Bellows & Bellows*, 515 F.3d 757, 764 (7th Cir. 2008).

Plaintiff has provided no evidence of Dumas admitting he recommended Plaintiff's

termination to the Commission over the 2018 Facebook posts.

Nor has Plaintiff demonstrated circumstantial evidence.  The only evidence cited

by Plaintiff was that recounted above, concerning Hunt, the email, and material

submitted by Dumas to the Commission, which the court has already determined does

not evince a retaliatory motive on the part of Dumas.  This leaves Plaintiff with suspicious timing.  However, Dumas issued Plaintiff the suspension for the posts on March 5, 2018, and did not issue his recommendation of termination to the Commission until, at the earliest, May 29, 2018, nearly three months later.

As already noted, suspicious timing will rarely be sufficient in and of itself to create a triable issue, and, accordingly, "for a suspicious-timing argument alone to give rise to an inference of causation, the plaintiff must demonstrate that 'an adverse employment action follows close on the heels of protected expression, and the plaintiff [must] show that the person who decided to impose the adverse action knew of the protected conduct.'" *Kidwell*, 679 F.3d at 966, quoting *Lalvani v. Cook County*, 269 F.3d 785, 790 (7th Cir. 2001).  A lapse of more than two months between the protected activity and the alleged retaliatory action is not enough to support an inference of causation on its own.  See *Kidwell*, 679 F.3d at 966-67; *Bless*, 9 F.4th at 572 (holding that it is clear from Seventh Circuit case law that the time period between the protected activity and the adverse action must be "very close" - as in "no more than a few days.").

For all of the above reasons, Plaintiff cannot demonstrate a genuine issue of material fact exists as to whether his speech was at least a motivating factor in his termination.  Thus, summary judgment is granted in Defendants' favor on Plaintiff's First Amendment claim in Count III of his Complaint.

## C.    Qualified Immunity

Plaintiff has failed to put forth any competent evidence which could support a nonspeculative inference that Defendant Dumas violated his constitutional rights.

Therefore, the court need not engage in an assessment of whether any constitutional right Plaintiff alleges Dumas violated was clearly established at the time of the relevant events.  *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017).  Defendant Dumas is entitled to qualified immunity as to Count III.

   IV.   Due Process Claim (Count VI)

   Defendants argue that summary judgment should be granted in their favor on Plaintiff's procedural due process claim because: (1) Plaintiff was afforded sufficient post-deprivation process to satisfy the Fourteenth Amendment in the face of a random and unauthorized deprivation; and (2) Plaintiff was afforded adequate pre-deprivation process.

   Plaintiff responds that: (1) Plaintiff never received a statement of the charges against him that identified Dumas' basis for seeking his termination; (2) he never received notice of a hearing before the Commission; (3) he never received any findings or a "final administrative hearing"; (4) the termination violated Illinois state law; and (5) he was not afforded sufficient post-deprivation process to satisfy the Fourteenth Amendment in the face of a random and unauthorized deprivation.

   In their Reply, Defendants respond that: (1) the guarantee of procedural due process under the U.S. Constitution's Fourteenth Amendment is not dictated by state law; (2) there is no Kankakee City handbook in the record, and, more fundamentally, such a handbook may not be relevant to defining the process due; and (3) Plaintiff has provided no evidence that Defendants are at fault for the failure of arbitration to occur in this case, as is his burden to do at summary judgment.

**A.  Whether Plaintiff's Claim Is Based on Established State Procedures or Random and Unauthorized Acts By State Employees**

"Public employees who are dischargeable only for cause have a property interest in continued employment and may not be deprived of that interest without notice and an opportunity to be heard."  *Vargas v. Cook County Sheriff's Merit Board*, 952 F.3d 871, 874 (7th Cir. 2020).  A procedural due process claim under § 1983 requires that the plaintiff allege (1) deprivation of a protected interest, and (2) insufficient procedural protections surrounding that deprivation.  *Cannici v. Village of Melrose Park*, 885 F.3d 476, 479 (7th Cir. 2018).

The parties do not dispute that Plaintiff had a protected interest in his continued employment as a KPD officer; thus, the issue before the court is whether the City provided sufficient procedural protections.  See *Cannici*, 885 F.3d at 479.

To determine whether a defendant provided sufficient procedural due process, we must first determine whether the claim is based on established state procedures or on random and unauthorized acts by state employees. *Leavell v. Ill. Dep't of Nat. Res.*, 600 F.3d 798, 804 (7th Cir. 2010). A claim based on a deprivation from established state procedures requires more than simply the availability of post-deprivation procedures. *Id.* at 805. The state's ability to predict when a deprivation will occur provides the state the ability to provide a pre-deprivation hearing. *Id.* Conversely, a claim based on random and unauthorized acts by state officials does not have the same predictability, and thus, only requires a meaningful post-deprivation remedy. *Id.* In this instance, the plaintiff must "avail herself of state post-deprivation remedies or demonstrate that the available remedies are inadequate." *Id.* (internal citations omitted).

*Cannici*, 885 F.3d at 479.

In his Complaint, Plaintiff alleges that Defendants acted in a bad faith, intentional, and malicious manner in depriving him of procedural due process by not giving him notice of the charges against him and an opportunity to be heard.  Plaintiff claims that Defendants "completely disregarded Illinois notice and hearing laws" in

terminating him.  Plaintiff makes no challenge to the disciplinary procedures prescribed

by municipal law.  Indeed, Plaintiff argues that "the City's own Handbook states that

the City will comply with all state and federal legal requirements relating to notice and

an opportunity to be heard in the event of discipline or dismissal."  Rather, Plaintiff

appears to allege that the City and its officials acted against him out of racial or political

bias and animus and acted "in an arbitrary and capricious manner," which suggest he

suffered a random and unauthorized deprivation of his property interest in public

employment.  See *Calderone v. City of Chicago*, 979 F.3d 1156, 1166 (7th Cir. 2020); *Vargas*,

952 F.3d at 873.

Further, Plaintiff is not complaining about the procedures themselves, but rather

Defendants' failure to follow those procedures, clarifying that his claim is based on the

random unauthorized acts of state employees.  See *Gonzalez v. City of Chicago*, 2020 WL

1233827, at *9 (N.D. Ill. Mar. 13, 2020) ("Here, because Gonzalez does not complain

about the procedures themselves but rather the City's failure to follow those

procedures, his claim is based on the random unauthorized acts of state employees.").

Plaintiff appears to argue that he had no pre-deprivation process whatsoever.  To

the extent such an argument is relevant to the determination of if he has suffered a

random unauthorized act, his contention is belied by the record.  Plaintiff did have at

least *some* pre-deprivation process.  Plaintiff was read a Notice of the Charges against

him at the April 18, 2018 interview, where he was represented by his Union attorney

and accompanied by a Union representative, and he was allowed to give his side of the

story.

69

On May 23, 2018, he was sent a notice of formal inquiry and ordered to appear for a meeting with administrators on May 29, 2018, where he was again accompanied by Union counsel and representation, and it was explained to Plaintiff why Dumas would be seeking Plaintiff's termination.

In any event, based on the determination above that Plaintiff's claim is based on the random unauthorized acts of state employees, the focus is on what *post*-deprivation process Plaintiff has been afforded.

## B.   Whether Plaintiff was Afforded Adequate Post-Deprivation Process to Satisfy the Fourteenth Amendment

In this instance, Plaintiff must avail himself of post-deprivation remedies or demonstrate that the available remedies are inadequate. *Calderone*, 979 F.3d at 1166.  An inadequate remedy, for the purposes of due process, is a "meaningless or nonexistent" one. *Calderone*, 979 F.3d at 1166.  Conversely, an adequate post-deprivation remedy is one that is promptly able to restore Plaintiff to his post. *Calderone*, 979 F.3d at 1166.

Here, as described in the undisputed facts, a CBA with "extensive grievance and arbitration procedures" protected Plaintiff's employment, and the Seventh Circuit has held that "[s]uch procedures 'can (and typically do) satisfy the requirements of post-deprivation due process.'" *Calderone*, 979 F.3d at 1166.  Thus, Defendants have provided for an adequate, due process-satisfying post-deprivation remedy.[8]

---

[8]Though the parties do not argue it, another post-deprivation remedy exists in the form of the Illinois Administrative Review Act (735 Ill. Comp. Stat. 5/3-101, et seq.), which "provides a constitutionally adequate post[-]deprivation remedy for public employees to challenge random and unauthorized departures from state law in disciplinary decisions." *Vargas*, 952 F.3d at 875.  It is an undisputed fact that Plaintiff has not filed for administrative review of his claim following his official termination from the KPD, and Plaintiff does not contend that his rights under the Act have not been afforded to him.  Thus, the court has no reason to believe Plaintiff has been

Plaintiff does not argue that the grievance and arbitration procedures were meaningless. Rather, Plaintiff argues that Defendant City has not lived up to its obligations under the CBA's grievance procedure, because after denying his grievance at the various steps under the CBA, on August 10, 2018, following the procedure outlined in the CBA, the Union sent a "Formal Notice of Referral to Arbitration" in correspondence addressed to Mayor Wells-Armstrong, but never heard back, and thus no arbitration has yet occurred.

However, as noted by Defendants, the burden is on Plaintiff at summary judgment to come up with definite, competent evidence in rebuttal to Defendants' arguments, as opposed to a merely evidentiary gap. This evidentiary gap in the record does not create a genuine issue of material fact as to whether the City is at fault for the failure to initiate arbitration. Defendants presented evidence from the record, in the form of the deposition testimony of Plaintiff's Union attorney Roy Carlson that Plaintiff's CBA grievance on this matter remains open. Indeed, Carlson testified that he could not recall why the arbitration had not yet gone forward.

Plaintiff, in his Response, simply asserts that it was the fault of the City, through the Mayor, as to why the grievance remains open and has not yet proceeded to arbitration. He cites to the August 10, 2018, letter sent by the Union to the Mayor informing her they were seeking to initiate arbitration, but Plaintiff has cited to no definite, competent evidence that the reason arbitration has not yet occurred is *the City's fault*.

---

deprived of his due process rights in regard to the relief possible under the Act. *Cannici*, 885 F.3d at 480.

71

At summary judgment, for a factual question to be in dispute, a party must point the court to the specific evidence in the record that supports a party's position on each of these questions.  See *Waldridge*, 24 F.3d at 923.  Plaintiff, if he has competent evidence establishing such, must directly cite to the portion of the record containing said evidence; otherwise the court will not consider his argument to be sufficiently supported by the facts at summary judgment.  See *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 703 (7th Cir. 2010) ("Beyond striking Gross's statement of facts, we strike any of the parties' factual assertions, in any section of their briefs, that lack direct citation to easily identifiable support in the record.").  Plaintiff has not done that. Plaintiff must cite to the factual evidence he believes supports his arguments; it is not the job of the court to search through the record to find facts that support Plaintiff's claims and arguments. See *Gross*, 619 F.3d at 702, quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("As we have repeated time and again, 'Judges are not like pigs, hunting for truffles buried in [the record].'").  Thus, Plaintiff has presented no evidence that the City has acted in any way to make the CBA grievance process "meaningless" or "non-existent."  See *Calderone*, 979 F.3d at 1166.

More to the point, the grievance process remains open and it has not yet concluded.  Plaintiff has simply not achieved the result he wants.  Plaintiff "does not challenge the fundamental fairness of the remedies afforded [him] under the collective bargaining agreement with the City; instead, [he] thinks the City has not held up its end of the deal[;]" however, "[t]he Constitution leaves such qualms about substance, as opposed to process, to state law."  *Calderone*, 979 F.3d at 1167.  Summary judgment is granted in favor of Defendants on Plaintiff's procedural due process claim (Count VI).

IT IS THEREFORE ORDERED:

(1)     Defendants' Motion to Strike (#34) is DENIED.  The clerk is directed to file

        Defendants' attached Memorandum In Response (#34-1).

(2)     Defendants' Motion for Summary Judgment (#22) is GRANTED in full.

        Judgment is entered in favor of Defendants and against Plaintiff.

(3)     The final pretrial date of April 4, 2022, and jury trial date of May 3, 2022,

        are hereby VACATED.

(4)     This case is terminated.

        ENTERED this ___28th___ day of ___September_____, 2021.


                        s/ COLIN S. BRUCE
                        U.S. DISTRICT JUDGE